UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSEPH GIBSON,<br><br>PLAINTIFF,<br><br>vs.<br><br>CITY OF VANCOUVER, MAYOR ANNE MCENERNY-OGLE, in her official capacity as Mayor of the city of Vancouver, JAMES MCELVAIN, in his official capacity as Chief of the Vancouver Police Department; JONATHAN YOUNG, in his official capacity as head of the Vancouver City Attorney's Office, ERIC HOLMES, in his official capacity as Manager of the City of Vancouver,<br>DEFENDANTS. | No. **3:20-cv-6162**<br><br>COMPLAINT FOR INJUNCTIVE RELIEF |

1   COMES NOW Joseph Gibson, by and through the Angus Lee Law Firm, PLLC, to bring

2   this Complaint and allege as follows:

3              **I.        NATURE OF ACTION**

4   1.1    This action seeks a temporary restraining order, preliminary injunction, and

5   permanent injunctive relief against defendants, pursuant to Fed. R. Civ. P. 65 for the narrow

6   purpose of preventing defendants from (1) enforcing a facially unconstitutional Proclamation to

7   arrest or prosecute Mr. Gibson for engaging in an outdoor spiritual gathering of 20 people, and



from (2) selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a religious/spiritual gathering to pray and protest against the enforcement of unconstitutional Covid-19 restrictions.

***Governor Inslee's Executive Orders Are Facially Unconstitutional***

1.2    Governor Inslee's proclamations and "Guidance," including the most recent "rollbacks" in Proclamation 20-25.8, place greater restrictions on religious/spiritual gatherings than have been placed on other secular activity such as adult recreational and youth sports, K-12 schools, higher education, and shopping.

1.3    Proclamations 20-25 et seq., prohibit outdoor spiritual and faith-based gatherings of groups larger than five. Indoor home-based prayer groups or faith formation groups are restricted to five people regardless of the size of the home.

1.4    Proclamations 20-25 et seq., however, allow outdoor adult recreational sport teams and youth sport teams to gather and play full contact sports such as soccer.  They permit groups of fifty adults to gather outdoors to play professional sports, full contact, without masks. They also permits all non-lecture based higher education activities (indoors or outdoors), even where social distancing cannot be maintained.  Indoor retail activities are allowed at 25 percent occupancy.

1.5    Proclamation 20-09.2, along with its K-12 Fall 2020-2021 Guidance, allows K-12 schools to be open and does not place a numerical limit on gatherings of students indoors, but requires only that social distancing be practiced where possible.

1.6    While outdoor spiritual gatherings on public property are limited to five, de facto exemptions to the general ban on gathering have been granted by Governor Inslee and by the Vancouver Police Department to secular organizations such as Black Lives Matter so that they may gather in groups of hundreds and thousands on public property.

COMPLAINT
NO. _____
Sunday, November 29, 2020

2

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    *Defendants Maintain Unconstitutional Policies to Suppress Disfavored Viewpoint*

2        1.7    Vancouver City maintains a written policy to selectively criminally target event

3    organizers of protests espousing a particular viewpoint, namely, protest of Covid-19 restrictions.

4        1.8    Despite having received numerous complaints about Covid-19 restrictions

5    noncompliant businesses and individuals, defendants have enacted a written policy to target its

6    criminal enforcement efforts specifically and only upon those individuals who are out of

7    compliance with Covid-19 restrictions *and who also* organize events to "advance their message"

8    in opposition to unconstitutional Covid-19 restrictions.

9        1.9    Pursuant to City policy, the Vancouver Police Department VPD has a practice of

10   selectively criminally investigating only event organizers of protests espousing a particular

11   viewpoint, namely, protest of Covid-19 Restrictions.

12       1.10   The Vancouver City Attorney has prosecuted only one individual pursuant to

13   Governor Inslee's proclamations: an event organizer of a protest espousing a particular viewpoint

14   (protest of Covid-19 restrictions) for "organizing and conducting a rally."

15       1.11   VPD and VCA developed and currently maintain a written policy to refer event

16   organizers of protests espousing a particular viewpoint, namely, protests of Covid-19, directly to

17   the City Attorney for prosecution where evidence merely "suggests" organizers violated Covid-19

18   restrictions.

19       1.12   The decision to charge for misdemeanors is usually a decision made by street level

20   officers.

21       1.13   The legal standard for charging a misdemeanor is whether probable cause existed,

22   not whether the evidence "suggests" a violation.

COMPLAINT
NO. _____
Sunday, November 29, 2020

3

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    *"Special Interest" Taken in Mr. Gibson by Vancouver City Police and Prosecutor*

2    1.14   In all but one of the criminal investigations into noncompliant protest gatherings,

3    Mr. Gibson's presence was noted by law enforcement and his actions were detailed, even though

4    he was not the event organizer.

5    1.15   No other protestors, outside of the event organizers, were mentioned by name and

6    had their actions documented in police investigative reports.

7    1.16   The Vancouver City Attorney, Jonathon Young, has also taken a special interest in

8    Mr. Gibson.

9    1.17   City Attorney Jonathon Young has previously requested charges be filed against

10   Mr. Gibson because he was the event organizer of protests against the enforcement of Covid-19

11   restrictions outside of Young's home.

12   1.18   City Attorney Young also directed Sergeant Moore to refer Mr. Gibson to County

13   Prosecutors and request felony charges against him for "Intimidating a Public Servant" even

14   though Sergeant Moore told Young that he believed that there was no probable cause supporting

15   Young's allegations.

16   1.19   These requests prompted Sergeant Moore to later file a complaint with the City

17   against City Attorney Young for Conflicts of Interests and for attempting to have Gibson charged

18   without probable cause.

19   1.20   Sergeant Moore accused City Attorney Young of being too emotionally involved

20   and of misusing his position with the City to attempt to improperly influence an officer to file

21   charges on Mr. Gibson.

22   1.21   City Attorney Young is currently under investigation by the City based on Sergeant

23   Moore's complaint.

COMPLAINT
NO. _____
Sunday, November 29, 2020

4

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    ***Mr. Gibson Intends to Organize and Lead an Outdoor Religious Gathering of 20***

2        1.22    Mr. Gibson is a street preacher who has been conducting prayer and protest

3    gatherings in the Vancouver area for many years.

4        1.23    Mr. Gibson intends to lead an outdoor religious gathering of twenty people in

5    prayer and protest in the open field next to the Vancouver Police Department's East Precinct on

6    December 5, 2020.

7        1.24    The protest will be comprised of gathering for song and prayer with the publicly

8    stated intention and request that God will intercede in the hearts the officers of the Vancouver

9    Police Department, and City Attorney's Office, such that the officers will have the wisdom,

10   courage, and fortitude to honor their oaths to uphold the Constitution and will refuse to enforce

11   unconstitutional restrictions imposed by gubernatorial proclamations.

12   ***Mr. Gibson Will Suffer Immediate and Irreparable Harm Without Judicial Intervention***

13       1.25    Gibson has reason to believe that he will be arrested and prosecuted based upon his

14   position as an event organizer of this religious gathering and protest of Covid-19 restrictions.

15       1.26    Because of the City's policy to target event organizers and because of the special

16   interest already taken in Mr. Gibson by law enforcement and City Attorney Young, Mr. Gibson

17   has a reasonable belief and fear that he will be subject to arrest and prosecution in retaliation for

18   his protected speech and based upon the City's efforts to enforce a patently unconstitutional

19   regulation.

20       1.27    Arresting or prosecuting Mr. Gibson for engaging in a religious gathering where

21   other similar secular gatherings are permitted would violation of the First, and Fourteenth

22   Amendments to the United States Constitution, and constitutes great and immediate irreparable

COMPLAINT
NO. _____
Sunday, November 29, 2020

5

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1  harm because the deprivation of Constitutional rights for even a short amount of time causes

2  irreparable harm.

3      1.28  This action seeks a temporary restraining order, preliminary injunction, and

4  permanent injunctive relief against defendants, pursuant to Fed. R. Civ. P. 65 for the narrow

5  purpose of preventing defendants, from arresting or prosecuting Mr. Gibson for participation in

6  the above referenced public protest and prayer as Governor Inslee's Covid-19 proclamations are

7  unconstitutional.

8      1.29  Selectively targeting Mr. Gibson for arrest or prosecution based on his position as

9  a leader or organizer of a public prayer to protest Covid-19 restrictions would violate the First,

10  Fifth, and Fourteenth Amendments to the United States Constitution, and would cause great and

11  immediate irreparable harm to Mr. Gibson and would chill protected speech and religious liberty

12  in the community.

13      1.30  Accordingly, Mr. Gibson also seeks a temporary restraining order, preliminary

14  injunction, and permanent injunctive relief against defendants, pursuant to Fed. R. Civ. P. 65 for

15  the narrow purpose of preventing defendants from selectively targeting Mr. Gibson for arrest or

16  prosecution based on his position as a leader or organizer of a public protest or prayer.

17      1.31  The City of Vancouver's policy and practice, as well as Governor Inslee's current

18  Covid-19 proclamation restrictions, deny Mr. Gibson equal protection of laws, and violate the

19  First, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. and

20  §§ 1983, 1985, and 1988.

COMPLAINT
NO. _____
Sunday, November 29, 2020
6
ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

## II.    JURISDICTION, VENUE, AND STANDING

2.1    The Western District of Washington at Tacoma has subject matter jurisdiction under Fed. R. Civ. P. 65 Federal Rule, 42 U.S.C. §§ 1983, 1985, and 1988, 28 U.S.C. §§ 1331, and 1343.

2.2    The Western District of Washington at Tacoma has personal jurisdiction over City of Vancouver, and all co-defendants, as City of Vancouver, and all co-defendants, are located in the jurisdiction of Western District of Washington at Tacoma.  Additionally, the acts and omissions complained of here took place in the jurisdiction of the Western District of Washington at Tacoma.

2.3    Venue is proper in Western District of Washington at Tacoma pursuant to 28 U.S.C. § 1391 as a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Vancouver, Washington.

2.4    All parties are resident in or doing business in Vancouver, Washington and are citizens of the United States of America and the State of Washington.

## III.    PARTIES

3.1    Plaintiff JOSEPH GIBSON, is a private individual residing in Clark County, Washington State.  Joseph Gibson was at all times relevant a citizen of the United States residing in Clark County, Washington.

3.2    Defendant CITY OF VANCOUVER, a municipal corporation, is a lawfully constituted municipal corporation and body politic of the State of Washington, and at all times material to this action operated the City of Vancouver Police Department.

3.3    Defendant, MAYOR ANNE MCENERNY-OGLE is and at all times relevant was, a resident of Vancouver, Washington, and the duly elected mayor of the City of Vancouver, acting at all times in her official capacity as mayor for the City of Vancouver.  As such Mayor Anne

COMPLAINT NO. _____
Sunday, November 29, 2020

7

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1   McEnerny-Ogle is and was the direct supervisor for, and superior to, defendants James McElvain,

2   Jonathan Young, and Eric Holmes, and was responsible for their training, supervision, and

3   conduct.  MAYOR ANNE MCENERNY-OGLE was also responsible by law for setting policy

4   and ensuring that subordinates were enforcing the regulations of the City of Vancouver and for

5   ensuring that City of Vancouver personnel obey the laws of the State of Washington and of the

6   United States.  At all relevant times, MAYOR ANNE MCENERNY-OGLE was acting in such

7   capacity as the agent, servant, and employee of the defendant City of Vancouver.  MAYOR ANNE

8   MCENERNY-OGLE is being sued in her official capacity.

9          3.4    Defendant, CHIEF JAMES MCELVAIN is and at all times relevant was, a resident

10   of Vancouver, Washington, and the duly appointed Chief of the City of Vancouver Police

11   Department, acting at all times in his official capacity as Chief of Police for the City of Vancouver

12   Police Department.  As such Chief McElvain is and was the commanding officer of the Vancouver

13   Police Department, and is responsible for their training, supervision, and conduct of officers in the

14   department.  Chief McElvain is and was also responsible by law for enforcing the regulations of

15   the City of Vancouver Police Department and for ensuring that City of Vancouver Police

16   Department personnel obey the laws of the State of Washington and of the United States.  Chief

17   McElvain is also the final policy maker for the Vancouver Police Department inside the

18   department.  At all relevant times, Chief McElvain is and was acting in such capacity as the agent,

19   servant, and employee of the defendant City of Vancouver.  Chief McElvain is being sued in his

20   official capacity.

21          3.5    Defendant, JONATHAN YOUNG is and at all times relevant was, a resident of

22   Vancouver, Washington, and the duly appointed Vancouver City Attorney, acting at all times in

23   his official capacity as head City Attorney for the Vancouver City Attorney's Office.  As such

COMPLAINT
NO. _____
Sunday, November 29, 2020

8

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1   Attorney Young is and was the commanding officer of the Vancouver City Attorney's Office, and

2   is responsible for their training, supervision, and conduct of all assistant city attorney's in the

3   office.  Attorney Young is and was also responsible by law for enforcing the regulations of the

4   Vancouver City Attorney's Office and for ensuring that Vancouver City Attorney's Office

5   personnel obey the laws of the State of Washington and of the United States.  Attorney Young is

6   also the final policy maker for the Vancouver City Attorney's Office inside the office.  At all

7   relevant times, Attorney Young is and was acting in such capacity as the agent, servant, and

8   employee of the defendant City of Vancouver.  Attorney Young is being sued in his official

9   capacity.

10       3.6     Defendant, ERIC HOLMES is, and at all times relevant was, a resident of

11   Vancouver, Washington, and the duly appointed Vancouver City Manager, acting at all times in

12   his official capacity as head City management.  As such Manager Holmes is and was the manager

13   for the City of Vancouver, had policy making authority, and at all relevant times was acting in

14   such capacity as the agent, servant, and employee of the defendant City of Vancouver.  Manager

15   Holmes is being sued in his official capacity.

16              **IV.     STATEMENT OF FACTS**

17   ***Intended Prayer and Political Speech***

18       4.1     Mr. Gibson is a private individual who has been organizing public prayer groups

19   and political demonstrations under the name "Patriot Prayer" since 2016 to promote prayer, living

20   a God-fearing lifestyle, and patriotism.

21       4.2     Mr. Gibson believes Jesus Christ is the Son of God and that all should repent and

22   seek forgiveness.  Mr. Gibson believes and states on his website that "it is imperative for followers

23   of Christ to take the church into the streets."

COMPLAINT
NO. _____
Sunday, November 29, 2020

9

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



4.3     Mr. Gibson's evangelization efforts require that he organize gatherings on public property.

4.4     Mr. Gibson has a lengthy history of organizing religious gatherings and protests in public spaces and on public property.

4.5     On December 5, 2020, Mr. Gibson intends to lead an outdoor spiritual gathering in prayer, to protest unconstitutional restrictions on religious liberty on public property.

4.6     The prayer group will last a total of thirty minutes from start to finish.

4.7     Participants will stand 6 feet apart from one another.

4.8     The number of participants for the prayer protest, including Mr. Gibson, will be 20.

4.9     The prayer protest will be conducted at Gretchen Fraser Neighborhood park, which is located in the City of Vancouver, Washington, immediately in front of the Vancouver Police Department East Precinct, and will consist of prayers for the courage, wisdom, and fortitude of VPD officers to refuse to enforce Governor Inslee's unconstitutional Covid-19 restrictions.

4.10    The Gretchen Fraser Neighborhood park has a grass field that is roughly 280 feet by 150, with a square footage of approximately 36,500 square feet.

4.11    The park provides enough space for over 1,000 separate six-foot by six-foot spaces for participants to observe social distancing and remain six feet apart during the protest.

4.12    Below is an accurate photo of the park with a white measuring rectangle imposed over the main portion of the park's grass field.

COMPLAINT
NO. _____
Sunday, November 29, 2020

10

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

4.13    Mr. Gibson's Christian faith teaches him that public prayer will cause virtue and good works to flourish; it will help obtain for souls the abundant mercy of God; it will withdraw the heart of men from the love of the world and its vanities, and will lift them to the desire of eternal things.

4.14    Mr. Gibson feels politically and religiously compelled to protest and pray in public by the words of the book of James 1:22-25:

> But be doers of the word, and not hearers only, deceiving yourselves.  For if any one is a hearer of the word and not a doer, he is like a man who observes his natural face in a mirror; for he observes himself and goes away and at once forgets what he was like.  But he who looks into the perfect law, the law of liberty, and perseveres, being no hearer that forgets but a doer that acts, he shall be blessed in his doing.

COMPLAINT
NO. _____
Sunday, November 29, 2020

11

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.15    Attached as Exhibit A is a true and correct copy of the worship guide that will be

2    distributed to and used by participants.

3    4.16    Upon completion of the above, Mr. Gibson will preach for five minutes on the

4    importance of bringing Jesus Christ back to the center of America's cultural and political

5    institutions, and the importance of peaceful and civil disobedience to unconstitutional orders that

6    restrict religious liberty.

7    4.17    The protest and prayer will conclude with Mr. Gibson leading the group in a singing

8    of "God Bless The U.S.A."

9    4.18    Pursuant to defendants' current formal written policies and practice, Mr. Gibson

10   will be selectively targeted for arrest and or prosecution by VPD and VCA.

11   ***COVID-19 Proclamations Overview: Restrictions and Exemptions on Gatherings***

12   4.19    On February 29, 2020, Governor Inslee issued Proclamation 20-05, proclaiming a

13   State of Emergency for all counties throughout the state of Washington as a result of coronavirus

14   disease 2019 (COVID-19).

15   4.20    Attached as Exhibit B is a true and correct copy of Proclamation 20-05.

16   4.21    Governor Inslee has subsequently issued amendatory Proclamations 20-06 through

17   20-53 and 20-55 through 20-63, prohibiting certain activities and waiving and suspending

18   specified laws and regulations.

19   4.22    On March 23, 2020, Governor Inslee issued Proclamation 20-25 which imposed a

20   "Stay Home - Stay Healthy Order" throughout Washington State by prohibiting all people in

21   Washington State from leaving their homes or participating in social, spiritual and recreational

22   gatherings of any kind regardless of the number of participants."

COMPLAINT
NO. _____
Sunday, November 29, 2020

12

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1      4.23    The Stay Home Stay Healthy Order specified that "all people in Washington State

2  are immediately prohibited from leaving their home or place of residence except to conduct or

3  participate in (1) essential activities" and further stated:

4      **All people in Washington State shall immediately cease participating in all**
5      **public and private gatherings and multi-person activities for social, spiritual**
6      **and recreational purposes, regardless of the number of people involved, except**
7      **as specifically identified herein**. Such activity includes, but is not limited to,
8      community, civic, public, leisure, faith-based, or sporting events; parades; concerts;
9      festivals; conventions; fundraisers; and similar activities. (emphasis added)

10      4.24    Proclamation 20-25 did not require "essential businesses" to close, but rather

11  "encourage[d]" them to "remain open and maintain operations."

12      4.25    The stay-home order defined "employment in essential business services" as "an

13  essential employee performing work for an essential business as identified in the 'Essential Critical

14  Infrastructure Workers' list."

15      4.26    The Essential Critical Infrastructure Workers' list, comprising fourteen pages,

16  identifies 158 classifications of workers and businesses spanning thirteen broad sectors of the

17  economy.

18      4.27    The Essential Critical Infrastructure Workers' List, attached as Exhibit C.

19      4.28    Schools K-12 were not classified as essential businesses, and were closed initially.

20      4.29    The Stay Home - Stay Healthy Order has been modified significantly and

21  frequently by additional Proclamations, "Safety Plans," or "Reopening Guidance," and various

22  memoranda.

23      4.30    Proclamation 20-25.1 was issued on April 2, 2020 and extended the Stay Home

24  Stay Healthy Order until May 4, 2020.

25      4.31    Attached as Exhibit D is a true copy of Proclamation 20-25.1.

COMPLAINT
NO. _____
Sunday, November 29, 2020

13

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.32    Proclamation 20-25.2 was issued April 27th and reaffirmed the extension of the

2    Stay Home - Stay Healthy Order, but exempted several outdoor recreational activities including

3    outdoor exercise such as running or hiking, day use activities at public parks, recreational boating,

4    and golfing.

5    4.33    Attached as Exhibit E is a true copy of Proclamation 20-25.2.

6    4.34    Proclamation 20-25.3 was issued on May 4, 2020 and adjusted and extended the

7    original Stay Home Stay Healthy Order through May 31st.

8    4.35    Attached as Exhibit F is a true copy of Proclamation 20-25.3.

9    4.36    Proclamations 20-25, 20-25.1, and 20-25.2 (Stay Home – Stay Healthy), prohibited

10   all people in Washington State from leaving their homes or participating in social, spiritual or

11   recreational gatherings of any kind regardless of the number of participants, and all non- essential

12   businesses in Washington State from conducting business.

13   4.37    Proclamation 20-25.3 "Safe Start Washington: Phase I – Re-Opening Washington"

14   extended the prohibitions of Proclamations 20-25, 20-25.1, and 20-25.2 but allowed for the

15   resumption of some religious services and certain business activities.

16   4.38    Proclamation 20-25.3 established an initial four-phased color code approach to

17   reopening Washington State, contained in a separate document, the "Safe Start Washington: A

18   Phased Approach to Recovery."

19   4.39    "Safe Start Washington: A Phased Approach to Recovery" identified its term

20   "Gatherings" as including both spiritual and social gatherings.

21   4.40    Below is the "A PHASED APPROACH TO RECOVERY" "WASHINGTON'S

22   PHASED APPROACH" chart.

COMPLAINT
NO. _____
Sunday, November 29, 2020

14

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

## WASHINGTON'S PHASED APPROACH
### Modifying Physical Distancing Measures as we Reopen the State

**INDIVIDUALS AND BUSINESSES SHOULD FOLLOW ALL REQUIREMENTS LISTED ABOVE DURING ALL PHASES**

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 |
|---|---|---|---|---|
| **High-Risk Populations*** | Continue to Stay Home, Stay Healthy | Continue to Stay Home, Stay Healthy | Continue to Stay Home, Stay Healthy | Resume public interactions, with physical distancing |
| **Recreation** | Some outdoor recreation (hunting, fishing, golf, boating, hiking) | Outdoor recreation involving fewer than 5 people outside your household (camping, beaches, etc.) | - Outdoor group recreational sports activities (5–50 people)<br>- Recreational facilities at <50% capacity (gyms, public pools, etc.)<br>- Professional sports without audience participation (horseracing, baseball, etc.) | Resume all recreational activity |
| **Gatherings** (social, spiritual) | - None<br>- Drive-in spiritual service with one household per vehicle | Gather with no more than 5 people outside your household per week | Allow gatherings with no more than 50 people | Allow gatherings with >50 people |
| **Travel** | Essential travel and limited non-essential travel for Phase I permissible activities | Essential travel and limited non-essential travel for Phase I & II permissible activities | Resume non-essential travel | Continue non-essential travel |
| **Business/ Employers** | - Essential businesses open<br>- Existing construction that meets agreed upon criteria<br>- Landscaping<br>- Auto/RV/Boat/ORV sales<br>- Retail (curb-side pick-up orders only)<br>- Car washes<br>- Pet walkers | - Remaining manufacturing<br>- Additional construction phases<br>- In-home/domestic services (nannies, housecleaning, etc.)<br>- Retail (in-store purchases allowed with restrictions)<br>- Real estate<br>- Professional services/office-based businesses (telework remains strongly encouraged)<br>- Hair and nail salons/barbers<br>- Pet grooming<br>- Restaurants <50% capacity table size no larger than 5 | - Restaurants/taverns <75% capacity/ table size no larger than 10<br>- Bar areas in restuarant/taverns at <25% capacity<br>- Movie theaters at <50% capacity<br>- Customer-facing government services (telework remains strongly encouraged)<br>- Libraries<br>- Museums<br>- All other business activities not yet listed except for nightclubs and events with greater than 50 people | - Nightclubs<br>- Concert venues<br>- Large sporting events<br>- Resume unrestricted staffing of worksites, but continue to practice physical distancing and good hygiene |





4.41    Under "Safe Start Washington: A Phased Approach to Recovery," spiritual gatherings were restricted to no more than five people outside your household per week during Phase 2.  Likewise, recreational gatherings were limited to outdoor gatherings involving five people outside your household.

4.42    Governor Inslee made clear that community interventions such as social distancing and mask wearing were necessary because of the nonexistence of an effective vaccine.

4.43    The Safe Start Washington: A Phased Approach to Recovery, included the following language: "Until there is an effective vaccine, effective treatment or herd immunity, it is crucial to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery."

COMPLAINT
NO. _____
Sunday, November 29, 2020

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

4.44    This language regarding the need for an "effective vaccine" exists and is repeated in every single subsequent Proclamation until it is conspicuously omitted in Proclamation 20-25.8

4.45    Governor Inslee issued Proclamation 20-25.4 ("Safe Start – Stay Healthy" County-By-County Phased Reopening) on May 31, 2020.

4.46    Attached as Exhibit G is a true copy of Proclamation 20-25.4.

4.47    Proclamation 20-25.4 provided that all provisions of Proclamations 20-25, 20-25.1, 20-25.2, and 20-25.3 were to remain in full force and effect except as otherwise modified by Proclamation 20-25.4 or by the newly established "Safe Start Washington Phased Reopening County-by-County Plan."

4.48    The Safe Start Washington: Phased Reopening County by County plan maintained the exact same restrictions on "Gatherings" as the Safe Start Washington: A Phased Approach to Recovery had: Phase 2 gatherings were restricted to no more than 5 people outside your household per week.

4.49    However, the Phased Reopening County by County Plan differed from the Washington Phased Reopening Plan in two significant ways.

4.50    The County by County Plan, which was updated October 13, 2020, did not include spiritual gatherings in its re-opening chart as its predecessor had.   Instead, it included the parenthetical "non religious" beneath the category heading "Gatherings."

4.51    Additionally, the County by County Plan permitted adult and youth sports to include adult recreational and youth soccer.

4.52    Below   is   the   "COUNTY-BY-COUNTY"   "WASHINGTON'S   PHASED APPROACH" chart as updated on October 13, 2020.

COMPLAINT
NO. _____
Sunday, November 29, 2020

16

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

## WASHINGTON'S PHASED APPROACH

Last updated: 10/13/2020

INDIVIDUALS AND BUSINESSES SHOULD FOLLOW ALL REQUIREMENTS LISTED ABOVE DURING ALL PHASES

| | **1** Modified Phase 1 | **2** Phase 2 | **3** Phase 3 | **4** Phase 4 |
|---|---|---|---|---|
| **Recreation** | Some outdoor recreation (hunting, fishing, golf, boating, hiking) | - Some adult/youth sports<br>- Some outdoor recreation runs/races/ride with more than 12 participants | - Outdoor group rec. sports activities (50 or fewer people)<br>- Recreational facilities at <25% capacity | Resume all recreational activity |
| **Gatherings** (non religious) | Allow gatherings outdoors with fewer than 5 people outside your household per week | Gather with no more than 5 people outside your household per week | Allow gatherings with no more than 10 people | Allow gatherings with >10 people |
| **Business/ Employers** (All businesses will be required to follow safety plans written by the state) | - Manufacturing, construction, domestic services, agritourism, photography, curbside library services, indoor fitness and drive-in events meeting Phase 2 guidance<br>- Retail following Phase 2 guidance, but guest occupancy at <30% of maximum<br>- Real Estate following Phase 2 guidelines, but guest occupancy at 25% of maximum and indoor services limited to 30 minutes<br>- Professional services following Phase 2 guidance, but occupancy limited to 25% of maximum, with an exception for 1-to-1 services in an enclosed room. Indoor service limited to 30 minutes<br>- Personal services following Phase 2 guidance, but occupancy limited to 25% of maximum with an exception for 1-to-1 services in an enclosed room<br>- Restaurants/Bars** following Phase 2 guidance, but indoor occupancy at 25% of maximum and outdoor occupancy at 50%<br>- Pet grooming following Phase 2 guidance but occupancy limited to 25% of maximum<br>- Staffed water recreation facilities | - Remaining manufacturing<br>- Additional construction phases<br>- In-home/domestic services (nannies, housecleaning, etc.)<br>- Retail (in-store purchases allowed with restrictions)<br>- Real estate<br>- League-play bowling<br>- Libraries and Museums at <25% capacity<br>- Movie theaters at <25% capacity<br>- Agritourism<br>- Professional services/office-based businesses (telework remains strongly encouraged)<br>- Personal services (hair and nail salons, barbers, tattoo, etc.)<br>- Pet grooming<br>- Restaurants <50% capacity, table size no larger than 6 (no bar-area seating)<br>- Bars**: no indoor seating unless min. food requirements in guidance met<br>- Drive-in events<br>- Limited indoor fitness and training with 300 square feet per person, up to 25% capacity for large facilities. | - Movie theaters at <50% capacity<br>- Customer-facing government services (telework remains strongly encouraged)<br>- Libraries<br>- Museums 50% capacity<br>- Limited indoor fitness and training with 200 square feet of distance/person, up to 25% capacity for large facilities.<br>- Restaurants <50% capacity, table size no larger than 8 (no bar-area seating)<br>- All other business activities not yet listed except for those specified for Phase 4<br>- Retail events (craft shows, etc.) <200 people | - Nightclubs<br>- Concert venues<br>- Large sporting events<br>- Resume unrestricted staffing of worksites, but continue to practice physical distancing and good hygiene<br>- Live entertainment |

4.53    Governor Inslee issued Proclamation 20-09.2 "Phased Reopening of K-12 Schools" on June 11, 2020.

4.54    Attached as Exhibit H is a true copy of Proclamation 20-09.2.

4.55    Proclamation 20-09.2 provided for the reopening of K-12 schools regardless of what phase a county was in, so long as it was conducted in accordance with his K-12 Schools Summer 2020 Guidance and his K-12 Fall 2020-2021 Guidance.

4.56    The K-12 Schools Guidance plans did not place a limit on the number of students in any given classroom or indoor structure, but stated that schools *should* "Practice physical distancing (six feet) within each group of students as much as possible."

COMPLAINT NO. _____
Sunday, November 29, 2020

17

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



1    4.57    The K-12 Schools Guidance plans also permit "high risk" activities such as choir

2  and specifies only that "Schools *may consider* . . . [cancelling] in person activities that are

3  considered high risk." (emphasis added).

4    4.58    By contrast, singing is prohibited altogether by church choirs and congregations

5  according to the Religious and Faith Based Organizations Guidance.

6    4.59    Attached as Exhibit I is a true copy of Religious and Faith Based Organizations

7  Guidance.

8    4.60    The Religious and Faith Based Organizations Guidance restrict private, in home

9  spiritual gatherings to five people.

10    4.61    The Religious and Faith Based Organizations Guidance is silent on private outdoor

11  spiritual gatherings on public property.  Thus, the previous guidance limiting all spiritual

12  gatherings, indoor or outdoors, applies and limits private outdoor spiritual gatherings to 5 people.

13    4.62    Governor Inslee issued Proclamation 20-25.5 ("Safe Start – Stay Healthy" County-

14  By-County Phased Reopening) on July 1, 2020.  Proclamation 20-25.5 amended the previous

15  proclamations, and incorporated the prohibitions involving statewide face coverings in Order of

16  the Secretary of Health 20-03.

17    4.63    Attached as Exhibit J is a true copy of Proclamation 20-25.5.

18    4.64    On July 2, 2020, Governor Inslee ordered a freeze on all counties moving forward

19  to a subsequent phase, and that freeze remains as of the date of the filing of this complaint.

20    4.65    Clark County Washington has never been advanced past Phase 2, and remains in

21  Phase 2 as of the filing of this complaint.

22    4.66    Governor Inslee issued Proclamation 20-25.6 on July 7, 2020.

23    4.67    Attached as Exhibit K is a true copy of Proclamation 20-25.6.

COMPLAINT
NO. _____
Sunday, November 29, 2020

18

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    4.68    Governor Inslee issued Proclamation 20-25.7 on July 24, 2020, in which he

2    proclaimed and ordered that a State of Emergency continues to exist in all counties of Washington

3    State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended,

4    and that, pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., are amended to extend

5    all of the prohibitions described therein until the order is amended or rescinded, and all other

6    provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

7    4.69    Attached as Exhibit L is a true copy of Proclamation 20-25.7.

8    4.70    Proclamation 20-25.7 again stated, "until there is an effective vaccine . . . it is

9    crucial to continue to maintain some level of community interventions to suppress the spread of

10   COVID-19 throughout all phases of recovery."

11   4.71    In the same paragraph, Governor Inslee specified these community interventions to

12   include: "practicing physical distancing, staying at least six feet away from other people," and

13   "wearing cloth face coverings in public settings."

14   4.72    Proclamation 20-25.7 concluded with the following warning:

15       Violators of this order may be subject to criminal penalties pursuant to
16       RCW 43.06.220(5). Further, if people fail to comply with the required social
17       distancing and other protective measures while engaging in this phased
18       reopening, I may be forced to reinstate the prohibitions established in earlier
19       proclamations.

20       This order goes into effect immediately, and remains in effect until the state
21       of emergency, issued on February 29, 2020, pursuant to Proclamation 20-
22       05, is rescinded or until this order is amended or rescinded.

23   4.73    On November 9, 2020, Pfizer announced that it had developed a COVID-19

24   vaccine which is 90% effective.

25   4.74    Governor Inslee issued Proclamation 20-25.8 on November 15, 2020, fewer than

26   14 days before Thanksgiving.  In it, he announced "rollbacks" to reopening Guidance.

COMPLAINT
NO. _____
Sunday, November 29, 2020

19

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

4.75    Attached as Exhibit M is a true copy of Proclamation 20-25.8.

4.76    Proclamation 20-25.8 included the following language:

I, Jay Inslee . . .  do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., renamed "Stay Safe – Stay Healthy" are amended to extend all of the prohibitions described herein until this order is amended or rescinded. Except as otherwise provided in this order, the *Safe Start Washington Phased Reopening County-by-County Plan* found here, the *Order of the Secretary of Health 20-03.1*, issued on July 24, 2020, found here, and all other provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

4.77    With respect to religious services by Religious Organizations, Proclamation 20-25.8 states: "Congregation members/attendees must wear facial coverings at all times and congregation singing is prohibited."

4.78    Proclamation 20-25.8 removed the language stating that community intervention was crucial until a vaccine was found.

4.79    Proclamation 20-25.8 permits in store retail gatherings of up to 25 percent of indoor occupancy limits.

4.80    Proclamation 20.25.8 specifically exempted K-12 education from the new restrictions on gatherings, stating, "These below modifications do not apply to education (including but not limited to K-12, higher education, trade and vocational schools), childcare, health care, and courts and judicial branch-related proceedings, all of which are exempt from the modifications and shall continue to follow current guidance."

4.81    While increasing restrictions on religious organizations, Proclamation 20-25.8 as supplemented by the Guidance for Professional Sports and Other Sporting Activities actually

COMPLAINT
NO. _____
Sunday, November 29, 2020

20

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1  *expanded* youth and adult recreational sports outdoor activities by allowing full team, full contact

2  practices for moderate risk sports such as soccer.

3       4.82    Attached Exhibit N is a true copy of the Guidance for Professional Sports and Other

4  Sporting Activities.

5       4.83    The Guidance for Sporting Activities was amended to state: "School and Non-

6  school sporting activities youth and adult low and moderate risk sports are *now* allowed intra-team

7  competitions and *are not restricted to groups of six*."  (emphasis added.)

8       4.84    Soccer teams typically roster 18 players and have two coaches.

9       4.85    Thus, a group of 18-20 adult men are permitted to assemble for the purpose of

10  playing full contact recreational soccer; but those same adult men are not permitted to assemble

11  and pray together outside on public property or parks.

12       4.86    Those same 18 men are likewise prohibited by Governor Inslee's Covid-19

13  proclamation from gathering to protest the Covid-19 restrictions.

14       4.87    Likewise, private indoor spiritual gatherings are prohibited in groups larger than

15  five, but schools, which are not classified as essential businesses in Washington, are allowed to

16  host students indoors without numerical limitation.

17       4.88    Thus, a gathering of ten children in a private residence for the purpose of Christian

18  Faith formation is not permitted, but the gathering of those same children in a public school

19  classroom is permitted.

20       4.89    Although secular indoor activities such as retail allow indoor gatherings of up to

21  25% of occupancy, and indoor public schools do not have an occupancy limitation, spiritual

22  gatherings in one's home are limited to five people, regardless of the size of the home by the

23  Religious and Faith Based Organizations Guidance.

COMPLAINT
NO. _____
Sunday, November 29, 2020

21

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1      4.90    Proclamation 20.25.8 did not modify restrictions on professional sports. Thus,

2    professional sports are permitted to hold full contact practices in teams of up to 50 people.

3      4.91    There is no requirement that nose and mouth coverings are used during professional

4    sports practices.

5      4.92    Outdoor and Indoor professional sports practices and competitions are permitted.

6      4.93    The Seattle Seahawks professional football team played a home game on November

7    19, 2020 against the Arizona Cardinals.

8      4.94    Dozens of players and support personnel were gathered for the game.

9      4.95    Below is an accurate photo of some of the players, and support persons gathering

10   during the game.



11

12     4.96    While Governor Inslee's proclamations preclude Christians from huddling

13   outdoors to celebrate the Lord, they allow the Seahawks to huddle to celebrate a touchdown.

COMPLAINT
NO. _____
Sunday, November 29, 2020

22

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1

2   ***De Facto Gathering Exemptions Granted to Certain Viewpoints by VPD and Governor Inslee***

3        4.97    In addition to the more favorable treatment received by secular activities under

4   Governor Inslee's host of proclamations, the State has also granted de facto gathering exemptions

5   for secular gatherings to protestors espousing certain viewpoints.

6        4.98    Following the tragic killing of George Floyd on May 25, 2020, thousands of

7   Washingtonians gathered for protests, demonstrations, and vigils. The Seattle Times described

8   these protests as "seas" of people "gathering" to "listen to speeches," with photos showing

9   protestors failing to comply with the State's gathering limits and social distancing protocols.[1]

---

[1] *See* Seattle Times Staff, *Seattle-area protests: Police declare a riot as demonstrators gather for fourth day to call for police accountability*, THE SEATTLE TIMES (updated June 3, 2020), https://www.seattletimes.com/seattle-news/george-floyd-protests-continue-in-seattle-area- demonstrators-expected-to-gather-for-fourth-day-to-call-for-racial-justice/.

COMPLAINT
NO. _____
Sunday, November 29, 2020

23

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1      4.99    Governor Inslee also publicly expressed full support of those protest gatherings.

2      4.100   On May 31, 2020, Governor Inslee acknowledged that "[t]housands were protesting

3   peacefully," and "I want to thank the protesters who carried a peaceful and important message."

4      4.101   Governor Inslee's above May 31, 2020 statement is attached as Exhibit O.

5      4.102   In another statement, Governor Inslee affirmed that "I fully support the right to free

6   speech and peaceful assembly," and "[a]s people gather today to protest the unjust death of George

7   Floyd, I hope they do so peacefully and safely."

8      4.103   Governor Inslee's above May 30, 2020 statement is attached as Exhibit P.

9      4.104   During a press conference on June 1, 2020, Governor Inslee encouraged protesters

10  "to be safe for themselves and the people around them," expressing his mere "hope" that protestors

11  might wear a mask and "distance as much as you can."[2]

12     4.105   In a press conference on June 4, 2020, Governor Inslee stated that, for secular

13  protesters, "there are some First Amendment rights that we have respected even though we do

14  understand there have been some increased risks in any large gathering and we have respected

15  people's rights in that regard . . . ."[3]

16     4.106   In a press conference on June 8, 2020, Governor Inslee acknowledged that

17  supporting protest gatherings while prohibiting other gatherings does "appear to be contradictory,"

18  but that "thousands of people have made a decision that the virus of racism is important enough to

19  fight back by peaceful protests and we have encouraged them to do so in the most distanced manner

20  as possible . . . ."[4]

---

[2] Governor Jay Inslee, Address Regarding Demonstrations, https://www.pscp.tv/w/1OyJAYjMnBgJb (June 1, 2020)
[3] Governor Jay Inslee, Press Conference on Covid-19 (June 4, 2020),
https://www.tvw.org/watch/?clientID=9375922947&eventID=2020061053
[4] Governor Jay Inslee, Press Conference on Covid-19 (June 8, 2020),

COMPLAINT
NO. _____                                          24
Sunday, November 29, 2020

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1       4.107   In collaboration with Governor Inslee, Vancouver Police Department provided its

2 own de facto exemption to large scale secular gatherings on June 19, 2020, when it facilitated a

3 250-person BLM protest in direct violation of the Proclamation 20-25, et seq., restrictions on

4 public gatherings which limited gatherings in Clark County to 5 people outside your household

5 per week.

6       4.108   WSP even closed I-5 and the interstate bridge so that the 250-person protest could

7 walk shoulder to shoulder in the freeway and across the bridge.

8       4.109   A day before the BLM protest, on June 18, 2020, Tim Martin of VPD sent an email

9 to others at VPD, wherein he wrote that "the freeway/bridge is being given to them *by order of the*

10 *Governor,* and WSP has been told to divert traffic from I-5 onto SR500." (emphasis added).

11       4.110   Attached as Exhibit Q is a true and correct copy of the email referenced above.

12       4.111   On June 19, WSP Trooper Tom Adams sent and email to WSP Trooper Jason Linn,

13 stating that the WSP was "under the order of the Governor" when WSP blocked Interstate-5 to

14 vehicle traffic.

15       4.112   Attached as Exhibit R is a true and correct copy of the email referenced above.

16       4.113   Prior to the BLM protest, Officers from VPD and WSP participated in a joint

17 briefing at the VPD West Precinct.

18       4.114   The briefing was presented by either VPD Commander Foster or VPD Commander

19 Dave King.

20       4.115   During the briefing there was no discussion about enforcement of any of the

21 COVID-19 restrictions.

---

https://www.tvw.org/watch/?clientID=9375922947&eventID=2020061125

COMPLAINT
NO. _____
Sunday, November 29, 2020

25

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1

      4.116   Below is a photo showing the BLM protesters on the I-5 bridge on June 19, 2020.



2

3

      4.117   The   BLM   protesters   largely   ignored   social   distancing   requirements   of

4

proclamations 20-25, et seq.

5

      4.118   VPD officers (including a lieutenant) posed for photos with participants of the BLM

6

protest while not only the participants, but also the officers, were in open violation of the social

7

distancing requirements and gathering bans of proclamations 20-25 et seq.

8

      4.119   Below is a true and correct photo of the BLM protesters and VPD officers standing

9

shoulder to shoulder on June 19, 2020.

COMPLAINT
NO. _____
Sunday, November 29, 2020

26

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



1

2         4.120   No VPD officer drafted an investigation report in relation to the BLM protest.

3         4.121   No VPD officer submitted a criminal investigation report to VCA in relation to the

4 BLM protest.

5         4.122   No VPD officer submitted a criminal investigation police report to VCA in relation

6 to the leaders or organizers of the BLM protest.

7         4.123   One or more VPD officers knew the identity of one or more of the organizers of the

8 BLM protest prior to the protest.

9         4.124   One or more VPD officers communicated with one or more the organizers of the

10 BLM protest prior to the protest but did not attempt to convince them to not have the protest as

11 was their own early intervention policy of dissuading violations of Covid-19 restrictions.

COMPLAINT
NO. _____
Sunday, November 29, 2020

27

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

4.125   VCA filed no criminal charges against any leader or organizer of the BLM protest.

4.126   VPD made no arrests in relation to the BLM protest.

4.127   Sergeant Moore was present for the BLM protest and made observations of the gathering.

4.128   During the June 30, 2020 defense interview, Sergeant Moore confirmed that on June 19, 2020, there was a large gathering of BLM supporters at Esther Short Park in downtown Vancouver.

4.129   During the interview, Moore confirmed that the BLM supporters walked from downtown onto Interstate-5, walked over the bridge into Oregon and then walked back over the bridge into Washington.

4.130   During the interview, Moore estimated the size of the BLM group as having approximately 250 protesters.

4.131   During the interview, Moore confirmed that many of the 250 BLM protesters obstructed vehicle traffic in violation of Washington's criminal prohibition on disorderly conduct under RCW 9A.84.030.

4.132   During the interview, Moore confirmed that during the earlier pre-protest briefing there was no discussion of enforcement of any of the Governor's proclamations

***City of Vancouver Develops Policy to Selectively Target for Criminal Investigation and Prosecution Only Individuals Who Engage in Protests Against Inslee's Proclamations or Individuals Who Organize Religious Gatherings of People Who Oppose Covid-19 Restrictions.***

4.133   In contrast to the de facto exemption provided to BLM protests, the City of Vancouver developed a practice and policy to target for criminal investigation and prosecution those individuals who are out of compliance with Covid-19 restrictions *and* who organize events to "advance their message" in opposition to unconstitutional Covid-19 restrictions.

COMPLAINT
NO. _____
Sunday, November 29, 2020

28

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.134   Following Inslee's issuance of Proclamation 20-25 on March 23, 2020, the City of

2    Vancouver began to receive complaints regarding non-compliance by businesses and individuals.

3    4.135   In response, defendants developed a policy and practice that generally exempted

4    businesses and other social distancing violators from criminal investigation, including those it

5    viewed as having acted illegally.

6    4.136   Thus, the vast majority of these complaints were referred to the City Emergency

7    Manager; and no criminal enforcement action was taken.

8    4.137   On April 11, 2020, the City received a written complaint regarding non-compliance

9    by Fred-Meyer with its obligations "as required by the Governor's Proclamation 20-25."

10   4.138   There, rather than refer the complaint for criminal prosecution, the City opted to

11   merely "[c]ontact store officials and remind them of the requirement to promote and enforce

12   physical distancing."

13   4.139   In an April 16, 2020, email from Vancouver Police Department Assistant Chief of

14   Police Troy Price, to City Emergency Manager Juve, Price wrote "[i]f the complaint is about social

15   distancing issues at a business, *we are not taking any enforcement action*."

16   4.140   Attached as Exhibit S is a true and correct copy of the email referenced above.

17   4.141   The email goes on to say that the official policy of the police department when they

18   receive a complaint of a non-essential business operating in violation of the proclamation is for

19   the police department to simply document that they contacted the business and send a report of

20   that contact to the City Emergency Manager, not the prosecutor.

21       We will contact businesses that are considered non-essential if we receive
22       information that they are operating and open to the public. In those instances, we
23       will actually create a call with CRESA and document our response. Our plan is that
24       **this information will be routed back to [the City Emergency Manager] via
25       email** through the precinct that addressed the complaint.

COMPLAINT
NO. _____
Sunday, November 29, 2020

29

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1        4.142   The City Emergency Manager replied that this policy "sounds good to me."

2        4.143   On April 16 and 17, 2020, the City received multiple written complaints regarding

3  non-compliance.

4        4.144   Again, the City chose not to involve the police department for those complaints.

5        4.145   On April 26, 2020, the City received a scathing complaint regarding non-

6  compliance by the Old Spaghetti Factory.

7        4.146   The City Emergency Manager forwarded the complaint in an email and indicated

8  his belief that the violations were indeed criminal based on Inslee's proclamation.

> 9        Sounds like a pretty blatant disregard by the Spaghetti Factory… I'm sure they will
> 10     have numerous explanations, but that doesn't excuse the obvious fact they were
> 11     woefully unprepared to operate within the rules. Not only is it ***illegal and***
> 12     ***unhealthy***, but it also jeopardizes the continued operation of their peers and
> 13     destroys customer rapport.

14        4.147   Nevertheless, even though the Old Spaghetti Factory complaint detailed an instance

15  of business non-compliance, which the City Emergency Manager perceived as illegal, it was not

16  sent to the police for criminal investigation.

17        4.148   Rather, the complaint was sent to City of Vancouver's director of Community

18  Economic Development, who replied, "I'm feeling like some of these recent complaints would be

19  better handled by the Health Department than the City."

20        4.149   The email continued, "We're happy to give them a call, but since we will likely be

21  getting more of these, can we find out if the Health District is set up to do any follow-up on food,

22  hairdresser, and similar businesses?"

23        4.150   A City spread sheet shows numerous non-compliance complaints between April

24  7th and May 14.

COMPLAINT
NO. _____
Sunday, November 29, 2020

30

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    4.151   Attached as Exhibit T is a true and correct copy of the above referenced spread

2    sheet prepared by the City.

3    4.152   According to the spread sheet, even City employees were alleged to have been in

4    violation of the proclamation.

5    4.153   Violations were also alleged against Fred Meyer, Lowe's, Chuck's Produce, Old

6    Spaghetti Factory, and various other entities.

7    4.154   On April 8, 2020, the City received a complaint of hair care services being provided

8    allegedly in violation of the proclamation.

9    4.155   The complaint about hair care services was forward in an April 9, 2020, email from

10   City Emergency Manager Gene Juve to City Attorney Jonathan Young.

11   4.156   Attached as Exhibit U is a true and correct copy of the above referenced email.

12   4.157   According to that email, "There are approximately 15,000 reports of business non-

13   compliance."

14   4.158   The email states that the business matters should be handled by "refer[ing] the

15   complaint to [Community and Economic Development] to Determine if the activity in fact violates

16   the Governor's order or any of the city's licensing or permitting requirements. If so, CED should

17   advise the operator to stop performing these services."

18   4.159   These internal City emails show that (1) VPD has a general policy and practice of

19   not enforcing the COVID Proclamations when they receive social distancing complaints, and (2)

20   a policy of referring complaints about businesses allegedly in criminal violation of the

21   Proclamation to a civil regulatory agency (not the police department).

COMPLAINT
NO. _____
Sunday, November 29, 2020

31

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1   ***City of Vancouver Selectively Targets for Criminal Investigation and Prosecution Individuals***
2   ***Who Either Protest Covid-19 Restrictions or Engage Religious Gatherings***

3       4.160   In contrast to the multiple instances where businesses were allegedly in criminal

4   violation of the Covid-19 restrictions and no enforcement action was taken, when the

5   noncompliance was accompanied by a protest against Covid-19 restrictions or involved a religious

6   gathering of individuals who oppose Covid-19 restrictions, the Vancouver Police Department

7   (VPD) initiated criminal investigations.

8       4.161   Although the City received numerous complaints of alleged violations of the

9   Governor's Proclamations, VPD has targeted for criminal investigation and prosecution only those

10   individuals who actively protest against the Covid-19 restrictions or who engage in private

11   religious gatherings of individuals who oppose the Covid-19 restrictions.

12       4.162   VPD has determined that noncompliance with Covid-19 restrictions does not

13   warrant criminal investigation or prosecution *unless* it involves a protest of Covid-19 restrictions

14   or involves a private religious gathering of individuals who oppose the Covid-19 restrictions.

15       4.163   As of the filing of this complaint, VPD has sent a total of four referrals to VCA for

16   prosecution of an alleged violation of Governor Inslee's Covid-19 proclamation restrictions.

17       4.164   All four of the referrals from VPD to VCA for prosecution based on alleged

18   violations of the Covid-19 Proclamations involved either open protest of Governor Inslee's Covid-

19   19 Proclamations or involved a religious gathering for prayer by individuals who opposed Covid-

20   19 restrictions.

21       4.165   The four referrals from VPD to the VCA for prosecution of COVID-19 related

22   offenses were Kelly Carroll, who led the PetBiz Rally against Covid-19 Restrictions on

23   businesses; Brandi Youngstrom, owner of HuggaMug, who advertised a "Rally to Fight for

COMPLAINT
NO. _____
Sunday, November 29, 2020

32

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1  Liberty" on her Facebook page, Patrick Morris, who allegedly held a "church gathering" in his

2  home, and Jerry Knutson, who held a rally in opposition to Governor Inslee's Stay Home-Stay

3  Healthy Proclamation outside of his tattoo shop.

4      4.166  In each instance, investigative reports by officers emphasize the content of the

5  individual's speech in opposition to Covid-19 restrictions and their status as an event organizer.

6      4.167  For example, VPD Lieutenant Chad Williams' report regarding the owner of

7  HuggaMug Diner, Brandi Youngstrom, indicated she was a suspect in a "COVID-19 RELATED"

8  offense and specified that Youngstrom's Facebook page was advertising a "Rally to Fight for

9  liberty!"

10     4.168  Lt. Williams report also noted that VPD officers "conducted undercover

11  surveillance" of the rally.

12     4.169  Mr. Gibson was present for the above referenced "Rally to Fight for liberty!"

13     4.170  Lt. Williams report also noted as follows:

14      When I walked outside, Joey Gibson, who I recognized from prior contacts, came
15      outside and began to video Lt. Hatley and me with his phone. Mrs. Youngstrom
16      came outside a short time later and Mr. Gibson continued to film, but did not insert
17      himself into the situation otherwise.

18     4.171  In another referral, VPD Officer Brandon Degraw's report, listing Patrick Morris

19  as a suspect, documented that Morris was the owner of a residence and "did have a church

20  gathering" at his residence.  Again the report emphasized the suspect's stated opposition to Covid-

21  19 restrictions.

22     4.172  Officer Degraw's report reads in part as follows:

23      I informed Patrick that there was a caveat to his statement and could be construed
24      as a violation of RCW 43.06.220. Patrick acknowledged, then proceeded to ask me
25      "what if your boss asked you to do something but you knew it was wrong, would

COMPLAINT
NO. _____
Sunday, November 29, 2020

33

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    you quit your job and stand up for what was right?" Patrick also alluded to several
2    other questions that were irrelevant to the conversation.

3    4.173   Mr. Gibson had previously participated in the church gatherings that were the
4    subject of the Morris investigation.

5    4.174   In another referral, VPD Lieutenant Kevin Hatley's report listing Jerry Knutson,
6    owner of Valkyrie Tattoo, as a suspect in a "COVID-19 RELATED" offense noted that Knutson's
7    "rally was held in opposition to Governor Inslee's Stay Home-Stay Healthy Proclamation
8    (Proclamation 20-25)."

9    4.175   Hatley noted in his report regarding Knutson that Mr. Gibson was present, and had
10   previously "attended at least two other peaceful rallies at The PetBiz and HuggaMug Diner."

11   4.176   Hatley's report also noted officers at Knutson's protest observed "Mr. Gibson
12   sp[eak] to attendees outside of the businesses" where the protest was held.

13   4.177   However, no criminal charges were filed on Youngstrom, Morris, and Knutson,
14   because the reports lacked sufficient evidence to prosecute.

15   4.178   As of the filing of this complaint, VPD has not sent any other referrals to VCA for
16   consideration of criminal charges for an alleged violation of Governor Inslee's Covid-19
17   proclamation restrictions.

18   ***The Selective Prosecution of Ms. Kelly Carroll For Her Protest of Covid-19 Restrictions.***

19   4.179   While there was insufficient evidence to file charges against Youngstrom, Morris,
20   and Knutson, the VCA did proceed with the prosecution of Kelly Carrol, owner of PetBiz, whom
21   had spoken out publicly against Covid-19 restrictions and engaged in public protest of the same.

22   4.180   VPD and VCA engaged in a calculated plan to investigate and selectively
23   prosecute Ms. Kelly Carroll because of her political speech in opposition to Covid-19 restrictions.

COMPLAINT
NO. _____
Sunday, November 29, 2020

34

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.181   When officers at VPD learned that Ms. Carroll was planning on protesting

2    Governor Inslee's Covid-19 restrictions and intended to hold a protest rally, a Department

3    Operational Plan was put in place.

4    4.182   The operational plan noted that her planned rally had "caught the attention of

5    others," and that "media is expected to be present."

6    4.183   Per the 9-page operational plan, Lt. Chad Williams was assigned to be the incident

7    commander during the protest and Lt. Hatley was assigned as the Deputy Incident Commander.

8    4.184   Sergeants Pat Moore was assigned to be the surveillance team leader.

9    4.185   Sergeant Pat Moore has worked for VPD for 19 or more years and has served as a

10   police officer for a total of 25 or more years.

11   4.186   At all times relevant to this matter, Sergeant Moore was the supervisor for VPD's

12   Special Investigations Unit (SIU).

13   4.187   SIU is generally tasked with intelligence gathering for VPD.

14   4.188   SIU is also tasked with gathering intelligence on local protests that take place in

15   Vancouver and the surrounding area.

16   4.189   Over the past several years SIU has conducted intelligence gathering on protests

17   that have occurred in the Vancouver and Portland area involving groups such as Antifa, Proud

18   Boys, Patriot Prayer, Black Lives Matter, and others.

19   4.190   SIU monitored protests through open source information such as social media, and

20   also observed the protests in plain clothing.

21   4.191   SIU prepares Operational Plans for the law enforcement response to the protests

22   and typically reaches out to some of the organizers in advance of the protests to coordinate when

23   possible.

COMPLAINT
NO. _____
Sunday, November 29, 2020

35

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1      4.192   In the past several years Sergeant Moore has coordinated with the leaders of several

2  protest groups in advance of protests.

3      4.193   On May 16th, 2020, Ms. Kelly Carroll held her protest rally in opposition to

4  Governor Inslee's Covid-19 restrictions on small businesses.

5      4.194   The protest was held outside of her pet boarding and grooming business on a public

6  sidewalk.

7      4.195   The protest received media coverage.

8      4.196   Vancouver Police Officer Sergeant Pat Moore observed Ms. Carroll's rally while

9  in 'plain clothes.'

10      4.197   On June 30, 2020, Sergeant Moore was interviewed by defense counsel for Ms.

11  Kelly Carroll as part of the defense of the criminal case brought against Ms. Carroll.

12      4.198   During the interview, Sergeant Moore stated as follows:

13      So if somebody's, if I can identify who the organizers of the event is, I pick up the
14      phone, make a phone call, and basically identify myself and say, "Hey, this is who
15      I am and uh, I understand you have an event and uh, you know, what are your
16      intentions, what are your plans." And then we kind of have start some type of a
17      dialogue. And some organizers are willing to chat with us and some others aren't.

18      4.199   During the interview, Sergeant Moore described his observations of the PetBiz

19  protest rally:

20      I was, we were, myself and Detective Remidi were in the same car together. Uh,
21      we're basically parked across the street. There's a large, uh, kind of business
22      complex across the street from PetBiz. Um, we're able to look right at the front of
23      the, the uh, business there and um, I'm guessing, oh, I'm, I'm, again, I don't know,
24      I'm gonna estimate 125 maybe, folks, arrived. Um, or, that was the most that was
25      there at any one given time, 125 to 150. Uh... the most that was there at any one
26      given time, 125 to 150. Uh, I believe there was some speeches given. Uh, Joey
27      Gibson from Patriot Prayer, uh, provided a speech. I believe Kelly spoke, uh, a little
28      bit. Uh, I believe there was some food, barbecue. Um, there was some peop-
29      obviously, there was quite a few people with, um, American flags and a few folks
30      that were, uh, open carry.

COMPLAINT
NO. _____
Sunday, November 29, 2020

36

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    4.200   In the interview, Moore also expressed that, prior to Ms. Carroll's rally there was

2   some concern that, since Mr. Gibson was speaking, "Antifa folks might show up and cause

3   problems."

4    4.201   During the interview, Sergeant Moore also stated as follows:

5        we were undercover capacity; we weren't even visible. We were, kind of blended
6        into the parking lots and just to watch, and our main, uh, objective that day was to
7        kind of just maintain the peace, keep the peace and if Antifa or anybody else showed
8        up that started causing problems, then we can make the determination if, uh, law
9        enforcement action, uh, was needed or any type of response.

10    4.202   During the interview, when Sergeant Moore was asked "did you see any criminal

11   behavior by any of the Patriot Prayer people or people supporting Ms. Carroll at that rally," he

12   stated as follows:

13        Uh, no. I mean, they they, they participated out front, they had their gathering, I,
14        I'm not 100% po- Maybe somebody, uh, drove by and made a couple comments,
15        but I mean, it was peaceful. Uh, obviously, there was no need to take, uh, police
16        action. Uh, we didn't,... So we, we ended up leaving after the event was over. I think
17        it lasted, uh ... I'm guessing we were there an hour and a half to two hours maybe.

18    4.203   During the interview, Sergeant Moore also stated that "…everybody has, protected

19   the First Amendment right to, to protest and, and we, we help facilitate that…"

20    4.204   During the interview, when Sergeant Moore was asked about his interactions with

21   Joseph Gibson on prior occasions where Mr. Gibson was organizing an event, Moore stated as

22   follows:

23        I know I've had a couple conversations with him, and he's been very, very upfront,
24        very cooperative. I've talked to him and basically, the conversation I just asked Jo,
25        I'd say, "Hey, I understand you're having this event. Kind of, what are your
26        intentions? Uh, what are your plans?" If they're marching, "Hey, what's your
27        route?" You know, "How long do you guys plan on staying there?"

28    4.205   Sergeant Moore attended but made no arrests at the Kelly Carroll protest as he

29   observed nothing he believed to be a violation of any law.

COMPLAINT
NO. _____
Sunday, November 29, 2020

37

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1      4.206   After Kelly Carroll's PetBiz Rally protest, VPD Lt. Williams was given direction

2   from a VPD Command Staff officer to write a report regarding Ms. Carroll's activities so that it

3   could be forwarded to the City Attorney.

4      4.207   As a lieutenant, Lt. Williams was primarily tasked with supervision of subordinate

5   officers and did not regularly participate in investigations or write investigative reports.

6      4.208   On information and belief, since being promoted to lieutenant, Lt. Williams had not

7   written a report, or conducted an investigation, on a simple misdemeanor.

8      4.209   On or about May 20, 2020, Lt. Williams later issued a written report regarding his

9   involvement in the investigation of the protest.

10      4.210   Attached as Exhibit V, is a true and correct copy of Lt. Williams report.

11      4.211   The narrative of Lt. Williams' report leads by detailing Ms. Carroll's political

12   activity in opposition to the proclamation.

13      4.212   The report of Lt. Williams reads, in part, as follows:

14      On May 14th, 2020, Investigations told me of an upcoming event in the
15      geographical area I oversee … The owner of the business, Kelly Carroll, made
16      several Facebook posts outlining her plan … Additionally, she urged people to
17      "Rally with me." She also said that she contacted the media and was doing this not
18      for her but for the whole State of Washington.

19      Carroll said that if she was arrested or fined that she encouraged people to
20      financially support her by making donations on her website.

21      On Saturday, May 16th, 2020, Carroll carried out her plan and had a re-opening
22      rally / celebration at The PetBiz. Vancouver Police Department members witnessed
23      the crowd and estimated that there were over 100 people present for the rally. Some
24      of the people in attendance marched around the area carrying flags and signs...

25      4.213   On May 27, 2020, shortly after the PetBiz protest, City of Vancouver City

26   Manager, Eric Holmes, sent a memo to City Mayor Anne McEnerny-Ogle which, in contrast to

27   the City's original policy exempting noncompliant businesses from criminal enforcement,

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



1    promised "diligent and disciplined" enforcement of Covid-19 restrictions specifically against non-

2    compliant individuals or organizations who organized events to "advance their message."

3        4.214   A true and correct copy of the above referenced memo is attached as Exhibit W.

4        4.215   The memo further specified that event organizers will be targeted for selective

5    prosecution:

6        it is important to understand that regardless of whether there are citations issued or
7    arrests of participants at these events, **the event organizers may still face**
8    **prosecution** by the City Attorney's office based on information and evidence
9    gathered by VPD at the scenes of these events.

10       4.216   On May 29, 2020, two days after the City adopted its policy of selectively targeting

11   protest organizers for prosecution, Assistant City Attorney Kevin McClure followed the policy

12   and filed criminal charges on Kelly Carroll alleging that she willfully violated a governor's

13   proclamation and was therefore guilty of a crime under RCW 43.06.220.

14       4.217   According to a motion filed in the Clark County District Court by City Attorney

15   Young, Ms. Kelly Carroll was specifically prosecuted for "organizing and conducting a 100+

16   person rally" in opposition to Governor Inslee's proclamations pursuant to its policy to criminally

17   investigate event organizers where the event protests against Covid-19 restrictions.

18       4.218   Attached as Exhibit X is a true and correct copy of the above referenced motion

19   filed by Young.

20       4.219   Proclamations 20-25, et seq., provide that "Violators of this order may be subject

21   to criminal penalties pursuant to RCW 43.06.220(5)."

22       4.220   A conviction under RCW 43.06.220 carries a maximum penalty of 90 days in jail

23   and a fine of $1,000.

24       4.221   No other person who participated in in Vancouver protest was criminally charged.

COMPLAINT
NO. _____
Sunday, November 29, 2020
39
ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1      4.222   Kelly Carroll was in fact innocent, as the VCA later admitted.

2      4.223   The prosecution of Ms. Carroll was a sham in retaliation for protesting the

3    governor's Covid-19 restrictions.

4      4.224   In addition to exempting noncompliant businesses and individuals from criminal

5    investigation and prosecution where those individuals and organizations did not seek to advance a

6    message in opposition to compliance with Covid-19 restrictions, the City of Vancouver provided

7    a de-facto exemption for noncompliant individuals who participated in secular BLM protests. VPD

8    developed a special interest in Mr. Gibson as an event organizer.

9    ***Special Interest Taken in Mr. Gibson Based On His Participation in and Organization of***
10   ***Protests Against Covid-19 Restrictions: City Attorney Requests Charges Be Filed on Gibson.***

11     4.225   Once the prosecution of Ms. Carroll became public knowledge, political protests in

12   opposition to her prosecution occurred at various locations in the City of Vancouver.

13     4.226   City Attorney Young believed that these protests were organized by Mr. Joseph

14   Gibson.

15     4.227   Gibson was vocal on social media that Governor Inslee's Covid-19 restrictions

16   were unconstitutional.

17     4.228   Gibson was vocal on social media that the prosecution of Ms. Carroll was

18   unconstitutional.

19     4.229   One protest against the prosecution of Ms. Carroll occurred outside of the home of

20   Assistant City Attorney Kevin McClure.

21     4.230   McClure was the Assistant City Attorney assigned to handle the prosecution of Ms.

22   Carroll.

23     4.231   McClure was working from home at the time of the protest.

COMPLAINT
NO. _____
Sunday, November 29, 2020                    40

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.232   Many at the protest openly prayed to God that McClure would see that the

2    prosecution should be dismissed.

3    4.233   City Attorney Young went to the location of the protest at the McClure residence

4    and told the protesters that he was removing McClure from the case against Ms. Carroll and

5    personally taking over the prosecution of Ms. Carroll.

6    4.234   The next protest against the prosecution of Ms. Carroll occurred outside of the

7    home of City Attorney Young.

8    4.235   Young was working from home at the time of the protest.

9    4.236   Many at the protest openly prayed to God that Young would see that the prosecution

10   should be dismissed.

11   4.237   In the summer of 2020, City Attorney Young announced his anti-Christian bias, by

12   placing a bumper sticker on his truck that reads "GOD PLEASE SAVE ME FROM YOUR

13   FOLLOWERS."

14   4.238   City Attorney Young also believed that protest was organized by Mr. Gibson.

15   4.239   The protesters openly called on Young to dismiss the charges against Ms. Carroll.

16   4.240   The protest was broadcast live over social media.

17   4.241   VPD sergeant Pat Moore was present at the protests against the prosecution of Ms.

18   Carroll, and also viewed extensive video footage of the protests.

19   4.242   Sergeant Moore issued a written report about those protests, in which he described

20   the protests against the prosecution of Ms. Carroll as non-threatening, law-abiding, and politically

21   themed.

22   4.243   Sergeant Moore's report noted that during all these events Mr. Gibson "reminded

23   individuals attending to not commit any crimes, do not trespass, do not threaten or intimidate, do

COMPLAINT
NO. _____
Sunday, November 29, 2020

41

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1   not violate the VMC noise ordinance and to make sure they clean up after themselves when they

2   leave an area."

3       4.244   Sergeant Moore's report reads in part as follows:

4   Det. Romiti and I have both been physically present during the events described
5   above, as well as monitoring the live feeds. At no time have I heard anyone in the
6   group, to include the organizers, threaten Attorneys [redacted] or Mayor Anne
7   McEnerny-Ogle with any use of force.
8   A Majority of the group's chants during these protests are:
9   "Drop the charges [redacted] Kelly is not a criminal."
10  "Grandmas Lives Matter."
11  "Dismiss the charges, do the right thing."
12  "Uphold the Constitution."

13      4.245   Sergeant Moore's report concluded "[a]t this time, I find there is no probable cause

14  for intimidating a public servant."

15      4.246   A true and correct copy of the above referenced report (with redactions) is attached

16  as Exhibit Y.

17      4.247   In stark contrast to Officer Moore's observations and characterization of the

18  demonstrations as law-abiding, respectfully led, and non-threatening, City Attorney Young

19  claimed he felt threatened and intimidated by those same demonstrations.

20      4.248   According to report authored by VPD Officer Mary-Jane Long, City Attorney

21  Young claimed to her that the comments of one woman at the protest made him "feel 'threatened'

22  and 'intimidated.'"

23      4.249   City Attorney Young also claimed to Officer Long that "he would be considering

24  applying for protection orders against some of the leaders in the protest groups that he felt were

25  especially threatening and intimidating him."

26      4.250   City Attorney Young claimed to Moore that he had been the victim of Intimidating

27  a Public Servant under RCW 9A.76.180, and sought criminal charges against Mr. Gibson.

COMPLAINT
NO. _____
Sunday, November 29, 2020

42

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

4.251   Intimidating a Public Servant under RCW 9A.76.180 is a felony.

4.252   The City Attorney's Office does not have lawful authority to file felony charges.

4.253   As Young did not himself have authority to file the felony charges, he pressured Moore to arrest Mr. Gibson on the alleged felony charges so that the Clark County Prosecuting Attorney's Office could file charges.

4.254   Sergeant Moore found no probable cause existed to arrest Mr. Gibson for Intimidating a Public Servant.

4.255   Although no police report regarding Mr. Gibson's protest activities had been referred to VCA, City Attorney Young nevertheless pressured Sergeant Moore to arrest Mr. Gibson for organizing the protests.

4.256   Sergeant Moore found no probable cause to arrest Mr. Gibson for a crime based on his status as an event organizer.

4.257   In response to Sergeant Moore's refusal to arrest or charge Mr. Gibson with a crime, City Attorney Jonathon Young (1) initiated an internal investigation into Sergeant Moore for allegedly being sympathetic to "Joey Gibson" and allegedly being unsympathetic to Antifa, and (2) developed a policy, in concert with VPD Chief James McElvain, to remove discretion from officers investigating protests against Covid-19 restrictions, and to require those officers to submit information about the event organizers directly to VCA if the evidence merely "suggests" a violation.

4.258   A true and correct copy of the above referenced VPD and VCA policy announcement is attached as Exhibit Z.

4.259   Sergeant Moore later filed a counter complaint with the City against Young for Conflicts of Interests and for trying to have Gibson charged without probable cause.

COMPLAINT
NO. _____
Sunday, November 29, 2020

43

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    4.260   A true and correct copy of the above referenced complaint filed by Sergeant Moore

2    is attached as Exhibit AA.

3    4.261   Sergeant Moore accused Young of misusing his position with the City to

4    improperly attempt to influence Moore to file criminal charges in a case where Young claimed he

5    viewed himself as a victim.

6    4.262   Moore wrote that he "believe[d] complaint IA 2020-0106 that Mr. Young filed was

7    in retaliation for [Moore] not moving forward with charging protest groups without probable cause

8    and for [Moore] disagreeing with [Young's] initial assessment regarding groups protesting at his

9    residence."

10   4.263   Moore wrote that "Mr. Young was too emotionally involved in this particular case

11   and set of circumstances. He had a conflict of interest given his personal interests, and yet he

12   continued without recusing himself."

13   4.264   The City emailed notice to Young that Moore had made a complaint against him

14   and that the City had hired "an outside investigator, Liani Reeves, to complete an employment

15   investigation."

16   4.265   On information and belief, the City's outside investigation into Young is ongoing

17   as of the filing of this complaint.

18   ***Charges Against Carroll Dismissed***

19   4.266   On August 3, 2020, defense counsel for Ms. Carroll filed a motion to dismiss the

20   charges filed by VCA, arguing that the charges were unconstitutional selective prosecution in

21   retaliation for speech in violation of the First and Fourteenth Amendments to the United States

22   Constitution.

COMPLAINT
NO. _____
Sunday, November 29, 2020

44

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    4.267   On August 6, 2020, Vancouver City Attorney Jonathan Young moved the court to

2    dismiss the charges.

3    4.268   In his motion, Young wrote "[t]he combination of these facts tends to negate the

4    guilt of the accused for the charged offense, and has created an inference of innocence of the

5    accused."

6    4.269   The state court dismissed the charges against Ms. Carroll with prejudice on August

7    6, 2020.

8    4.270   On August 6, 2020, Young and McElvain, publicly announced a written policy for

9    VCA and VPD directing officers and assistant city attorney's to investigate and prosecute event

10   organizers who lead protest gatherings in violation, and protest, of Governor Inslee's Covid-19

11   Orders.

12   4.271   Attached as Exhibit BB to this complaint is a true and correct copy of that policy

13   announcement referenced in the paragraph above.

14   4.272   The policy reads in part (with emphasis added):

15   We recognize that not all residents or businesses will voluntarily comply with the
16   emergency orders and there are individuals and organizations that will seek to
17   deliberately violate standing orders. In these cases, the City's approach relies on
18   early intervention focused on dissuading potentially illegal activities, education and
19   awareness to improve understanding of the current orders to encourage voluntary
20   compliance and, if a large gathering or event proceeds in violation of an emergency
21   order, assuring a physical presence at the event focused on preserving public order
22   and continuing to encourage voluntary compliance.
23   ***
24   We will also make every attempt to contact the unsanctioned event organizers.
25   Despite our efforts on early intervention, some event sponsors may choose to
26   proceed. … Regardless of whether there are citations issued or arrests of
27   participants at these events, **information concerning the event organizers will be
28   referred for prosecutorial review** if evidence suggests that their conduct was
29   carried out in willful violation of the Governor's Order. Prosecutorial review is
30   conducted by the City Attorney's office based on information and evidence
31   gathered by VPD at the scenes of these events. (emphasis added)

COMPLAINT
NO. _____
Sunday, November 29, 2020

45

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1  *Imminent Irreparable Harm*

2      4.273  Allowing defendants, to selectively target Mr. Gibson for arrest or prosecution

3  based on his position as a leader or organizer of a public prayer protest would irreparably harm

4  Mr. Gibson's and his rights under the First, Fifth, Fourteenth Amendments to the United States

5  Constitution.

6      4.274  Allowing defendants, to arrest or prosecute Mr. Gibson based on his participation

7  in a public protest or prayer would also cause irreparable harm to his rights under the First, Fifth,

8  Fourteenth Amendments to the United States Constitution.

9      4.275  Defendants will almost certainly selectively targeting Mr. Gibson for arrest or

10  prosecution based on his position as a leader, organizer, or participant of a public protest or prayer

11  if a court order enjoining defendants, is not entered prior to December 5, 2020.

12      4.276  The above referenced injury is both imminent and irreparable.

13      4.277  There is no adequate remedy at law to address the above referenced activity sought

14  to be barred.

15      4.278  There is a substantial likelihood that Mr. Gibson will prevail on the merits of this

16  matter.

17      4.279  The injury faced by Mr. Gibson is far greater than any possible injury that would

18  be or could be sustained by defendants by the requested injunctive relief.

19      4.280  The requested injunctive relief would not adversely affect public policy or public

20  interest.

COMPLAINT
NO. _____
Sunday, November 29, 2020

46

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

V.   FIRST CAUSE OF ACTION FOR RELIEF
(POLICY AND PRACTICE IN VIOLATIONS OF RIGHTS)

5.1     Plaintiff Mr. Gibson hereby restates and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

5.2     Plaintiff Mr. Gibson has a clear legal and equitable right under Fed. R. Civ. P. 65, the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. and §§ 1983, 1985, and 1988, in prohibiting defendants from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer.

5.3     Unless defendants are first temporarily and then permanently enjoined from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer, Mr. Gibson and others could or will be irreparably harmed because defendants are very likely to engage in selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer as evidenced by the fact that defendants have already done so in another matters.

5.4     Further, there is no public interest in allowing selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer by defendants.

5.5     In fact, selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer is a violation of the First and Fourteenth Amendments to the Constitution of the United States.

5.6     Thus, under Fed. R. Civ. P. 65, Mr. Gibson is entitled to enjoin the defendants from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer.

COMPLAINT
NO. _____
Sunday, November 29, 2020

47

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    5.7    Mr. Gibson has a well-grounded fear that defendants will selectively targeting Mr.

2    Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest

3    or prayer should they not be enjoined from selectively targeting Mr. Gibson for arrest or

4    prosecution based on his position as a leader or organizer of a public protest or prayer.

5    5.8    The likely injury to Mr. Gibson is irreparable if the defendants are not restrained

6    from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or

7    organizer of a public protest or prayer.

8    5.9    Mr. Gibson has no adequate remedy at law to prevent the harm that will befall Mr.

9    Gibson should defendants selectively targeting Mr. Gibson for arrest or prosecution based on his

10    position as a leader or organizer of a public protest or prayer.

11    5.10    Mr. Gibson asks this court to issue a temporary restraining order immediately

12    preventing defendants from selectively targeting Mr. Gibson for arrest or prosecution based on his

13    position as a leader or organizer of a public protest or prayer, and thereafter a temporary and

14    permanent injunction preventing defendants from selectively targeting Mr. Gibson for arrest or

15    prosecution based on his position as a leader or organizer of a public protest or prayer.

16    **VI.    SECOND CAUSE OF ACTION FOR RELIEF**
17    **(GOVERNOR'S RESTRICTIONS IN VIOLATION OF RIGHTS)**

18    6.1    Plaintiff Mr. Gibson hereby restates and incorporates by reference all paragraphs

19    of this Complaint as if fully set forth herein.

20    6.2    Plaintiff Mr. Gibson has a clear legal and equitable right under Fed. R. Civ. P. 65,

21    the First, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. and §§

22    1983, 1985, and 1988, in prohibiting defendants from arresting or prosecuting Mr. Gibson for

23    participating in the planned protest prayer.

COMPLAINT
NO. _____
Sunday, November 29, 2020

48

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



6.3     Unless defendants are first temporarily and then permanently enjoined from arresting or prosecuting Mr. Gibson for participating in the planned protest prayer, Mr. Gibson and others could or will be irreparably harmed because defendants are very likely to arrest or prosecute Mr. Gibson for participating in the planned protest prayer, as evidenced by the fact that defendants have already done so in another matters.

6.4     Further, there is no public interest in arresting or prosecuting Mr. Gibson for participating in the planned protest prayer.

6.5     In fact, arresting or prosecuting Mr. Gibson for participating in the planned protest prayer is a violation of the First and Fourteenth Amendments to the Constitution of the United States.

6.6     Thus, under Fed. R. Civ. P. 65, Mr. Gibson is entitled to enjoin the defendants from arresting or prosecuting Mr. Gibson for participating in the planned protest prayer.

6.7     Mr. Gibson has a well-grounded fear that defendants will arrest or prosecute Mr. Gibson for participating in the planned protest prayer should they not be enjoined from doing so.

6.8     The likely injury to Mr. Gibson is irreparable if the defendants are not restrained.

6.9     Mr. Gibson has no adequate remedy at law to prevent the harm that will befall Mr. Gibson should defendants arrest or prosecute Mr. Gibson for participating in the planned protest prayer.

6.10    Mr. Gibson asks this court to issue a temporary restraining order immediately preventing defendants from arresting or prosecuting Mr. Gibson for participating in the planned protest prayer, and thereafter a temporary and permanent injunction preventing defendants from arresting or prosecuting Mr. Gibson for participating in the planned protest prayer.

COMPLAINT
NO. _____
Sunday, November 29, 2020

49

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

The image crops show the Angus Lee logo.

# VII.   PRAYER FOR RELIEF

7.1     WHEREFORE, Joseph Gibson prays for the following relief as provided by law:

7.2     A Temporary Restraining Order immediately preventing defendants from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer; and

7.3     Thereafter, an order temporarily and then permanently enjoining defendants from selectively targeting Mr. Gibson for arrest or prosecution based on his position as a leader or organizer of a public protest or prayer; and

7.4     A Temporary Restraining Order immediately preventing defendants from arresting or prosecuting Mr. Gibson for participating in a spiritual gathering of 20 people in protest of Governor Inslee's Covid-19 proclamation restriction; and

7.5     Thereafter, an order temporarily and then permanently enjoining defendants from arresting or prosecuting Mr. Gibson for participating in a spiritual gathering of 20 people in protest of Governor Inslee's Covid-19 proclamation restriction; and

7.6     To the extent allowed by law, an award of attorneys' fees and costs incurred in this action; and

7.7     For such other legal and equitable relief as this court deems appropriate.

DATED this Sunday, November 29, 20.

*S// D. Angus Lee*
D. Angus Lee, WSBA# 36473
Attorneys for Joseph Gibson
Angus Lee Law Firm, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA 98665
Phone: 360.635.6464 Fax: 888.509.8268
E-mail: Angus@AngusLeeLaw.com

COMPLAINT
NO. _____
Sunday, November 29, 2020

50

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



# EXHIBIT A

COMPLAINT
NO. _____
Sunday, November 29, 2020

51

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

<div align="center">

**December 5th, 2020**
**Prayer and Protest**
**Joseph Gibson**
*Please remember to maintain 6 feet of distance during the prayer*

</div>

## Introductory Prayer to be read by all:

In the name of the Father, and of the Son, and of the Holy Spirit. Amen.
Christ, our Savior and our King, renew in us allegiance to Your Kingship.
We pray for the grace to place You above the powers of this world in all things.
We pray for the grace to obey You before any civic authority.
We pray that you, God, will intercede in the hearts the officers of the Vancouver Police Department, and City Attorney's Office, such that the officers will have the wisdom, courage, and fortitude to honor their oaths to uphold the Constitution and will refuse to enforce unconstitutional restrictions imposed by gubernatorial proclamations.
We pray for the grace to fervently bring about Your Kingdom in our families and community.
We pray that You will reign in our minds.  We pray that You will reign in our hearts. O Prince of Peace, may Your reign be complete in our lives and in the life of the world.
Amen.

## James 1:22-25 to be read by Joseph Gibson:

> But be doers of the word, and not hearers only, deceiving yourselves.  For if any one is a hearer of the word and not a doer, he is like a man who observes his natural face in a mirror; for he observes himself and goes away and at once forgets what he was like.  But he who looks into the perfect law, the law of liberty, and perseveres, being no hearer that forgets but a doer that acts, he shall be blessed in his doing.

## Joseph Gibson Speaks on Liberty for 5 minutes:

Mr. Gibson will preach for five minutes on the importance of bringing Jesus Christ back to the center of America's cultural and political institutions, and the importance of peaceful and civil disobedience to unconstitutional orders that restrict religious liberty.

## Concluding song to be read by all:

If tomorrow all the things were gone I'd worked for all my life
And I had to start again with just my children and my wife
I'd thank my lucky stars to be living here today
'Cause the flag still stands for freedom and they can't take that away
And I'm proud to be an American, where at least I know I'm free
And I won't forget the men who died, who gave that right to me
And I'd gladly stand up next to you and defend her still today
'Cause there ain't no doubt I love this land! God bless the U.S.A.
From the lakes of Minnesota, to the hills of Tennessee
Across the plains of Texas, from sea to shining sea
From Detroit down to Houston and New York to LA
Well, there's pride in every American heart
And it's time we stand and say:
I'm proud to be an American where at least I know I'm free
And I won't forget the men who died, who gave that right to me
And I'd gladly stand up next to you and defend her still today
'Cause there ain't no doubt I love this land! God bless the U.S.A.
And I'm proud to be an American where at least I know I'm free
And I won't forget the men who died, who gave that right to me
And I'd gladly stand up... next to you and defend her still today
'Cause there ain't no doubt I love this land! God bless the U.S.A.

END

# EXHIBIT B

COMPLAINT
NO. _____
Sunday, November 29, 2020

52

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**



**STATE OF WASHINGTON**

OFFICE OF THE GOVERNOR

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATION 20-05**

**20-25**

**STAY HOME – STAY HEALTHY**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS**, as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06, 20-07, 20-08, 20-09, 20-10, 20-11, 20-12, 20-13, 20-14, 20-15, 20-16, 20-17, 20-18, 20-19, 20-20, 20-21, 20-22, 20-23, and 20-24, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS**, the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State, significantly increasing the threat of serious associated health risks statewide; and

**WHEREAS**, there are currently at least 2,221 cases of COVID-19 in Washington State and, tragically, 110 deaths of Washingtonians associated with COVID-19; and

**WHEREAS**, models predict that many hospitals in Washington State will reach capacity or become overwhelmed with COVID-19 patients within the next several weeks unless we substantially slow down the spread of COVID-19 throughout the state; and

**WHEREAS**, hospitalizations for COVID-19 like illnesses are significantly elevated in all adults, and a sharply increasing trend in COVID-19 like illness hospitalizations has been observed for the past three (3) weeks; and

**WHEREAS**, the worldwide COVID-19 pandemic and its progression in Washington State continues to threaten the life and health of our people as well as the economy of Washington State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim: that a State of Emergency continues to exist in all counties of Washington State; that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended; and that Proclamations 20-05, 20-07, 20-11, 20-13, and 20-14 are amended and superseded by this Proclamation to impose a Stay Home – Stay Healthy Order throughout Washington State by prohibiting all people in Washington State from leaving their homes or participating in social, spiritual and recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations provided herein.

I again direct that the plans and procedures of the Washington State Comprehensive Emergency Management Plan be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the Washington State Comprehensive Emergency Management Plan and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

**FURTHERMORE,** based on the above situation and under the provisions of RCW 43.06.220(1)(h), to help preserve and maintain life, health, property or the public peace, and to implement the Stay Home—Stay Healthy Order described above, I hereby impose the following necessary restrictions on participation by all people in Washington State by prohibiting each of the following activities by all people and businesses throughout

Washington State, which prohibitions shall remain in effect until midnight on April 6, 2020, unless extended beyond that date:

1. **All people in Washington State shall immediately cease leaving their home or place of residence except: (1) to conduct or participate in essential activities, and/or (2) for employment in essential business services.** This prohibition shall remain in effect until midnight on April 6, 2020, unless extended beyond that date.

   **To implement this mandate, I hereby order** that all people in Washington State are immediately prohibited from leaving their home or place of residence except to conduct or participate in (1) essential activities, and/or (2) employment in providing essential business services:

   a. **Essential activities** permitted under this Proclamation are limited to the following:
      1) **Obtaining necessary supplies and services** for family or household members and pets, such as groceries, food and supplies for household consumption and use, supplies and equipment needed to work from home, and products necessary to maintain safety, sanitation and essential maintenance of the home or residence.
      2) **Engaging in activities essential for the health and safety** of family, household members and pets, including things such as seeking medical or behavioral health or emergency services and obtaining medical supplies or medication.
      3) **Caring for** a family member, friend, or pet in another household or residence, and to transport a family member, friend or their pet for essential health and safety activities, and to obtain necessary supplies and services.
      4) **Engaging in outdoor exercise activities**, such as walking, hiking, running or biking, but only if appropriate social distancing practices are used.

   b. **Employment in essential business services** means an essential employee performing work for an essential business as identified in the "Essential Critical Infrastructure Workers" list, or carrying out minimum basic operations (as defined in Section 3(d) of this Order) for a non-essential business.

   c. **This prohibition shall not apply to** individuals whose homes or residences are unsafe or become unsafe, such as victims of domestic violence. These individuals are permitted and urged to leave their homes or residences and stay at a safe alternate location.

   d. **This prohibition also shall not apply to** individuals experiencing homelessness, but they are urged to obtain shelter, and governmental and other entities are strongly encouraged to make such shelter available as soon as possible and to the maximum extent practicable.

e. For purposes of this Proclamation, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **All people in Washington State shall immediately cease participating in all public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved, except as specifically identified herein.** Such activity includes, but is not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities. This prohibition also applies to planned wedding and funeral events.  This prohibition shall remain in effect until midnight on April 6, 2020, unless extended beyond that date.

    **To implement this mandate, I hereby order** that all people in Washington State are immediately prohibited from participating in public and private gatherings of any number of people for social, spiritual and recreational purposes. **This prohibition shall not apply to** activities and gatherings solely including those people who are part of a single household or residential living unit.

3. **Effective midnight on March 25, 2020, all non-essential businesses in Washington State shall cease operations except for performing basic minimum operations. All essential businesses are encouraged to remain open and maintain operations, but must establish and implement social distancing and sanitation measures established by the United States Department of Labor or the Washington State Department of Health Guidelines.** This prohibition shall remain in effect until midnight on April 8, 2020, unless extended beyond that date.

    **To implement this mandate, I hereby order** that, effective midnight on March 25, 2020, all non-essential businesses in Washington State are prohibited from conducting all activities and operations except minimum basic operations.

    a. **Non-essential businesses** are strongly encouraged to immediately cease operations other than performance of basic minimum operations, but must do so no later than midnight on March 25, 2020.
    b. **Essential businesses** are prohibited from operating under this Proclamation unless they establish and implement social distancing and sanitation measures established by the United States Department of Labor's Guidance on Preparing Workplaces for COVID-19 at https://www.osha.gov/Publications/OSHA3990.pdf and the Washington State Department of Health Workplace and Employer Resources & Recommendations at https://www.doh.wa.gov/Coronavirus/workplace.
    c. **This prohibition does not apply to** businesses consisting exclusively of employees or contractors performing business activities at their home or residence, and who do not engage in in-person contact with clients.

d.  For purposes of this Proclamation, minimum basic operations are the minimum activities necessary to maintain the value of the business' inventory, preserve the condition of the business' physical plant and equipment, ensure security, process payroll and employee benefits, facilitate employees of the business being able to continue to work remotely from their residences, and related functions.

This Proclamation shall not be construed to prohibit working from home, operating a single owner business with no in-person, on-site public interaction, or restaurants and food services providing delivery or take-away services, so long as proper social distancing and sanitation measures are established and implemented.

No business pass or credentialing program applies to any activities or operations under this Proclamation.

Violators of this of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 23rd day of March, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State

# EXHIBIT C

COMPLAINT
NO. _____
Sunday, November 29, 2020

53

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

On March 23, 2020, Governor Inslee issued Proclamation directing all residents immediately to heed current State public health directives to stay home, except as needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as the State Public Health Officer may designate as critical to protect health and well-being of all Washingtonians.

In accordance with this Proclamation, the Governor has designated the following list of "Essential Critical Infrastructure Workers" to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security.

# HEALTHCARE / PUBLIC HEALTH

**Sector Profile**

The Healthcare and Public Health (HPH) Sector is large, diverse, and open, spanning both the public and private sectors. It includes publicly accessible healthcare facilities, research centers, suppliers, manufacturers, and other physical assets and vast, complex public-private information technology systems required for care delivery and to support the rapid, secure transmission and storage of large amounts of HPH data.

**Essential Workforce**

- Workers providing COVID-19 testing and workers that perform critical clinical research and development needed for COVID-19 response.
- Health care providers and caregivers (e.g., physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, midwives and doulas attending facility-based or home-based births, alternative healthcare providers, social workers, speech pathologists and diagnostic and therapeutic technicians and technologists).
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.).
- Workers in other medical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric, Residential, Rural Health Clinics and Federally Qualified Health Centers, biotechnology therapies, consumer health products, cannabis retailers).
- Manufacturers, technicians, logistics and warehouse operators, and distributors of medical equipment, medical devices, diagnostics, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

- Public health / community health workers, including those who compile, model, analyze and communicate public health information.
- Behavioral health workers (including mental and substance use disorder) responsible for coordination, outreach, engagement, and treatment to individuals in need of mental health and/or substance use disorder services.
- Blood and plasma donors and the employees of the organizations that operate and manage related activities.
- Workers that manage health plans, billing, and health information, who cannot practically work remotely.
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely.
- Workers who provide support to vulnerable populations to ensure their health and well-being including family care providers
- Workers performing cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely.
- Workers conducting research critical to COVID-19 response.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters.
- Pharmacy employees necessary for filling prescriptions.
- Workers performing mortuary services, including funeral homes, crematoriums, and cemetery workers.
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to behavioral health services to the family members, responders, and survivors of an incident.
- Workers supporting veterinary hospitals and clinics

# EMERGENCY SERVICES SECTOR

### Sector Profile

The Emergency Services Sector (ESS) is a community of highly-skilled, trained personnel, along with the physical and cyber resources, that provide a wide range of prevention, preparedness, response, and recovery services during both day-to-day operations and incident response. The ESS includes geographically distributed facilities and equipment in both paid and volunteer capacities organized primarily at the federal, state, local, tribal, and territorial levels of government, such as city police departments and fire stations, county sheriff's offices, Department of Defense police and fire departments, and town public works departments. The ESS also includes private sector resources, such as industrial fire departments, private security organizations, and private emergency medical services providers.

2

**Essential Workforce - Law Enforcement, Public Safety and First Responders**

- Including front line and management, personnel include emergency management, law enforcement, Emergency Management Systems, fire, and corrections, search and rescue, tactical teams including maritime, aviation, and canine units.
- Military personnel, including National Guard personnel and Coast Guard personnel
- Emergency Medical Technicians
- Public Safety Answering Points and 911 call center employees
- Fusion Center employees
- Fire Mitigation Activities
- Hazardous material responders and hazardous devices teams, from government and the private sector.
- Workers – including contracted vendors -- who maintain digital systems infrastructure supporting law enforcement and emergency service operations.
- Private security, private fire departments, and private emergency medical services personnel.
- Protective services workers responsible for mission critical functions in state institutions, programs, and community facilities, including homeless shelters.

**Essential Workforce - Public Works**

- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees
- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences.
- Support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications. Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste.

# FOOD AND AGRICULTURE

### Sector Profile

The Food and Agricultural (FA) Sector is composed of complex production, processing, and delivery systems and has the capacity to feed people and animals both within and beyond the boundaries of the United States. Beyond domestic food production, the FA Sector also imports many ingredients and finished products, leading to a complex web of growers, processors, suppliers, transporters, distributors, and consumers. This sectors is critical to maintaining and securing our food supply.

3

**Essential Workforce**

- Workers supporting groceries, pharmacies, and other retail that sells food and beverage products, including but not limited to Grocery stores, Corner stores and convenience stores, including liquor stores that sell food, Farmers' markets, Food banks, Farm and produce stands, Supermarkets, Similar food retail establishments, Big box stores that sell groceries and essentials.
- Restaurant carry-out and quick serve food operations – including food preparation, carry-out and delivery food employees
- Food manufacturer employees and their supplier employees—to include those employed in food processing (packers, meat processing, cheese plants, milk plants, produce, etc.) facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; shellfish facilities including hatcheries and nurseries and growing areas; brewery and wine-making facilities; coffee production facilities; artisan food production; and the production of food packaging
- Farm workers to include those employed in animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically
- Farm workers and support service workers to include those who field crops; commodity inspection; fuel ethanol facilities; storage facilities; and other agricultural inputs
- Employees and firms supporting food, feed, and beverage distribution (including curbside distribution and deliveries), including warehouse workers, vendor-managed inventory controllers, blockchain managers, distribution
- Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail
- Company cafeterias - in-plant cafeterias used to feed employees
- Workers in food testing labs in private industries and in institutions of higher education
- Workers essential for assistance programs and government payments
- Workers supporting cannabis retail and dietary supplement retail
- Employees of companies engaged in the production of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids
- Animal agriculture workers to include those employed in veterinary health; manufacturing and distribution of animal medical materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, etc.; transportation of live animals, animal medical materials; transportation of deceased animals for disposal; raising of animals for food; animal production operations; slaughter and packing plants and associated regulatory and government workforce
- Workers who support the manufacture and distribution of forest products, including, but not limited to timber, paper, and other wood products
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution

# ENERGY

**Sector Profile**

The Energy Sector consists of widely-diverse and geographically-dispersed critical assets and systems that are often interdependent of one another. This critical infrastructure is divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power, except for hydroelectric and commercial nuclear power facilities and pipelines. The Energy Sector supplies fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the Nation. In turn, it depends on the Nation's transportation, information technology, communications, finance, water, and government infrastructures.

**Essential Workforce - Electricity industry:**

- Workers who maintain, ensure, or restore the generation, transmission, and distribution of electric power, including call centers, utility workers, reliability engineers and fleet maintenance technicians
- Workers needed for hydroelectric, biofuels, biogas, geothermal energy, wind, biomass, solar and coal energy generation.
- Workers who maintain emergency management, risk management, safety and security, and business continuity at all energy generation, transmission, distribution, delivery, production, processing or refining facilities that provide critical community services to Washington state.
- Workers needed for safe and secure operations at nuclear generation
- Workers at generation, transmission, and electric blackstart facilities
- Workers at Reliability Coordinator (RC), Balancing Authorities (BA), and primary and backup Control Centers (CC), including but not limited to independent system operators, regional transmission organizations, and balancing authorities
- Mutual assistance personnel
- IT and OT technology staff – for Energy Management System and Supervisory Control and Data
- Acquisition (SCADA) systems, and utility data centers; Cybersecurity engineers; cybersecurity risk management
- Vegetation management crews and traffic workers who support
- Environmental remediation/monitoring technicians
- Instrumentation, protection, and control technicians

**Essential Workforce - Petroleum workers:**

- Petroleum product storage, pipeline, marine transport, terminals, rail transport, road transport
- Crude oil storage facilities, pipeline, and marine transport
- Petroleum refinery facilities
- Petroleum security operations center employees and workers who support emergency response services
- Petroleum operations control rooms/centers

- Petroleum drilling, extraction, production, processing, refining, terminal operations, transporting, and retail for use as end-use fuels or feedstocks for chemical manufacturing
- Onshore and offshore operations for maintenance and emergency response
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.

**Essential Workforce - Natural and propane gas workers:**

- Natural gas transmission and distribution pipelines, including compressor stations
- Underground storage of natural gas
- Natural gas processing plants, and those that deal with natural gas liquids
- Liquefied Natural Gas (LNG) facilities
- Natural gas security operations center, natural gas operations dispatch and control rooms/centers natural gas emergency response and customer emergencies, including natural gas leak calls
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation
- Propane gas dispatch and control rooms and emergency response and customer emergencies, including propane leak calls
- Propane gas service maintenance and restoration, including call centers
- Processing, refining, and transporting natural liquids, including propane gas, for use as end-use fuels or feedstocks for chemical manufacturing
- Propane gas storage, transmission, and distribution centers

# WATER AND WASTEWATER

**Sector Profile**

The Water and Wastewater Sector is a complex sector composed of drinking water and wastewater infrastructure of varying sizes and ownership types. Multiple governing authorities pertaining to the Water and Wastewater Sector provide for public health, environmental protection, and security measures, among others.

**Essential Workforce**

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities
- Operational staff at community water systems
- Operational staff at wastewater treatment facilities
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring
- Operational staff for water distribution and testing

- Operational staff at wastewater collection facilities
- Operational staff and technical support for SCADA Control systems
- Chemical disinfectant suppliers for wastewater and personnel protection
- Workers that maintain digital systems infrastructure supporting water and wastewater operations

# TRANSPORTATION AND LOGISTICS

**Sector Profile**

The Transportation Systems Sector consists of seven key subsectors, or modes:

- Aviation includes aircraft, air traffic control systems, and airports, heliports, and landing strips. Commercial aviation services at civil and joint-use military airports, heliports, and sea plane bases. In addition, the aviation mode includes commercial and recreational aircraft (manned and unmanned) and a wide-variety of support services, such as aircraft repair stations, fueling facilities, navigation aids, and flight schools.

- Highway and Motor Carrier encompasses roadway, bridges, and tunnels. Vehicles include trucks, including those carrying hazardous materials; other commercial vehicles, including commercial motorcoaches and school buses; vehicle and driver licensing systems; taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies; traffic management systems; AND cyber systems used for operational management.

- Maritime Transportation System consists of ferries, coastline, ports, pilotage, waterways, and intermodal landside connections that allow the various modes of transportation to move people and goods to, from, and on the water.

- Mass Transit and Passenger Rail includes terminals, operational systems, and supporting infrastructure for passenger services by transit buses, trolleybuses, monorail, heavy rail—also known as subways or metros—light rail, passenger rail, and vanpool/rideshare.

- Pipeline Systems consist of pipelines carrying natural gas hazardous liquids, as well as various chemicals. Above-ground assets, such as compressor stations and pumping stations, are also included.

- Freight Rail consists of major carriers, smaller railroads, active railroad, freight cars, and locomotives.

- Postal and Shipping includes large integrated carriers, regional and local courier services, mail services, mail management firms, and chartered and delivery services.

**Essential Workforce**

- Employees supporting or enabling transportation functions, including dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, workers engaged in snow removal and avalanche control for state highways, and workers that maintain and inspect infrastructure (including those that require cross-border travel)
- Employees of firms providing services that enable logistics operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
- Mass transit workers
- Ferry workers
- Taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies
- Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment
- Maritime transportation workers - port workers, pilots, longshoremen, mariners, equipment operators, ship and vessel operators, crane operators, and shipyard foremen/women, marina workers.
- Truck drivers who haul hazardous and waste materials to support critical infrastructure, capabilities, functions, and services
- Automotive, motorcycle, bicycle and motorized wheelchair/scooter repair and maintenance facilities
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations
- Postal and shipping workers, to include private companies
- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers
- Air transportation employees, including air traffic controllers, ramp personnel, aviation security, and aviation management
- Workers who support the maintenance and operation of cargo by air transportation, including flight crews, maintenance, airport operations, and other on- and off- airport facilities workers

# COMMUNICATIONS AND INFORMATION TECHNOLOGY

## Sector Profile

The Communications Sector provides products and services that support the efficient operation of today's global information-based society. Communication networks enable people around the world to contact one another, access information instantly, and communicate from remote areas. This involves creating a link between a sender (including voice signals) and one or more recipients using technology (e.g., a telephone system or the Internet) to transmit information from one location to another. Technologies are changing at a rapid pace, increasing the number of products, services, service providers, and communication options. The national communications architecture is a complex collection of networks that are owned and operated by individual service providers. Many of this

sector's products and services are foundational or necessary for the operations and services provided by other critical infrastructure sectors. The nature of communication networks involve both physical infrastructure (buildings, switches, towers, antennas, etc.) and cyber infrastructure (routing and switching software, operational support systems, user applications, etc.), representing a holistic challenge to address the entire physical-cyber infrastructure.

The IT Sector provides products and services that support the efficient operation of today's global information-based society and are integral to the operations and services provided by other critical infrastructure Sectors. The IT Sector is comprised of small and medium businesses, as well as large multinational companies. Unlike many critical infrastructure Sectors composed of finite and easily identifiable physical assets, the IT Sector is a functions-based Sector that comprises not only physical assets but also virtual systems and networks that enable key capabilities and services in both the public and private sectors.

**Essential Workforce - Communications:**

- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, undersea cable landing stations, Internet Exchange Points, and manufacturers and distributors of communications equipment
- Workers who support radio, television, newspapers and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering and reporting, and workers involved in the printing and distribution of newspapers.
- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and/or technicians to manage the network or operate facilities
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables
- Installation, maintenance and repair technicians that establish, support or repair service as needed
- Central office personnel to maintain and operate central office, data centers, and other network office facilities
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, and troubleshooting
- Dispatchers involved with service repair and restoration

**Essential Workforce - Information Technology:**

- Workers who support command centers, including, but not limited to Network Operations Command Center, Broadcast Operations Control Center and Security Operations Command Center
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers, data transfer solutions engineers, software and hardware engineers, and database administrators
- Client service centers, field engineers, and other technicians supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, and

information technology equipment (to include microelectronics and semiconductors) for critical infrastructure
- Workers responding to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, and other critical infrastructure categories and personnel
- Workers supporting the provision of essential global, national and local infrastructure for computing services (incl. cloud computing services), business infrastructure, web-based services, and critical manufacturing
- Workers supporting communications systems and information technology used by law enforcement, public safety, medical, energy and other critical industries
- Support required for continuity of services, including janitorial/cleaning personnel

# OTHER COMMUNITY-BASED GOVERNMENT OPERATIONS AND ESSENTIAL FUNCTIONS

**Essential Workforce**

- Critical government workers, including the Governor's Office, as defined by the employer and consistent with Continuity of Operations Plans and Continuity of Government plans.
- State and county workers responsible for determining eligibility for safety net benefits
- Workers responsible for facilitating return to work resources.
- The Courts, consistent with direction from the Washington State Chief Justice
- Workers to ensure continuity of building functions
- Security staff to maintain building access control and physical security measures
- Elections personnel
- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
- Trade Officials (FTA negotiators; international data flow administrators)
- Weather forecasters
- Workers that maintain digital systems infrastructure supporting other critical government operations
- Workers at operations centers necessary to maintain other essential functions
- Workers who support necessary credentialing, vetting and licensing operations for transportation workers
- Workers who are critical to facilitating trade in support of the national, state, and local emergency response supply chain
- Workers supporting public and private childcare establishments, licensed pre-K establishments, K-12 schools, colleges, and universities for purposes of distance learning, or the provision of school meals, or child care for the children of essential workers across all sectors and for uniquely vulnerable children.

- Hotel workers.
- Construction workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects (including housing construction) for all essential facilities, services and projects included in this document, and for residential construction related to emergency repairs and projects that ensure structural integrity.
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of construction sites and construction projects (including those that support such projects to ensure the availability of needed facilities, transportation, energy and communications; and support to ensure the effective removal, storage, and disposal of solid waste and hazardous waste)
- Commercial Retail Stores, that supply essential sectors, including convenience stores, pet supply stores, auto supplies and repair, hardware and home improvement, garden stores and nurseries that support food cultivation and production, office supply stores that support working-from home, and home appliance retailers
- Workers providing care to animals in zoos, aquariums, wildlife parks, nature preserves and game farms.
- Workers critical to operating Rental Car companies that facilitate continuity of operations for essential workforces, and other essential travel
- Workers who provide or determine eligibility for food, shelter, in-home supportive services, child welfare, adult protective services and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including family members and individuals experiencing homelessness)
- Professional services, such as legal or accounting  and tax preparation services, when necessary to assist in compliance with legally mandated activities and critical sector services
- Artists and musicians providing services through streaming or other technology
- Unions and worker advocacy organizations
- Workers providing, maintaining and repairing heating, cooling and refrigeration services.
- Professional employer organizations providing payroll benefits, regulatory assistance and HR services.
- Laundromats and laundry services

# CRITICAL MANUFACTURING

## Sector Profile

The Critical Manufacturing Sector identifies several industries to serve as the core of the sector: Primary Metals Manufacturing, Machinery Manufacturing, Electrical Equipment, Appliance, and Component Manufacturing, Transportation Equipment Manufacturing Products made by these manufacturing industries are essential to many other critical infrastructure sectors.

## Essential Workforce

• Workers necessary for the manufacturing of materials and products needed for medical supply chains, transportation, energy, communications, food and agriculture, chemical manufacturing, nuclear facilities, the operation of dams, water and wastewater treatment, emergency services, and the defense industrial base.

# HAZARDOUS MATERIALS

**Essential Workforce**

- Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
- Workers who support hazardous materials response and cleanup
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations

# FINANCIAL SERVICES

**Sector Profile**

The Financial Services Sector includes thousands of depository institutions, providers of investment products, insurance companies, other credit and financing organizations, and the providers of the critical financial utilities and services that support these functions. Financial institutions vary widely in size and presence, ranging from some of the world's largest global companies with thousands of employees and many billions of dollars in assets, to community banks and credit unions with a small number of employees serving individual communities. Whether an individual savings account, financial derivatives, credit extended to a large organization, or investments made to a foreign country, these products allow customers to: Deposit funds and make payments to other parties; Provide credit and liquidity to customers; Invest funds for both long and short periods; Transfer financial risks between customers.

**Essential Workforce**

- Workers who are needed to process and maintain systems for processing financial transactions and services (e.g., payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities)
- Workers who are needed to provide consumer access to banking and lending services, including ATMs, and to move currency and payments (e.g., armored cash carriers)
- Workers who support financial operations, such as those staffing data and security operations centers

# CHEMICAL

**Sector Profile**

The Chemical Sector—composed of a complex, global supply chain—converts various raw materials into diverse products that are essential to modern life. Based on the end product produced, the sector can be divided into five main segments, each of which has distinct characteristics, growth dynamics, markets, new developments, and issues: Basic chemicals; Specialty chemicals; Agricultural chemicals; Pharmaceuticals; Consumer products

**Essential Workforce**

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, and packaging that prevents the contamination of food, water, medicine, among others essential products
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing

# DEFENSE INDUSTRIAL BASE

**Sector Profile**

The Defense Industrial Base Sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance of military weapons systems, subsystems, and components or parts, to meet U.S. military requirements. The Defense Industrial Base partnership consists of Department of Defense components, Defense Industrial Base companies and their subcontractors who perform under contract to the Department of Defense, companies providing incidental materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities. Defense Industrial Base companies include domestic and foreign entities, with production assets located in many countries. The sector provides products and services that are essential to mobilize, deploy, and sustain military operations.

March 23, 2020
Proclamation 20-25
Appendix

**Essential Workforce**

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals, include but are not limited to, aerospace; mechanical and software engineers, manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers
- Personnel working for companies, and their subcontractors, who perform under contract to the Department of Defense providing materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities

To clarify status, or to petition to be added to this list, please email: business@mil.wa.gov.

14

# EXHIBIT D

COMPLAINT
NO. _____
Sunday, November 29, 2020

54

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**
## OFFICE OF THE GOVERNOR
*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR
AMENDING PROCLAMATIONS 20-05 AND 20-25**

**20-25.1
EXTENDING STAY HOME – STAY HEALTHY
TO MAY 4, 2020**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington state as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06, 20-07, 20-08, 20-09, 20-10, 20-11, 20-12, 20-13, 20-14, 20-15, 20-16, 20-17, 20-18, 20-19, 20-20, 20-21, 20-22, 20-23, 20-24, 20-25, 20-26, 20-27, 20-28, 20-29, 20-30, 20-31, 20-32, 20-33, 20-34, 20-35, 20-36, 20-37, 20-38, and 20-39, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamation 20-25, Stay Home – Stay Healthy, prohibiting all people in Washington State from leaving their homes or participating in social, spiritual and recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations therein; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and is a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS,** since Proclamation 20-25 was issued on March 23, the number of confirmed cases and deaths in Washington State has more than doubled, and there are currently at least 5,984 cases of COVID-19 in Washington State with 247 associated deaths; and, furthermore, models predict that many hospitals in Washington State will reach capacity or become overwhelmed with COVID-19 patients within the next few weeks unless we significantly slow its spread throughout the state; and

**WHEREAS,** hospitalizations for COVID-like illnesses have been sharply increasing for the past month, and a large surge in the number of serious COVID-19 infections will compromise the ability of our health care system to deliver necessary health care services; and

**WHEREAS,** these conditions necessitate that to protect the health and safety of all Washingtonians, the stringent restrictions imposed on the people of Washington State in Proclamation 20-25 must be continued until May 4, 2020; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continues to threaten the life and health of our people as well as the economy of Washington State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamation 20-25 (Stay Home – Stay Healthy) is amended to extend all of its provisions and each expiration date therein to 11:59 PM on May 4, 2020. All other provisions of Proclamation 20-25 shall remain in full force and effect.

I again direct that the plans and procedures of the Washington State Comprehensive Emergency Management Plan be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the Washington State Comprehensive Emergency Management Plan and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are again reminded that no business pass or credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 2nd day of April, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

# EXHIBIT E

COMPLAINT
NO. _____
Sunday, November 29, 2020

55

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05, 20-25 AND 20-25.1**

**20-25.2**

**ADJUSTING**
**STAY HOME – STAY HEALTHY**
**TO MAY 4, 2020**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-52, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamation 20-25,and 20-25.1 (Stay Home – Stay Healthy), prohibiting all people in Washington State from leaving their homes or participating in gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations therein; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and is a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS,** while there are currently at least 13,521 cases of COVID-19 in Washington State with 749 associated deaths, current models predict that we have started to slow its spread throughout the State; and

**WHEREAS,** Washington State is known for a high level of outdoor recreation on its many trails, parks, lakes, beaches and other outdoor recreational areas, and outdoor recreation is a fundamental part of maintaining physical, emotional and mental health, particularly in a time of great stress;

**WHEREAS,** these conditions now permit adjustment of some of the prohibitions in Proclamation 20-25 and 20-25.1 to allow for some recreational activities and related employment, while continuing to protect the health and safety of all Washingtonians by retaining the remainder of the prohibitions imposed in Proclamations 20-25 and 20-25.1; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continues to threaten the life and health of our people as well as the economy of Washington State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under RCW 38.08, 38.52 and 43.06, do hereby proclaim and order that a State of Emergency continues to exist in all counties of the state, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25 and 20-25.1 (Stay Home – Stay Healthy) are amended to extend all of their provisions, except those specifically listed below and as specifically allowed in the requirements available here, and each expiration date therein, to May 4, 2020:

As of April 27, 2020, in order to prepare for re-opening on May 5, 2020, all employees necessary to operate and maintain day-use activity and trails, including those in state parks and state public lands, state hunting and fishing operations, golf operations, and day-use activities and trails in other public parks and public lands are authorized to return to work; and

As of May 5, 2020, the following outdoor recreational activities, when and where permitted, are authorized to commence so long as participants fully comply with the social distancing and coronavirus related hygiene requirements found here, such as:

- Recreational hunting, fishing, and boating
- Outdoor exercise, including hiking, running, walking and biking
- Golfing
- Day-use activities at public parks and public lands

All other provisions of Proclamation 20-25 and 20-25.1 shall remain in full force and effect.

**ADDITIONALLY,** except as exempted above, I continue to prohibit all other public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved. Such activity includes, but is not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; team sports activities, and similar activities that involve a gathering of people other than a household unit. This prohibition continues to apply to planned wedding and funeral events.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of the Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

Violators of this of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and coronavirus hygiene practices while engaging in outdoor recreation, or if the numbers of COVID-19 cases increase, I may be forced to reinstate the prohibition of recreational activities.

Signed and sealed with the official seal of the state of Washington on this 27th day of April, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State

# EXHIBIT F

COMPLAINT
NO. _____
Sunday, November 29, 2020

56

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05, 20-25, 20-25.1, and 20-25.2**

**20-25.3**

**ADJUSTING AND EXTENDING**
**STAY HOME – STAY HEALTHY**
**TO MAY 31, 2020**

**Safe Start Washington:  Phase I – Re-Opening Washington**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-52, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamations 20-25, 20-25.1, and 20-25.2 (Stay Home – Stay Healthy), prohibiting all people in Washington State from leaving their homes or participating in social, spiritual or recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations therein; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS**, when I last amended the Stay Home – Stay Healthy order (Proclamation 20-25.2) on April 27, 2020, there were 13,521 cases of COVID-19 in Washington State with 749 deaths; and, just five days later, through May 2, 2020, the Department of Health confirmed another 1,664 cases and 85 more deaths, for a total of 15,185 cases with 834 associated deaths, demonstrating the ongoing, present threat of this lethal disease; and

**WHEREAS,** while there continues to be a significant number of cases of COVID-19 in Washington State with associated deaths, the data and epidemiological models predict that we have passed the peak of the virus' progression in the state; and, the health experts credit this decline to the mandatory social distancing practices and prohibitions we have put in place; and

**WHEREAS,** the health professionals and epidemiological modeling experts predict that we have passed the peak of the progression in the state, and the data suggests it is appropriate to continue a careful, phased, and science-based approach to slowly re-opening Washington State. In addition, modelers agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases; and

**WHEREAS,** this unprecedented health crisis has caused extraordinary anxiety and a significant disruption of routine and important activities for every Washingtonian; and I recognize the extraordinary resiliency, strength, adaptability, and courage of every Washingtonian during this difficult time; and

**WHEREAS,** many people in Washington State attend religious services on a regular basis. Such services are a vital part of the spiritual and mental health of our community, and some of these services can be conducted in a manner similar to comparable secular activities to prevent prolonged exposure to individuals outside of their immediate household while ensuring safe social distancing and hygiene practices. And, to help inform future lifting of additional restrictions in phases, I have directed my staff to engage with a broad range of religious leaders beginning as soon as this week; and

**WHEREAS,** the science also suggests that some business activities can be conducted with limited exposure to customers while ensuring safe social distancing and hygiene practices. These business activities include landscaping, pet walking, car washing, vehicle and vessel sales, and retail limited to curb-side pickup, all of which are important to revitalizing Washington State's economy, restoring jobs and providing necessary goods and services; and

**WHEREAS,** counties in Washington State with lower population density generally are experiencing a lower transitory population which decreases the risk of virus spread and, under appropriate conditions, are able to control and absorb virus outbreaks within the capacity of existing local and regional health care systems without significant increased risk of being overwhelmed; and

**WHEREAS,** the Washington State Department of Health's data demonstrates that some less-populated counties with fewer than 75,000 residents have not identified a new COVID-19 case for the last three consecutive weeks, and this data supports providing those counties with an opportunity to lift additional restrictions, subject to certain conditions and requirements, an opportunity that is not yet safe to offer to other counties; and

**WHEREAS,** based on the science and data, current COVID-19 pandemic conditions now permit further adjustment of the prohibitions in Proclamations 20-25, 20-25.1 and 20-25.2 to allow for resumption of some religious services and certain business activities, and the opportunity for less densely populated counties that have not identified a resident with COVID-19 in the last three weeks to seek additional exceptions to these prohibitions under certain limited circumstances, while retaining the remainder of the restrictions imposed in Proclamations 20-25, 20-25.1 and 20-25.2 to protect the health and safety of all Washingtonians; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, 20-25.1 and 20-25.2 (Stay Home – Stay Healthy) are amended to extend all of the prohibitions and each expiration date therein to May 31, 2020, except for those prohibitions regarding the specific activities listed below. All other provisions of Proclamations 20-25, 20-25.1, 20-25.2 shall remain in full force and effect.

**FURTHERMORE,** in collaboration with the Washington State Department of Health, and based on analysis of the data and epidemiological modeling, I have established a phased-in approach to re-opening Washington State, which can be found in the Safe Start Washington re-opening plan here; and, while all counties are currently in Phase I, counties with a population of less than 75,000 that have not identified a resident with COVID-19 the three most recent consecutive weeks, may request an exemption from specific aspects of the remaining prohibitions of this Proclamation by submitting a variance application to the Secretary of the Washington State Department of Health in compliance with the requirements found in the Safe Start Washington re-opening plan.

**FURTHERMORE**, while I continue to permit remote spiritual and religious services, and while I continue to classify religious counseling as an essential activity that may be conducted in person if it is not possible to provide those counseling services remotely, I now hereby order that religious services may also be provided as a drive-in service, with one household per vehicle, but only so long as participants fully comply with requirements that will be issued as soon as possible, but no later than May 15, 2020, and with the social distancing requirements and coronavirus related hygiene recommended by the Washington State Department of Health.

**FURTHERMORE,** I continue to permit the low-risk activities previously permitted, including some outdoor recreation as reflected in Emergency Proclamation 20-25.2 and its accompanying guidance materials issued April 27, 2020, as well as the business activities reflected or clarified in formal guidance documents issued on March 25, 2020 (construction), March 27, 2020 (real estate and mortgage), March 31, 2020 (general guidance) and April 29, 2020 (construction).

**FURTHERMORE**, I hereby order that the data and science supports re-opening additional low-risk activities during Phase I, including the business activities listed below. Re-opening these low-risk activities may occur when participants are able to fully comply with the industry-specific requirements that will be issued as soon as possible but no later than May 15, 2020, which, at a minimum, will require compliance with the social distancing and hygiene requirements indicated by the Washington State Department of Health:

- Landscaping and lawn care
- Vehicle and vessel sales
- Pet walking
- Retail (curb-side pick-up orders only)
- Car washes

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust the Safe Start Washington re-opening plan accordingly.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military

Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are again reminded that no credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing while engaging in the phased modifications of the mandatory social distancing requirements, I may be forced to reinstate the prohibitions established in earlier proclamations.

Signed and sealed with the official seal of the state of Washington on this 4th day of May, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State



# Safe Start Washington



## A Phased Approach to Recovery

ISSUED BY THE OFFICE OF THE GOVERNOR | MAY 4, 2020

## Safe Start Washington
### Governor Jay Inslee

Governor Jay Inslee, in collaboration with the Washington State Department of Health, has established a data-driven approach to reopen Washington and modify physical distancing measures while minimizing the health impacts of COVID-19.

This approach reduces the risk of COVID-19 to Washington's most vulnerable populations and preserves capacity in our health care system, while safely opening up businesses and resuming gatherings, travel, shopping, and recreation. The plan involves assessing COVID-19 activity in the state along with health care system readiness, testing capacity and availability, case and contact investigations, and ability to protect high-risk populations.

## COVID-19 DISEASE ACTIVITY

Before reopening Washington and modifying physical distancing measures, COVID-19 disease burden must be low and decreasing as measured by:

- Number and trend of COVID-19 cases, hospitalizations and deaths in Washington State
- Modeling data, including Institute for Disease Modeling on Puget Sound area rates of COVID-19 spread, University of Washington Institute for Health Metrics and Evaluation modeling, and Youyang Gu modeling
- Mobility trends in Washington State, including WSDOT traffic data and Google Mobility Data

## READINESS AND CAPABILITIES NEEDED

The Department of Health and local public health officials will monitor data to assess our state's readiness for safely reopening and modifying physical distancing measures. In addition to a low and decreasing disease burden, readiness must be achieved in four key areas to proceed from where we are now in the "Stay Home, Stay Healthy" order (Phase I) to Phase II, III and IV of the plan. The four key areas include healthcare system readiness, testing capacity and availability, case and contact investigations, and ability to protect high-risk populations. The overall goals for each area, along with the pertinent data that will be considered, are detailed below.

HIGH RISK

LOW RISK

**COVID-19 Disease Activity**



SAFE START WASHINGTON: A PHASED APPROACH TO RECOVERY



**Health Care System Readiness**

LOW RISK — HIGH RISK

## 1. Health Care System Readiness

Adequate bed capacity, staffing and supplies in the health care system to handle a surge in COVID-19 cases, measured by:

- Number and percentage of licensed beds and ICU beds available in hospitals
- Number of available ventilators
- Days of personal protective equipment (PPE) supply available at hospitals, long-term care facilities, and other health care settings
- Ability of the state to fill high priority PPE requests from local emergency management agencies
- Ability of hospitals and other health care facilities to surge and coordinate movement of patients

**Testing Capacity and Availability**

LOW RISK — HIGH RISK

## 2. Testing Capacity and Availability

Ability for everyone with COVID-19 symptoms and those with high-risk exposures to be tested immediately using a polymerase chain reaction (PCR) test and rapidly receive test results as measured by:

- Geographic distribution of testing sites and ability to serve the entire population
- Number and capacity of laboratories in Washington performing COVID-19 testing
- Availability of sufficient swabs, viral transport media, lab reagents, and other materials required for COVID-19 testing
- Number of tests performed per day

**Case and Contact Investigations**

LOW RISK — HIGH RISK

## 3. Case and Contact Investigations

Ability to rapidly isolate those with COVID-19, identify and quarantine their contacts, and provide case management services as measured by:

- Number of investigators trained and working
- Plans for case management
- Availability of isolation and quarantine facilities in local jurisdictions
- Percent of cases investigated within 24 hours of receipt of positive test report
- Percent of contact investigations initiated within 48 hours of receipt of positive test report





**Risk to Vulnerable Populations**

HIGH RISK

LOW RISK

## 4. Ability to Protect High-Risk Populations

Ability to immediately respond to outbreaks in congregate settings, such as long-term care facilities, behavioral health facilities, agricultural worker housing, homeless shelters and correctional facilities, and address the needs of other high-risk populations, including the elderly and the medically frail, measured by:

- Number of outbreaks in long-term care facilities
- Demographic data, including race/ethnicity data, on COVID-19 cases, hospitalizations and deaths
- Ability of local or state strike teams with adequate PPE to respond to an outbreak within 24 hours

## ALL INDIVIDUALS AND BUSINESSES

Until there is an effective vaccine, effective treatment or herd immunity, it is crucial to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery. This includes heightened protections for the health and safety of workers in essential sectors, people living and working in high-risk facilities (e.g., senior care facilities) and all other workers.

All Washingtonians have a responsibility to protect themselves and others. Each phase, while allowing for additional services to open and return to full capacity, is grounded in the following required basic practices:

### Guidance for Individuals

All phases – Individuals should continue to:

- Engage in physical distancing, staying at least six feet away from other people
- Wear cloth face coverings in public places when not eating or drinking (cloth face coverings should not be placed on children younger than 2 years of age, anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the cover without assistance)
- Stay home if sick
- Avoid others who are sick
- Wash hands frequently with soap and water (use hand sanitizer if soap and water are not available)
- Cover coughs and sneezes
- Avoid touching eyes, nose and mouth with unwashed hands
- Disinfect surfaces and objects regularly



## Requirements for All Employers

All phases – Employers are required to:

- Maintain the six-foot physical distancing requirements for employees and patrons. Adopt other prevention measures such as barriers to block sneezes and coughs when physical distancing is not possible for a particular job task.
- Provide services while limiting close interactions with patrons.
- Provide adequate sanitation and personal hygiene for workers, vendors and patrons. Ensure employees have access to hand washing facilities so they can wash their hands frequently with soap and running water.
- Ensure frequent cleaning and disinfection of the business, particularly of high-touch surfaces.
- Identify personal protective equipment (PPE) and cloth facial coverings in accordance with L&I requirements on facial coverings and industry specific COVID-19 standards. Provide the necessary PPE and supplies to employees.
- Identify strategies for addressing ill employees, which should include requiring COVID-19 positive employees to stay at home while infectious, and potentially restricting employees who were directly exposed to the COVID-19 positive employee. Follow CDC cleaning guidelines to deep clean after reports of an employee with suspected or confirmed COVID-19 illness. This may involve the closure of the business until the location can be properly disinfected.
- Educate employees about COVID-19 in a language they best understand. The education should include the signs, symptoms and risk factors associated with COVID-19 and how to prevent its spread.
- On a case-by-case basis, as directed by federal, state and local public health and workplace safety officials, implement other practices appropriate for specific types of businesses, such as screening of employees for illness and exposures upon work entry, requiring non-cash transactions, etc.
- Follow requirements in Governor Inslee's Proclamation 20-46 High-Risk Employees – Workers' Rights.
- Keep a safe and healthy facility in accordance with state and federal law, and comply with COVID-19 worksite-specific safety practices, as outlined in Governor Inslee's "Stay Home, Stay Healthy" Proclamation 20-25, and in accordance with the Washington State Department of Labor & Industries General Coronavirus Prevention Under Stay Home, Stay Healthy Order and the Washington State Department of Health Workplace and Employer Resources & Recommendations.
- Challenge Seattle and the Washington Roundtable have developed a business checklist which is a great starting point for businesses as they prepare for a Safe Start. Our shared goal is to establish clear requirements that everyone can understand and apply — employers, workers and customers.

Businesses are also expected to implement any additional requirements developed specifically for their industry, such as those that have been established for construction.

## PHASED APPROACH TO REOPENING WASHINGTON AND MODIFYING PHYSICAL DISTANCING MEASURES

Phase I of reopening Washington begins on May 5, 2020. When COVID-19 disease burden is low and decreasing and the four above capabilities are met, the Governor will issue an order for the state to move into future phases. The state will stay in every phase for a **minimum of three weeks**. During that time, the Department of Health and the Governor will re-evaluate the above indicators and determine if the state should remain in the current phase, advance to the next phase or return to the previous phase. No phase will last less than three weeks before moving to the next phase, in order to allow one complete disease incubation period plus an additional week to compile complete data and confirm trends.

The following table shows the phased approach for reopening businesses and resuming activities not authorized under Proclamation 20-25. **This phased approach may be adjusted as the pandemic evolves.** The industries listed are not an exclusive or exhaustive list of industries. Businesses listed in each phase of the plan will have industry-specific guidance and safety criteria developed to ensure workplace safety and public health are maintained. Those business activities are not authorized to open until the industry-specific guidance and safety criteria are issued.

A number of different factors were considered when deciding which activities could be resumed and which businesses could be reopened in various phases. These factors included:

- Risk of disease spread during the individual or business activity
- Number of people who could potentially be infected during the individual or business activity
- Economic benefits to opening the business
- Individual benefits to opening the business

Additional plans for a phased approach to restarting health care and educational activities are under development.

Families are adjusting to a new way of life, and we understand the impacts this is having on them. The connection between education, childcare, youth sports, summer programs and extracurricular activities is critical and must be viewed from a holistic lens to ensure equity and high quality of life. As we prepare for what the reopening of school looks like, we will be working closely with the Department of Health, Office of the Superintendent for Public Instruction, Department of Children, Youth and Families, and parents to release plans in the future.

While childcare is currently an essential business activity and a key component to the reopening plan, we know there is more to do. The state will continue efforts to ensure adequate access and affordability for families.

# WASHINGTON'S PHASED APPROACH
Modifying Physical Distancing Measures as we Reopen the State

**INDIVIDUALS AND BUSINESSES SHOULD FOLLOW ALL REQUIREMENTS LISTED ABOVE DURING ALL PHASES**

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 |
|---|---|---|---|---|
| **High-Risk Populations*** | Continue to Stay Home, Stay Healthy | Continue to Stay Home, Stay Healthy | Continue to Stay Home, Stay Healthy | Resume public interactions, with physical distancing |
| **Recreation** | Some outdoor recreation (hunting, fishing, golf, boating, hiking) | Outdoor recreation involving fewer than 5 people outside your household (camping, beaches, etc.) | - Outdoor group recreational sports activities (5-50 people)<br>- Recreational facilities at <50% capacity (gyms, public pools, etc.)<br>- Professional sports without audience participation (horseracing, baseball, etc.) | Resume all recreational activity |
| **Gatherings** (social, spiritual) | - None<br>- Drive-in spiritual service with one household per vehicle | Gather with no more than 5 people outside your household per week | Allow gatherings with no more than 50 people | Allow gatherings with >50 people |
| **Travel** | Essential travel and limited non-essential travel for Phase I permissible activities | Essential travel and limited non-essential travel for Phase I & II permissible activities | Resume non-essential travel | Continue non-essential travel |
| **Business/ Employers** | - Essential businesses open<br>- Existing construction that meets agreed upon criteria<br>- Landscaping<br>- Auto/RV/Boat/ORV sales<br>- Retail (curb-side pick-up orders only)<br>- Car washes<br>- Pet walkers | - Remaining manufacturing<br>- Additional construction phases<br>- In-home/domestic services (nannies, housecleaning, etc.)<br>- Retail (in-store purchases allowed with restrictions)<br>- Real estate<br>- Professional services/office-based businesses (telework remains strongly encouraged)<br>- Hair and nail salons/barbers<br>- Pet grooming<br>- Restaurants <50% capacity table size no larger than 5 | - Restaurants/taverns <75% capacity/ table size no larger than 10<br>- Bar areas in restaurant/taverns at <25% capacity<br>- Movie theaters at <50% capacity<br>- Customer-facing government services (telework remains strongly encouraged)<br>- Libraries<br>- Museums<br>- All other business activities not yet listed except for nightclubs and events with greater than 50 people | - Nightclubs<br>- Concert venues<br>- Large sporting events<br>- Resume unrestricted staffing of worksites, but continue to practice physical distancing and good hygiene |

\* High-risk populations are currently defined by CDC as: persons 65 years of age and older; people of all ages with underlying medical conditions (particularly not well controlled), including people with chronic lung disease or moderate to severe asthma, people who have serious heart conditions, people who are immunocompromised; people with severe obesity, people with diabetes, people with chronic kidney disease undergoing dialysis, and people with liver disease; people who live in a nursing home or long-term care facility.

SAFE START WASHINGTON: A PHASED APPROACH TO RECOVERY

## COUNTY VARIANCE REQUESTS

The Department of Health recognizes that there are currently some small counties with a population of less than 75,000 that have not identified a resident with COVID-19 for the past three weeks. These counties have the opportunity to apply for a variance to move to Phase II of this plan before the rest of the state. To apply for a variance, the local jurisdiction must follow the below process and submit the following materials to the Department of Health. County variance applications will be approved or denied by the Secretary of Health.

**1. The process must adhere to the following steps:**

    a. The local public health officer must submit a signed recommendation to the local board of health with one of the following recommendations: not request a variance and stay in Phase I, request a variance to include all of the Phase II modifications above, or request a variance to include a subset of Phase II modifications.

    b. The local board of health, if they choose to move forward with a variance request, must vote on such a request.

    c. The local hospital(s) must submit a letter certifying that they have adequate bed capacity to serve their community and adequate PPE supplies to keep their workers safe.

    d. The county commission/council must request to move to Phase II (or a subset of Phase II) of the plan.

**2. The county commissioner must submit a letter requesting a variance, the letter from the local hospital certifying they have adequate bed capacity to serve their community and adequate PPE supplies to keep their workers safe, and a document that includes the following information to the Department of Health:**

    a. Plans to make COVID-19 testing available and accessible to everyone in the county with symptoms consistent with COVID-19.

    b. The number of tests performed by week over the past three weeks.

    c. The number of people trained and ready to perform case investigations and contact tracing.

    d. Plans to house people in isolation or quarantine who do not have a home or wish to isolate or quarantine themselves outside of their home.

    e. Plans to provide case management services to cases and contacts in isolation and quarantine.

    f. Plans to rapidly respond to outbreaks in congregate settings.



**3. Included with this application are documents demonstrating approvals and endorsements for all of the following:**

a. The local public health officers' recommendation to the Board of Health.

b. Documentation of the vote of the Board of Health, including the motion and the vote totals.

c. Letters from all hospitals used by the county certifying their bed capacity for COVID-19 patients and PPE supplies.

d. Documentation of the vote of the county commission, including the vote totals.

In the next two weeks, the Department of Health and Governor Inslee will consider additional criteria which could include cases per capita for allowing other counties to apply for a variance. Local jurisdictions will be allowed to partially implement a phase.

# EXHIBIT G

COMPLAINT
NO. _____
Sunday, November 29, 2020

57

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268





**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR
AMENDING PROCLAMATIONS 20-05, 20-25, 20-25.1, 20-25.2 and 20-25.3**

**20-25.4**

**TRANSITION FROM "STAY HOME – STAY HEALTHY" TO
"SAFE START – STAY HEALTHY" COUNTY-BY-COUNTY PHASED
REOPENING**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State
of Emergency for all counties throughout the state of Washington as a result of the
coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed
person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant
progression in Washington State, and the high risk it poses to our most vulnerable
populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53
and 20-55 through 20-57, exercising my emergency powers under RCW 43.06.220 by
prohibiting certain activities and waiving and suspending specified laws and regulations,
including issuance of Proclamations 20-25, 20-25.1, 20-25.2 and 20-25.3 *(Stay Home –
Stay Healthy)*, prohibiting all people in Washington State from leaving their homes except
to participate in essential services or essential work and preventing all non-essential
businesses in Washington State from conducting business, within the limitations therein;
and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to
person which may result in serious illness or death and has been classified by the World
Health Organization as a worldwide pandemic, has broadly spread throughout Washington
State and remains a significant health risk to all of our people, especially members of our
most vulnerable populations; and

**WHEREAS**, when I last amended the *Stay Home – Stay Healthy* order (Proclamation 20-
25.3) on May 4, 2020, there were approximately 15,462 cases of COVID-19 in
Washington State with 841 deaths; and, now, as of May 31 2020, the Department of Health
indicated that there have been 21,349 cases and 1,118 deaths, demonstrating the ongoing,
present threat of this lethal disease; and

**WHEREAS**, the health professionals and epidemiological modeling experts predict that although we have passed the peak of the first wave of COVID-19 in the State and we have made adequate progress as a state to modify some of the initial community mitigation efforts, the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to slowly re-open Washington State only through a careful, phased, and science-based approach. Modelers continue to agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases; and

**WHEREAS**, although the judicial system, an essential service, has undergone significant disruption and modification to operate safely during this crisis, and by order of the Supreme Court has delayed most jury trials in criminal and civil matters, in-person proceedings are necessary in many circumstances, and the judicial system is currently working with health officials to innovate and plan for the safe resumption of jury trials and other court services including at offsite facilities; and the efforts undertaken to innovate and plan are equally essential to the resumption of our judicial system, and should be conducted remotely if possible but otherwise may be conducted in person if appropriate physical distancing and protective measures are in place; and

**WHEREAS**, this unprecedented health crisis has caused extraordinary anxiety and a significant disruption of routine and important activities for every Washingtonian; and I recognize the extraordinary resiliency, strength, adaptability, and courage of every Washingtonian during this difficult time; and

**WHEREAS**, many people in Washington State attend religious services on a regular basis, making such services a vital part of the spiritual and mental health of our community, and previous guidance issued related to remote services, drive-in services, counseling, outdoor services, and Phase 2 indoor services, all subject to restrictions outlined in those guidance documents, remain in place and may be further expanded or modified as the science and data support; and

**WHEREAS**, the science also suggests that by ensuring safe social distancing and hygiene practices, many business activities can be conducted with limited exposure to customers, which is important to revitalizing Washington State's economy, restoring jobs, and providing necessary goods and services; and

**WHEREAS**, in Proclamation 20-25.3 I established an initial four-phased approach to reopening Washington State; and, while all counties started in Phase I on May 4, 2020, a total of 28 counties are now either in or eligible to apply for Phase 2; and

**WHEREAS**, the Washington State Department of Health's data and modeling demonstrate that many counties have significantly reduced or eliminated the number of new COVID-19 cases sufficiently to enable those counties to control and respond to virus outbreaks within the capacity of existing local and regional health care systems without significant increased risk of being overwhelmed, and this data supports

providing all counties with an opportunity to lift some restrictions, subject to certain conditions and requirements; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, 20-25.1, 20-25.2, and 20-25.3 (*Stay Home – Stay Healthy*) are amended to extend all of the prohibitions and each expiration date therein to 11:59 p.m. on July 1, 2020, and are renamed (*Safe Start – Stay Healthy*), and that except as otherwise provided in this order or the *Safe Start Washington* Phased Reopening County-by-County Plan found here, all other provisions of Proclamations 20-25, 20-25.1, 20-25.2, and 20-25.3 shall remain in full force and effect.

**FURTHERMORE,** in collaboration with the Washington State Department of Health, and based on analysis of the data and epidemiological modeling, I hereby order that, beginning on June 1, 2020, the *Safe Start Washington* Phased Reopening Plan will be applied on a county-by-county basis, and will allow any county that has been in Phase 1 or 2 for three weeks to apply to the Secretary of Health to move in whole or in part to the next phase; and further, the application process will include target metrics (intended to be applied as "targets" and not hard-line measures) set by the Secretary of Health, and the application must be submitted by the County Executive, or, in the absence of a County Executive, with the approval of the County Council or Commission, in accordance with the instructions provided by the Secretary of Health; and

**FURTHERMORE**, in evaluating any application to move forward, the Secretary of Health may approve a county moving in whole to the next phase, or may only approve certain activities moving to the next phase; and

**FURTHERMORE**, until there is an effective vaccine, effective treatment or herd immunity, it is crucial to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery; and, therefore, throughout all phases, individuals should continue to engage in personal protective behaviors including: practice physical distancing, staying at least six feet away from other people; wear cloth face coverings in public places when not eating or drinking; stay home if sick; avoid others who are sick; wash hands frequently; cover coughs and sneezes; avoid touching eyes, nose and mouth with unwashed hands; and disinfect surfaces and objects regularly; and

**FURTHERMORE**, I hereby order, in addition to other requirements detailed in the *Safe Start Washington* Phased Reopening Plan, that, beginning on June 8, 2020, when on the job, all employees must wear a facial covering except when working alone or when the job has no in-person interaction as detailed in the *Safe Start Washington* Phased Reopening Plan; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection; and

**FURTHERMORE,** I continue to permit the low-risk activities previously permitted as reflected or clarified in formal guidance documents here, and which may be updated or modified as the science and data supports; and

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust the *Safe Start Washington* Phased Reopening Plan accordingly.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are again reminded that no credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order goes into effect on June 1, 2020, and expires at 11:59 pm on July 1, 2020.

Signed and sealed with the official seal of the state of Washington on this 31st day of May, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State



# Safe Start Washington

## Phased Reopening County-By-County

ISSUED BY THE OFFICE OF THE GOVERNOR  | October 7, 2020

## Safe Start Washington – Phased Reopening County-by-County
### Governor Jay Inslee

Governor Jay Inslee, in collaboration with the Washington State Department of Health, has established a data-driven approach to reopen Washington and modify physical distancing measures while minimizing the health impacts of COVID-19. Washington will move through the phased reopening county-by-county allowing for flexibility and local control to address COVID-19 activity geographically.

This approach reduces the risk of COVID-19 to Washington's most vulnerable populations and preserves capacity in our health care system, while safely opening up businesses and resuming gatherings, travel, shopping and recreation.

The plan involves assessing COVID-19 activity along with health care system readiness, testing capacity and availability, case and contact investigations, and ability to protect high-risk populations. The plan allows counties and the secretary of Health to holistically review COVID-19 activity and the ability for the county to respond when determining if a county is ready to move into a new phase.

### County Application Process

On June 1, each county began in their then current phase. Any county can apply to the secretary of Health to move to the next phase, unless a "freeze" is in place. The application process will require the county to report on key metrics set by the secretary of Health along with other quantitative and qualitative data. The application must be submitted by the county executive, in accordance with the instructions provided by the secretary of Health. If the county does not have a county executive, it must be submitted with the approval of the county council/ commission.

The secretary of Health will evaluate county applications based on how their data for the key metrics compare to the targets and their ability to respond to situations that may arise in their county, including outbreaks, increased hospitalizations or deaths, health system capacity and other factors. The metrics are intended to be applied as targets, not hardline measures. The targets each contribute to reducing risk of disease transmission, and are to be considered in whole. Where one target is not fully achieved, actions taken with a different target may offset the overall risk. A final decision on whether a county is ready to move to the next phase rests with the secretary of Health. The secretary may approve a county moving in whole to the next phase, or may only approve certain activities in the next phase depending on a specific county's situation.



A county that remains in Phase 1 has the ability to apply for a modified Phase 1 (as described below) to allow additional activity. That application would be submitted to the secretary of Health. The secretary of Health has discretion to modify or change any part of the modified Phase 1 to address the needs of a specific county. All activities must follow the health and safety requirements for those activities.

Nothing in the Safe Start Proclamation or this Reopening Plan prevents the governor and secretary of Health from, based on analysis of the data and epidemiological modeling, delaying ("freezing") progress of any or all counties to a subsequent phase or returning any or all counties to a prior phase.

## COVID-19 DISEASE ACTIVITY

COVID-19 disease burden is measured by the following key metrics:

# COVID-19 Disease Activity

| Metric | Target |
|---|---|
| 1. Incidence of new cases reported during prior two weeks | <25 cases / 100,000 / 14 days |
| 2. Trends in hospitalizations for lab-confirmed COVID-19 | Flat or decreasing |
| 3. Reproductive rate (if available) | $R_e$ < 1 |

## READINESS AND CAPABILITIES NEEDED

The Department of Health and local public health officials will monitor data to assess a county's readiness for safely reopening and modifying physical distancing measures. In addition to disease burden, readiness will be evaluated in four key areas. The four key areas include health care system readiness, testing capacity and availability, case and contact investigations, and ability to protect high-risk populations. Key metrics and their targets for each area, along with other pertinent data that will be considered, are detailed below.

## 1. Health Care System Readiness

Adequate bed capacity, staffing and supplies in the healthcare system to handle a surge in COVID-19 cases, measured by the following key metrics:

# Health Care System Readiness

| Metric | Target |
|---|---|
| 1. % licensed beds occupied by patients (i.e., hospital census relative to licensed beds) | ● Green: <80%<br>● Yellow: 81-90%<br>● Red: >90% |
| 2. % licensed beds occupied by suspected and confirmed COVID-19 cases | ● Green: <10%<br>● Yellow: 11-20%<br>● Red: >20% |

Other data that will be considered include availability of PPE in hospitals, long term care facilities and other healthcare settings and availability of ventilators in hospitals.

## 2. Testing Capacity and Availability

Ability for everyone with COVID-19 symptoms and those with high-risk exposures to be tested immediately using a polymerase chain reaction (PCR) test and rapidly receive test results as measured by the following key metrics:

# Testing

| Metric | Target |
|---|---|
| 1. Average number of tests performed per day during the past week (or average % tests positive for COVID-19 during the past week) | 50 times the number of cases (or 2%) |
| 2. Median time from symptom onset to specimen collection during the past week | Median <2 days |

Other data that will be considered include the geographic distribution of testing sites in counties, the ability to test the entire population, and the availability of sufficient swabs, viral transport media, lab reagents and other materials required for COVID-19 testing.

## 3. Case and Contact Investigations

Ability to rapidly isolate those with COVID-19, identify and quarantine their contacts, and provide case management services as measured by the following key metrics:

# Case & Contact Investigations

| Metric | Target |
|---|---|
| 1. Percent of cases reached by phone or in person within 24 hours of receipt of + lab test report | 90% |
| 2. Percent of contacts reached by phone or in person within 48 hours of receipt of + lab test report on a case | 80% |
| 3. Percent of cases being contacted daily (by phone or electronically) during their isolation period | 80% |
| 4. Percent of contacts being contacted daily (by phone or electronically) during their quarantine period | 80% |

Other data that will be considered include the number of investigators trained and working, the availability of isolation and quarantine facilities, and plans for case management.

## 4. Ability to Protect High-Risk Populations

Ability to immediately respond to outbreaks in congregate settings, such as long-term care facilities, behavioral health facilities, agricultural worker housing, homeless shelters and correctional facilities, and address the needs of other high-risk populations, including the elderly and the medically frail, measured by the following key metric:

# Protect High-Risk Populations

| Metric | Target |
|---|---|
| 1. Number of outbreaks reported by week (defined as 2 or more non-household cases epidemiologically linked within 14 days in a workplace, congregate living or institutional setting) | 0 - small counties (<75,000)<br>1 - medium counties (75,000-300,000)<br>2 - large counties (>300,000)<br>3 - very large counties (>1 million) |

Other data that will be considered include a county's ability to rapidly respond to an outbreak and address health disparities in their communities.

## ALL INDIVIDUALS AND BUSINESSES

Until there is an effective vaccine, effective treatment or herd immunity, it is crucial to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery. This includes heightened protections for the health and safety of workers in essential sectors, people living and working in high-risk facilities (e.g. senior care facilities) and all other workers.

All Washingtonians have a responsibility to protect themselves and others. Each phase, while allowing for additional services to open and return to full capacity, is grounded in the following required basic practices:

### Requirements for Individuals

All phases – Individuals should continue to:

- When not at work: Wear face coverings that cover the nose and mouth when in any indoor or outdoor public setting, subject to the requirements and exceptions in Order of the Secretary of Health 20-03; and
- While at work: Wear a face covering when working, in compliance with the requirements in the "Requirements or All Employers" section below.
- Cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19 and with the implementation of infection control measures pursuant to State Board of Health rule WAC 246-101-425.

### Guidance for Individuals

All phases – Individuals should continue to:

- Engage in physical distancing, staying at least six feet away from other people
- Stay home if sick
- Avoid others who are sick
- Wash hands frequently with soap and water (use hand sanitizer if soap and water are not available)
- Cover coughs and sneezes
- Avoid touching eyes, nose and mouth with unwashed hands
- Disinfect surfaces and objects regularly



## Requirements for All Employers

All phases – Employers are required to:

- Provide (at no cost to employees) cloth facial coverings to employees, unless their exposure dictates a higher level of protection under the Department of Labor & Industries' safety and health rules and guidance. Since June 8, all employees have been required to wear a cloth facial covering, consistent with the Washington State Department of Labor & Industries' COVID-19 workplace safety and health rules and guidance. A cloth face covering should be worn as a minimum level of protection, with the following exceptions: when working alone in an office, vehicle, or at a job site; if the individual is deaf or hard of hearing, or is communicating with someone who relies on language cues such as facial markers and expression and mouth movements as a part of communication; if the individual has a medical condition or disability that makes wearing a facial covering inappropriate; or when the job has no in-person interaction. Employees may remove a face covering when any party to a communication is deaf or hard of hearing or relies on language cues such as facial markers and expression and mouth movements as part of the communication. Refer to Coronavirus Facial Covering and Mask Requirements for additional details. Employees may choose to wear their own facial coverings at work, provided it meets the minimum requirements.

- Cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19; cooperate with the implementation of infection control measures, including but not limited to isolation and quarantine and environmental cleaning; and comply with all public health authority orders and directives. Cooperation and compliance includes, but is not limited to:

  - Returning phone calls within 4 hours;

  - Meeting with public health officials promptly and answering questions from public health officials to help determine if and where transmission might be occurring in the work place;

  - Sharing lists of employees with their contact information and other relevant documents, if requested;

  - Allowing immediate and unfettered access to any work place and facility, as well as to all employees without threatened or actual retaliation against those employees;

  - Following public health recommendations for testing and disease control measures; and

  - Engaging in respectful and productive conversations regarding public health interactions.

- Notify your local health jurisdiction within 24 hours if you suspect COVID-19 is spreading in your workplace, or if you are aware of 2 or more employees who develop confirmed or suspected COVID-19 within a 14-day period.

- Keep a safe and healthy facility in accordance with state and federal law, and comply with COVID-19 worksite-specific safety practices, as outlined in Governor Inslee's Proclamation 20-25, and all amendments and extensions thereto, and in accordance with the Washington State Department of Labor & Industries'



interpretive guidance, regulations, and rules, including WAC 296-800-14035 and General Coronavirus Prevention under the "Stay Home, Stay Healthy" order and the Washington State Department of Health's Workplace and Employer Resources and Recommendations.

- Educate workers in the language they understand best about coronavirus and how to prevent transmission, and the employer's COVID-19 policies.

- Maintain minimum six-foot separation between all employees (and customers) in all interactions at all times When strict physical distancing is not feasible for a specific task, other prevention measures are required, such as use of barriers, minimizing staff or customers in narrow or enclosed areas, and staggering breaks and work shift starts.

- Ensure frequent and adequate hand washing with adequate maintenance of supplies. Use disposable gloves where safe and applicable to prevent virus transmission on tools or other items that are shared.

- Establish a housekeeping schedule that includes frequent cleaning and sanitizing with a particular emphasis on commonly touched surfaces

- Screen employees for signs/symptoms of COVID-19 at the start of their shift. Make sure sick employees stay home or immediately go home if they feel or appear sick. Cordon off any areas where an employee with probable or confirmed COVID-19 illness worked, touched surfaces, etc. until the area and equipment is cleaned and sanitized. Follow the cleaning guidelines set by the Centers for Disease Control to deep clean and sanitize.

- Post a sign requiring customers to wear cloth facial coverings, and prominently display it at the entrance to the business so that it is immediately noticeable to all customers entering the store.

- Follow requirements in Governor Inslee's Proclamation 20-46 High-Risk Employees – Workers' Rights.

Businesses are also required to implement any health and safety requirements developed specifically for their industry.

Challenge Seattle and the Washington Roundtable have developed a business checklist which is a great starting point for businesses as they prepare for "Safe Start Washington". Our shared goal is to establish clear requirements that everyone can understand and apply – employers, workers and customers.



## PHASED APPROACH TO REOPENING WASHINGTON COUNTY-BY-COUNTY AND MODIFYING PHYSICAL DISTANCING MEASURES

A county will stay in every phase for a **minimum of three weeks**. During that time, the Department of Health, County Elected Leadership, Local Health Jurisdictions, and the governor will re-evaluate the above targets. No phase will last less than three weeks before moving to the next phase, unless moving to a previous phase, in order to allow one complete disease incubation period plus an additional week to compile complete data and confirm trends. After three weeks, a county may apply to move to the next phase through the application provided by the secretary of Health.

If a county experiences an increase in COVID-19 disease activity and they need to return to an earlier phase, they must notify the secretary of Health and include their rationale but they do not need prior approval. Alternatively, the secretary has the authority to return a county to an earlier phase if the county chooses not to do so on its own, and the secretary has identified a need to do so. The secretary must notify a county in writing and provide a rationale for it being moved to an earlier phase.

The following table shows the phased approach for reopening businesses and resuming activities. **This phased approach may be adjusted as the pandemic evolves.** The industries listed are not an exclusive or exhaustive list of industries. Businesses listed in each phase of the plan will have industry-specific guidance and safety criteria developed to ensure workplace safety and public health are maintained. Those business activities are not authorized to open until the industry-specific guidance and safety criteria are issued.

If a county is not ready to move from Phase 1 to Phase 2, they have the ability to apply for a modified Phase 1. The secretary of Health has discretion to modify or change any part of the modified Phase 1 to address the needs of a specific county. All activities must follow the health and safety requirements for those activities.

As of August 26, 2020, Chelan, Douglas, Benton, Franklin and Yakima counties are in a Modified Phase 1. In addition to all phase 1 activities, the following activities are allowed in a modified phase 1 status starting August 27, 2020.

- **High-risk populations**
  - Strongly encouraged, but not required, to stay home unless engaging in modified Phase I permissible activities.
- **Recreation and fitness**
  - Outdoor fitness classes are limited to multiple groups of 5 at a time with one instructor as long as the groups don't mix and physical distancing of at least 6 feet is maintained among participants.
  - Indoor fitness and training facilities as outlined in Phase 2 guidance.



- **Social Gatherings**
  - Social gatherings are only allowed outdoors with 5 or fewer people outside the household per week. Physical distancing of at least 6 feet must be maintained.
- **Agritourism**
  - As outlined in Phase 2 guidance.
- **Additional construction**
  - As outlined in Phase 2 guidance.
- **Manufacturing operations**
  - As outlined in Phase 2 guidance.
- **Real estate**
  - As outlined in Phase 2 guidance but guest occupancy limited to 25% of building occupancy and indoor services limited to 30 minutes per customer.
- **In-store retail**
  - As outlined in Phase 2 guidance.
- **Personal services**
  - As outlined in Phase 2 guidance, but occupancy limited to 25% of building occupancy, with the exception of one to one service in an enclosed room.
- **Professional services**
  - As outlined in Phase 2 guidance, but occupancy limited to 25% of building occupancy, with the exception of one to one service in an enclosed room, and indoor services limited to 30 minutes per customers.
- **Photography**
  - As outlined in Phase 2 guidance.
- **In-home/domestic services**
  - As outlined in Phase 2 guidance.
- **Pet grooming**
  - As outlined in Phase 2 guidance, but occupancy limited to 25% of building occupancy.
- **Restaurants, taverns, breweries, wineries and distilleries**
  - As outlined in Phase 2 guidance but guest occupancy indoors is limited to 25% of maximum building occupancy as determined by the fire code. Outdoor seating is permitted at 50% capacity.
- **Staffed water recreation facilities**
  - As outlined in modified Phase 1 guidance.
  - Authorized operations include appointment-only lap swimming, one-on-one lessons, and small group classes (groups of 5 or less) at general use swimming pools only (e.g., athletic club pools and municipal



pools) as defined in WAC 246-260-010(34) and WAC 246-260-010(74). General use spas, general use wading pools, general use spray pools, limited use pools as defined in WAC 246-260, and any recreational water contact facility regulated under WAC 246-262 are not included in this authorization at this time.

- **Religious services**
  - As outlined in Phase 2 religious guidance but indoor services at a place of worship limited to 25% of room capacity or up to 50 people, whichever is less, so long as six feet of physical distancing can be achieved between households.
- **Curbside Library Services**
  - As outlined in Phase 2 guidance.
- **Drive-in events, including movies and airshows**
  - As outlined in Phase 2 guidance for drive-in theaters.
- **Team gymnastics, including training for USA Gymnastics**
  - As outlined in Phase 2 guidance.
- **Outdoor card rooms**
  - As outlined in Phase 2 guidance but the outdoor card room designated area of each facility is limited to 50 individuals, (excluding organization staff), if proper physical distancing can be achieved.

Families are adjusting to a new way of life, and we understand the impacts this is having on them. The connection between education, child care, youth sports, summer programs and extracurricular activities is critical and must be viewed from a holistic lens to ensure equity and high quality of life. As we prepare for what the reopening of school looks like, we will be working closely with the Department of Health, Office of the Superintendent for Public Instruction, Department of Children, Youth and Families, and parents to release plans in the future.

While child care is currently an essential business activity and a key component to the reopening plan, we know there is more to do. The state will continue efforts to ensure adequate access and affordability for families.



# WASHINGTON'S PHASED APPROACH

Last updated: 10/13/2020

**INDIVIDUALS AND BUSINESSES SHOULD FOLLOW ALL REQUIREMENTS LISTED ABOVE DURING ALL PHASES**

| | **1** Modified Phase 1 | **2** Phase 2 | **3** Phase 3 | **4** Phase 4 |
|---|---|---|---|---|
| **Recreation** | Some outdoor recreation (hunting, fishing, golf, boating, hiking) | - Some adult/youth sports<br>- Fewer or fewer outdoor recreation runs/races/ride with more than 12 participants | - Outdoor group rec. sports activities<br>- Recreational facilities at <25% capacity | Resume all recreational activity |
| **Gatherings** (non religious) | Allow gatherings outdoors with fewer than 5 people outside your household per week | Gather with no more than 5 people outside your household per week | Allow gatherings with no more than 10 people | Allow gatherings with >10 people |
| **Business/ Employers** (All businesses will be required to follow safety plans written by the state) | - Manufacturing, construction, domestic services, agritourism, photography, curbside library services, indoor fitness and drive-in events meeting Phase 2 guidance<br>- Retail following Phase 2 guidance, but guest occupancy at <30% of maximum<br>- Real Estate following Phase 2 guidelines, but guest occupancy at 25% of maximum and indoor services limited to 30 minutes<br>- Professional services following Phase 2 guidance, but occupancy limited to 25% of maximum, with an exception for 1-to-1 services in an enclosed room. Indoor service limited to 30 minutes<br>- Personal services following Phase 2 guidance, but occupancy limited to 25% of maximum with an exception for 1-to-1 services in an enclosed room<br>- Restaurants/Bars** following Phase 2 guidance, but indoor occupancy at 25% of maximum and indoor services at 50%<br>- Pet grooming following Phase 2 guidance but occupancy limited to 25% of maximum of maximum<br>- Staffed water recreation facilities | - Remaining manufacturing<br>- Additional construction phases<br>- In-home/domestic services (nannies, housecleaning, etc.)<br>- Retail (in-store purchases allowed with restrictions)<br>- Real estate<br>- League-play bowling<br>- Libraries and Museums at <25% capacity<br>- Movie theaters at <25% capacity<br>- Agritourism<br>- Professional services/office-based businesses (telework remains strongly encouraged)<br>- Personal services (hair and nail salons, barbers, tattoo, etc.)<br>- Pet grooming<br>- Restaurants <50% capacity, table size no larger than 5 (no bar-area seating)<br>- Bars** no indoor seating unless min. food requirements in guidance met<br>- Drive-in events<br>- Limited indoor fitness and training with 300 square feet per person, up to 25% capacity for large facilities. | - Movie theaters at <50% capacity<br>- Customer-facing government services (telework remains strongly encouraged)<br>- Libraries<br>- Museums 50% capacity<br>- Limited indoor fitness and training with 200 square feet of distance/person, up to 25% capacity for large facilities.<br>- Restaurants <50% capacity, table size no larger than 10<br>- All other business activities not yet listed except for those specified for Phase 4<br>- Retail events (craft shows, etc.) <200 people | - Nightclubs<br>- Concert venues<br>- Large sporting events<br>- Resume unrestricted staffing of worksites, but continue to practice physical distancing and good hygiene<br>- Live entertainment |

High-risk populations* are strongly encouraged, but not required, to stay home unless engaging in activities permissible in their current phase.
Non-essential travel should be limited until Phase 3

*High-risk populations are currently defined by CDC as persons 65 years of age and older; people of all ages with underlying medical conditions (particularly not well controlled), including people with chronic lung disease or moderate to severe asthma, people who have serious heart conditions, people who are immunocompromised, people with severe obesity, people with diabetes, people with chronic kidney disease undergoing dialysis, and people with liver disease; people who live in a nursing home or long-term care facility.
**For the purposes of the Safe Start Phased Plan, bars are defined as taverns, breweries, wineries and distilleries.
***For the purposes of the Safe Start Phased Plan, maximum occupancy refers to the maximum building occupancy as determined by the fire code.

11

SAFE START WASHINGTON: PHASED REOPENING COUNTY-BY-COUNTY

# EXHIBIT H

COMPLAINT
NO. _____
Sunday, November 29, 2020

58

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05, 20-08, 20-09, and 20-09.1**

**20-09.2**
**Phased Reopening of K-12 Schools**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53 and 20-55 through 20-57, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamations 20-25, 20-25.1, 20-25.2 and 20-25.3 (Stay Home – Stay Healthy), and 20-25.4 (Safe Start WA), all of which limit people in Washington State from leaving their homes except to participate in certain permitted activities; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS,** during early stages of the COVID-19 pandemic, health professionals and epidemiological modeling experts indicated that the spread of COVID-19, if left unchecked, threatened to overwhelm portions of Washington's public and private health-care system;

**WHEREAS,** health professionals and epidemiological modeling experts indicated that continued operation of schools could increase the spread of COVID-19 throughout Washington and would increase the threat to our residents and our health system; and

**WHEREAS,** to counter the threat of COVID-19 spread posed by continued operation of schools, in Proclamations 20-08, 20-09, and 20-09.1, I prohibited public school districts, charter schools, and private schools from conducting in-person educational, recreational, and other K-12 school programs using school facilities, and also prohibited the Washington Center for Deaf and Hard of Hearing Youth, the Washington School for the Deaf, and the Washington State School for the Blind from conducting student educational and outreach services; and

**WHEREAS,** schools are the foundation of Washington's communities, and in addition to traditional classroom education, schools provide a variety of vital services to students, families and communities that play a vital role in students' ability to succeed, including academic supports, special education supports, health therapies, mental/behavioral supports, access to nutritious food, and other community services; and

**WHEREAS,** closing our schools has been stressful for all Washingtonians, and has been particularly difficult for children with heightened social, physical, developmental, or emotional needs, and those who rely on our schools to provide services, structure, and positive social interactions; and

**WHEREAS,** although parents, students, school teachers, and administrators have made tremendous efforts to continue to function through distance learning, and I recognize their extraordinary resilience, strength, adaptability, and courage, all agree that re-opening our schools and restarting face-to-face learning as soon as can be safely accomplished will benefit our children, families and communities; and

**WHEREAS**, although the Department of Health indicates that on June 1, 2020, there were 21,977 cases of COVID-19 in Washington State with 1,124 associated deaths and as of June 11, 2020, there currently are 24,652 cases of COVID-19 with 1,190 associated deaths, demonstrating the ongoing, present threat of this lethal disease, health professionals and epidemiological modeling experts predict that we have passed the peak of the first wave of COVID-19 in the state and we have made adequate progress against COVID-19 as a state to modify statewide closure of K-12 school facilities; and

**WHEREAS,** the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to re-open schools only through a careful, phased, flexible, and science-based approach; and

**WHEREAS,** the science suggests that by ensuring safe social distancing and hygiene practices, and modifying procedures and facilities, many school functions can be conducted with limited risk of exposure and spread of COVID-19; and

**WHEREAS,** school programs, activities, and services offered during the summer generally involve fewer students than school-year programs, activities, and services, and accordingly are well-suited to operate with the modified procedures and facilities necessary for a safe opening; and

**WHEREAS**, all schools must engage in planning for fall programs, activities, and services, and they must do so well in advance of the fall; and

**WHEREA**S, schools will continue to need to prepare to be flexible to pivot in whole or in part to distance learning if there is an outbreak of COVID-19 in their county or within their school community and to follow guidance from the Department of Health, the Department of Labor and Industries, and the Superintendent of Public Instruction to help mitigate risk to students, teachers, and the community; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-08, 20-09, and 20-09.1 are amended to extend all of the prohibitions and each expiration date therein until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded, except as amended to allow re-opening as provided in this order and subject to the requirements in the *K-12 Schools Summer 2020 Guidance* document found here and the *Re-opening K-12 Fall 2020-2021 Guidance* document found here.

**FURTHERMORE**, until there is an effective vaccine, effective treatment or herd immunity, it is crucial, and therefore ordered, that schools implement and require all personal protective behaviors set forth in the *K-12 Summer 2020 Services During the COVID-19 Outbreak* and the *COVID-19 School Worksite K-12 Fall 2020 Services* guidance documents.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

This order goes into effect on June 20, 2020, and will remain in effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded, or until this order is amended or rescinded, whichever occurs first.

Signed and sealed with the official seal of the state of Washington on this 11th day of June, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

4

# EXHIBIT I

COMPLAINT
NO. _____
Sunday, November 29, 2020

59

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

# Religious and Faith-based Organizations COVID-19 Requirements

With continuing reports of COVID-19 outbreaks at spiritual gatherings, the Governor still strongly encourages religious leaders and communities to conduct services remotely. Alternatively, drive-in services are permitted and capacity limits do not apply.  Counseling services are essential and may be permitted in-person, if remote counseling is not viable.

In addition to remote and drive-in services, religious and faith-based organizations are permitted to conduct the following activities, provided all requirements in this document are met:

A) Hold indoor services at a place of worship with up to 25% of room capacity or up to 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households in all directions. Cloth face coverings are required for all participants.

B) Hold outdoor services on the organization's property (or immediately adjacent property if explicitly permitted by the local jurisdiction) with up to 200 individuals, so long as six feet of physical distancing can be achieved between households in all directions. Cloth face coverings are required for all participants.

Outdoor services may be conducted under an outdoor structure (temporary or permanent) so long as the Outdoor Seating Requirements are followed.

C) Hold or provide in-home services inside a person's residence with up to five total individuals (excluding organization staff). Cloth face coverings are required for all participants.

Staff are excluded from the maximum number of individuals, but any organization volunteers are included in the maximum number of permissible individuals. The services covered in these operational guidelines include all worship services, religious study classes, religious ceremonies, and religious holiday celebrations. Religious weddings and funerals are not covered under this document and must follow the guidance in this memo.

Organizations are strongly encouraged to keep a log of attendees at each service or counseling session, and to retain that log for at least two weeks. If an outbreak occurs, this information may be critical to help save lives.

## Safety and Health Requirements

All employers (including religious and faith-based organizations) have a general obligation to keep a safe and healthy facility in accordance with state and federal law and safety and health rules for a variety of workplace hazards. In addition, they must comply with the following COVID-19 organization-specific safety practices, as outlined in the Governor's *Stay Home, Stay Healthy* Proclamation 20-25, et seq., and in accordance with the Washington State Department of Labor & Industries General Requirements and Prevention Ideas for Workplaces and the Washington State Department of Health Workplace and Employer Resources & Recommendations at https://www.doh.wa.gov/Coronavirus/workplace.

Religious and faith-based organizations must specifically ensure operations follow the main L&I COVID-19 requirements to protect employees:

- Educate all employees in the language they understand best about coronavirus, how to prevent transmission, and the owner's COVID-19 policies.

- Screen employees for signs/symptoms of COVID-19 at the start of every shift. Make sure sick employees stay home or immediately go home if they feel or appear sick. Cordon off any areas where an employee with probable or confirmed COVID-19 illness worked, touched surfaces, etc., until the area and equipment is cleaned and sanitized. Follow the cleaning guidelines set by the CDC to deep clean and sanitize.

- Maintain minimum six-foot separation between all persons in all interactions and at all times. When strict physical distancing is not feasible for a specific task, other prevention measures are required, such as use of barriers, minimization of individuals in narrow, enclosed areas and waiting rooms, staggered breaks, and work shift starts.

- Provide (at no cost to employees) and require the wearing of personal protective equipment (PPE) such as gloves, goggles, face shields and face covering masks as appropriate or required for the work activity being performed. Cloth face coverings must be worn by every employee not working alone at the location unless their exposure dictates a higher level of protection under Department of Labor & Industries safety and health rules and guidance. The facial covering requirement **does** apply to the individual(s) leading the service.

  o Exceptions to this requirement for cloth face coverings include when working alone in an office, vehicle, or at a job site; if the individual is deaf or hard of hearing and is communicating with someone who relies on language cues such as facial markers and expression and mouth movements as a part of communication; if the individual has a medical condition or disability that makes wearing a facial covering inappropriate; or when the job has no in-person interaction.

- Refer to Coronavirus Facial Covering and Mask Requirements for additional details. A cloth facial covering is described in the Department of Health guidance, Department of Health guidance.

- Ensure frequent and adequate hand washing with adequate maintenance of supplies. Use disposable gloves, where safe and applicable, to prevent virus transmission on items that are touched frequently or shared and discard after a single use.

- Establish a housekeeping schedule that includes frequent cleaning and sanitizing with a particular emphasis on commonly touched services.

- Post a sign at the entrance to the organization that says face coverings are required.

A location-specific COVID-19 supervisor shall be designated by the organization at each location (indoor and outdoor) to monitor the health of employees and enforce the COVID-19 safety plan.

An employee may refuse to perform unsafe work, including hazards created by COVID-19. And, it is unlawful for the employer to take adverse action against an employee who has engaged in safety-protected activities under the law if the individual's work refusal meets certain requirements. Information is available in these publications: Safety and Health Discrimination in the Workplace brochure and Spanish Safety and Health Discrimination brochure.

Employees who choose to remove themselves from a worksite because they do not believe it is safe to work due to the risk of COVID-19 exposure may have access to certain leave or unemployment benefits. Employers must provide high-risk individuals covered by Proclamation 20-46, et seq., with their choice of access to available employer-granted accrued leave or unemployment benefits if an alternative work arrangement is not feasible. Other employees may have access to expanded family and medical leave included in the Families First Coronavirus Response Act, access to unemployment benefits, or access to other paid time off depending on the circumstances. Additional information is available at Novel

Coronavirus Outbreak (COVID-19) Resources and Paid Leave under the Washington Family Care Act and the Families First Coronavirus Response Act.

**All religious and faith-based organizations are required to comply with the following COVID-19 organization-specific safety practices:**

1. Prior to beginning operations as described in this document, all religious and faith-based organizations are required to develop for each location (indoor and outdoor if applicable) a comprehensive COVID-19 exposure control, mitigation and recovery plan. The plan must include policies regarding the following control measures: PPE utilization; on-location physical distancing; hygiene; sanitation; symptom monitoring; incident reporting; location disinfection procedures; COVID-19 safety training; exposure response procedures and a post-exposure incident project-wide recovery plan. A copy of the plan must be available at the location for inspection by state and local authorities, but state and local authorities do not preapprove the plan. Failure to meet planning requirements may result in sanctions, including the location being shut down.

2. COVID-19 safety information and requirements, such as CDC, DOH, OSHA posters shall be visibly posted at each location (indoor and outdoor).

3. Face Coverings and Exemptions - All employees, members, and visitors in attendance shall wear face coverings before, during, and after the service (whether indoor or outdoor).  The face covering requirement **does** apply to individual(s) leading the service and others who speak during any live service. There are exemptions to wearing face covering, so please refer to the Department of Health's Order on Face Coverings. If the speaker needs an accommodation due to a medical exemption, then a Plexiglas 3-sided barrier may be used during the service. The barrier must be disinfected after every use.

   For services that are recorded or filmed without a live audience, then face coverings are not required for individuals while they are speaking.

4. There may be no direct physical contact between servers and members or visitors. Anything to be consumed may not be presented to the members or visitors in a communal container or plate.

5. Music – No choir, band, or ensemble shall perform during the service and congregation singing is prohibited. Soloist musical performances are permitted with a piano accompanist so long as the performer wears a face covering. In the event the soloist is performing on a woodwind or brass instrument, the soloist may remove their face covering only during the performance.

6. All services may provide access to restrooms, provided that access is controlled and capacity is limited to no more than the number of stalls in the restroom.  Individuals waiting to use the restroom must maintain at least 6 feet of distance between each person.

7. Soap and running water shall be abundantly provided at locations for frequent handwashing. Employees should be encouraged to leave their workstations to wash their hands regularly, and required to do so before and after going to the bathroom, before and after eating and after coughing, sneezing or blowing their nose. Alcohol-based hand sanitizers with greater than 60% ethanol or 70% isopropanol should also be provided and used, but are not a replacement for the water requirement.

8. Disinfectants must be available to employees, members, and visitors throughout the location (indoor and outdoor) and ensure cleaning supplies are frequently replenished.

9. Clean and disinfect high-touch surfaces after each use—including personal work stations, mirrors, chairs, headrests and armrests, doorknobs, handrails, restrooms and breakrooms—using soapy water, followed by the appropriate disinfectants. If these areas cannot be cleaned and disinfected frequently, the organization shall be shut down until such measures can be achieved and maintained.

10. All organizations must adhere to physical distancing requirements and have six feet of space between workstations or have physical barriers between them.

11. All organizations must adhere to physical distancing requirements and have six feet of space in all directions between the congregation's seats, pews, and benches or have physical barriers between them. Members of the same household may be seated together as a single unit. This may require the organization to reconfigure the congregation's seats, pews, and benches or have physical barriers between them. The organization must place markings on the floors and seats indicating a six feet radius to help guide members and visitors. Brief physical contact may be permitted among a limited number of people (up to 5 individuals) if it is a critical component to the organization's religious service so long as masks are worn and hands are sanitized immediately before and after the contact.

12. Increase ventilation rates where feasible.

13. Ensure that tissues and trashcans are placed throughout the location (indoor and outdoor).

14. Inform all employees, members, and guests that they must self-screen for signs and symptoms of COVID-19 before arriving at the location.

   • Request employees, members, and visitors to take their temperature before attending a service. Any individual with a temperature of 100.4°F will not be permitted to attend the service or attend work at the organization.

   • Any individual with a household member who has been diagnosed with COVID-19 or with symptoms of COVID-19 (including a fever above 100.4°F) may not attend the service or attend work at the organization.

15. For in-home services, religious and faith-based organizations are permitted to convene up to five individuals excluding organization staff. These individuals do not need to be from the same household. However, individuals must wear face coverings when individuals from outside of the household participate.

All issues regarding worker safety and health are subject to enforcement action under L&I's Division of Occupational Safety and Health (DOSH).

• Employers can request COVID-19 prevention advice and help from DOSH.

• Employee workplace safety and health complaints may be submitted to the DOSH Call Center: (1-800-423-7233) or via e-mail to adag235@lni.wa.gov.

• General questions about how to comply with the agreement practices can be submitted to the state's Business Response Center at https://coronavirus.wa.gov/how-you-can-help/covid-19-business-and-worker-inquiries.

• All other violations related to Proclamation 20-25, et seq., can be submitted at https://coronavirus.wa.gov/report-safe-start-violation.

# EXHIBIT J

COMPLAINT
NO. _____
Sunday, November 29, 2020

60

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**

OFFICE OF THE GOVERNOR

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATIONS 20-05 and 20-25 et seq.**

**20-25.5**

**"SAFE START – STAY HEALTHY"**
**COUNTY-BY-COUNTY PHASED REOPENING**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53 and 20-55 through 20-61, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS**, I issued Proclamations 20-25, 20-25.1, 20-25.2,and 20-25.3 *(Stay Home – Stay Healthy)*, and I subsequently issued Proclamation 20-25.4 ("*Safe Start – Stay Healthy" County-By-County Phased Reopening*), wherein I amended and transitioned the previous proclamations' requirements to "*Safe Start – Stay Healthy*" requirements, prohibiting all people in Washington State from leaving their homes except under certain circumstances and limitations based on a phased reopening of counties as established in Proclamation 20-25.4 and according to the phase each county was subsequently assigned by the Secretary of Health; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS**, when I issued the *Safe Start–Stay Healthy* order (Proclamation 20-25.4) on May 31, 2020, there were approximately 21,349 cases of COVID-19 in Washington State with 1,118 deaths; and, now, as of July 1, 2020, the Department of Health indicated that there have been 32,824 cases and 1,332 deaths, demonstrating the ongoing, present threat of this lethal disease; and

**WHEREAS**, the health professionals and epidemiological modeling experts predict that although Washington State has passed the peak of the first wave of COVID-19 and has made adequate progress to modify some of the initial community mitigation efforts, the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to slowly re-open Washington State only through a careful, phased, and science-based approach. Modelers continue to agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases; and

**WHEREAS**, the United States Centers for Disease Control and Prevention recommends that, in addition to its recommendation to maintain six-feet of physical distance from non-household members and frequent hand washing with soap and water or alcohol-based hand sanitizer, people wear cloth face coverings when they are in public settings where they cannot reliably maintain six feet of distance from others at all times, given the substantial increase in the numbers of cases of COVID-19 infection, these precautions must be mandatory; and

**WHEREAS,** the science also suggests that by ensuring safe social distancing hygiene practices, and the use of cloth face coverings, many business and recreational activities can be conducted with limited exposure to customers, which is important to revitalizing Washington State's economy, restoring jobs, and providing necessary goods and services; and

**WHEREAS,** the Washington State Department of Health's data and modeling demonstrate that many counties have significantly reduced or eliminated the number of new COVID-19 cases sufficiently to enable those counties to control and respond to virus outbreaks within the capacity of existing local and regional health care systems without significant increased risk of being overwhelmed, and this data continues to support providing all counties with an opportunity to lift some restrictions, subject to certain conditions and requirements, including the use of cloth face coverings; and

**WHEREAS**, on June 8, 2020, I ordered all employees to wear a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start Washington Phased Reopening Plan*; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 workplace safety and health requirements; and

**WHEREAS**, on June 24, 2020, the Secretary of Health issued Order 20-03, effective June 26, 2020, requiring every individual in Washington state to wear a face covering that covers their nose and mouth when in any indoor or outdoor public setting, except under certain circumstances, which provides a minimum level of protection for Washingtonians when they are not at work where the Department of Labor & Industries' face covering requirements apply; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

2

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., are amended to extend all of the prohibitions and each expiration date therein to 11:59 p.m. on July 9, 2020, and that except as otherwise provided in this order, the *Safe Start Washington Phased Reopening County-by-County Plan* found here, the *Order of the Secretary of Health 20-03*, issued on June 24, 2020, found here, and all other provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

**FURTHERMORE**, until there is an effective vaccine, effective treatment or herd immunity, it is crucial to continue to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery; and, therefore, throughout all phases, individuals should (or must, as noted below) continue to engage in personal protective behaviors including:

- practicing physical distancing, staying at least six feet away from other people;
- wearing cloth face coverings in public settings (required, with some exceptions, pursuant to *Order of the Secretary of Health 20-03*);
- staying home if sick;
- avoiding others who are sick;
- washing hands frequently;
- covering coughs and sneezes;
- avoiding touching eyes, nose and mouth with unwashed hands; and
- disinfecting surfaces and objects regularly; and

**FURTHERMORE**, I hereby incorporate a reference to the previously issued order requiring face coverings in the work place and further order, in addition to other requirements detailed in the *Safe Start Washington Phased Reopening Plan*, that:

While at work:
- No employee may work unless that employee wears a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start Washington Phased Reopening Plan*; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 Workplace Safety and Health Requirements. These face covering requirements supersede the face covering requirements in *Order of the Secretary of Health 20-03* to the extent that they would apply to employees when working.

3

When not at work:
- As required by *Order of the Secretary of Health 20-03*, or as I otherwise direct, no individual who is not expressly exempted may appear in any indoor or outdoor public setting, including but not limited to, a business, without wearing a face covering.

Employers:
- No employer may operate, allow a customer to enter a business, conduct business, or employ employees unless the employer (a) cooperates with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19; (b) cooperates with the implementation of infection control measures, including but not limited to isolation and quarantine and following the cleaning guidelines set by the CDC to deep clean and sanitize; (c) complies with all public health authority orders and directives; and (d) complies with all Department of Labor & Industries interpretive guidance, regulations, and rules and Department of Labor & Industries-administered statutes. Cooperation and compliance requirements are listed in the Reopening Plan.

**FURTHERMORE,** I continue to permit the low-risk activities previously permitted as reflected or clarified in formal guidance documents here, and which may be updated or modified as the science and data supports; and

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust the *Safe Start Washington Phased Reopening Plan* accordingly. Such adjustments may include, if necessary based on the data and science, delaying progress of any or all counties to a subsequent phase, or returning any or all counties to a prior phase.

**ADDITIONALLY,** in furtherance of these prohibitions and for general awareness:

1. Employers must comply with all conditions for operation required by the state Department of Labor & Industries, including interpretive guidance, regulations and rules, such as WAC 296-800-14035, and Department of Labor & Industries-administered statutes.
2. Everyone is required to cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19 and with the implementation of infection control measures pursuant to State Board of Health rule in WAC 246-101-425.
3. All mandatory guidelines for businesses and activities, which remain in effect except as modified by this Proclamation and the *Order of the Secretary of Health 20-03*, may be found at the Governor's Office website, *COVID-19 Resources and Information*, and at *COVID-19 Reopening Guidance for Businesses and Workers*.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are reminded again that no credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order goes into effect immediately, and remains in effect until it expires at 11:59 p.m. on July 9, 2020, or until this order is amended or rescinded, whichever occurs first.

Signed and sealed with the official seal of the state of Washington on this 1st day of July, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

5

# EXHIBIT K

COMPLAINT
NO. _____
Sunday, November 29, 2020

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268





**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**JAY INSLEE**
**Governor**

### PROCLAMATION BY THE GOVERNOR
### AMENDING PROCLAMATIONS 20-05 and 20-25 et seq.

### 20-25.6

### "SAFE START - STAY HEALTHY"
### COUNTY-BY-COUNTY PHASED REOPENING

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53 and 20-55 through 20-61, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS**, I issued Proclamations 20-25, 20-25.1, 20-25.2,and 20-25.3 *(Stay Home - Stay Healthy)*, and I subsequently issued Proclamation 20-25.4 ("*Safe Start – Stay Healthy" County-By-County Phased Reopening*), wherein I amended and transitioned the previous proclamations' prohibitions to the "*Safe Start – Stay Healthy*" prohibitions, prohibiting all people in Washington State from leaving their homes except under certain circumstances and limitations based on a phased reopening of counties as established in Proclamation 20-25.4 and according to the phase each county was subsequently assigned by the Secretary of Health; and on July 1, 2020, I issued Proclamation 20-25.5 ("*Safe Start – Stay Healthy" County-By-County Phased Reopening*) wherein I amended the previous proclamations, and incorporated the prohibitions involving statewide face coverings in *Order of the Secretary of Health 20-03;* and prohibited, among other things, employers from failing to cooperate with public health authorities; and updated the Reopening Plan; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS**, when I issued the *Safe Start–Stay Healthy* order (Proclamation 20-25.4) on May 31, 2020, there were approximately 21,349 cases of COVID-19 in Washington State with 1,118 deaths; when I issued the Safe Start-Stay Healthy order (Proclamation 20-25.5) on July 1, 2020, there were approximately 32,824 cases and 1,332 deaths; and, now, as of July 7, 2020, the Department of Health indicated that there have been 37,420 cases and 1,384 deaths, demonstrating the ongoing, present threat of this lethal disease; and

**WHEREAS**, health professionals and epidemiological modeling experts predict that although Washington State has passed the peak of the first wave of COVID-19 and has made adequate progress to modify some of the initial community mitigation efforts, the nature of COVID-19 viral transmission, including both asymptomatic and symptomatic spread as well as the relatively high infectious nature, suggests it is appropriate to slowly re-open Washington State only through a careful, phased, and science-based approach. Modelers continue to agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases, which the country is currently experiencing in many states; and

**WHEREAS**, the United States Centers for Disease Control and Prevention recommends that, in addition to its recommendation to maintain six-feet of physical distance from non-household members and frequent hand washing with soap and water or alcohol-based hand sanitizer, people wear cloth face coverings when they are in public settings where they cannot reliably maintain six feet of distance from others at all times, given the substantial increase in the numbers of cases of COVID-19 infection, these precautions must be mandatory; and

**WHEREAS,** the science also suggests that by ensuring safe social distancing hygiene practices, and the use of cloth face coverings, many business and recreational activities can be conducted with limited exposure to customers, which is important to revitalizing Washington State's economy, restoring jobs, and providing necessary goods and services; and

**WHEREAS,** the Washington State Department of Health's data and modeling demonstrate that many counties have significantly reduced or eliminated the number of new COVID-19 cases sufficiently to enable those counties to control and respond to virus outbreaks within the capacity of existing local and regional health care systems without significant increased risk of being overwhelmed, and this data continues to support providing all counties with an opportunity to lift some restrictions, subject to certain conditions and requirements, including the use of cloth face coverings; and

**WHEREAS**, on June 8, 2020, I ordered all employees to wear a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start Washington Phased Reopening Plan*; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 workplace safety and health requirements; and

**WHEREAS**, on June 24, 2020, the Secretary of Health issued Order 20-03, effective June 26, 2020, requiring all individuals in Washington state to wear a face covering that covers their nose and mouth

when in any indoor or outdoor public setting, except under certain circumstances, which provides a minimum level of protection for Washingtonians when they are not at work where the Department of Labor & Industries' face covering requirements apply; and

**WHEREAS**, due to a surge in COVID-19 infections in Yakima County, on June 24, 2020, I issued Proclamation 20-60, wherein I prohibited all employers in Yakima County from operating, allowing a customer to enter a business, or conducting in-person business with a customer unless the customer wore a face covering in compliance with Order of the Secretary of Health 20-03;

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., are amended to extend all of the prohibitions and each expiration date therein to 11:59 p.m. on August 6, 2020, and that except as otherwise provided in this order, the *Safe Start Washington Phased Reopening County-by-County Plan* found here, the *Order of the Secretary of Health 20-03*, issued on June 24, 2020, found here, and all other provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

**FURTHERMORE**, in addition to new prohibitions established in this Order and Reopening Plan, for the convenience of the reader, I repeat the language in Proclamation 20-25.5 below; and

**FURTHERMORE**, until there is an effective vaccine, effective treatment or herd immunity, it is crucial to continue to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery; and, therefore, throughout all phases, individuals should (or must, as noted below) continue to engage in personal protective behaviors including:

- practicing physical distancing, staying at least six feet away from other people;
- wearing cloth face coverings in public settings (required, with some exceptions, pursuant to *Order of the Secretary of Health 20-03*);

- staying home if sick;
- avoiding others who are sick;
- washing hands frequently;
- covering coughs and sneezes;
- avoiding touching eyes, nose and mouth with unwashed hands; and
- disinfecting surfaces and objects regularly; and

**FURTHERMORE**, I hereby incorporate a reference to the previously issued order requiring face coverings in the work place and further order, in addition to other requirements detailed in the *Safe Start Washington Phased Reopening Plan*, that:

While at work:
- No employee may work unless that employee wears a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start Washington Phased Reopening Plan*; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 Workplace Safety and Health Requirements. These prohibitions involving the use of face coverings supersede the prohibitions involving the use of face coverings in *Order of the Secretary of Health 20-03* to the extent that they would apply to employees when working.

When not at work:
- As required by *Order of the Secretary of Health 20-03*, or as I otherwise direct, no individual who is not expressly exempted may appear in any indoor or outdoor public setting, including but not limited to, a business, without wearing a face covering.

Employers:
- No employer may operate, allow a customer to enter a business, conduct business, or employ employees unless the employer (a) cooperates with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19; (b) cooperates with the implementation of infection control measures, including but not limited to isolation and quarantine and following the cleaning guidelines set by the CDC to deep clean and sanitize; (c) complies with all public health authority orders and directives; and (d) complies with all Department of Labor & Industries interpretive guidance, regulations, and rules and Department of Labor & Industries-administered statutes. Cooperation and compliance requirements are listed in the Reopening Plan.
- No business may operate, allow a customer to enter a business, or conduct business with a customer inside any building that is open to the public or outdoors in a public place unless the customer is wearing a face covering, as required by *Order of the Secretary of Health 20-03*.
- No employer may operate, unless it notifies the employer's local health jurisdiction within 24 hours if the employer suspects COVID-19 is spreading in the employer's workplace, or if the employer is aware of 2 or more employees who develop confirmed or suspected COVID-19 within a 14-day period; and

**FURTHERMORE,** I continue to permit the low-risk activities previously permitted as reflected or clarified in formal guidance documents here, and which may be updated or modified as the science and data support; and

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust the *Safe Start Washington Phased Reopening Plan* accordingly. Such adjustments may include, if necessary based on the data and science, delaying progress of any or all counties to a subsequent phase, or returning any or all counties to a prior phase.

**ADDITIONALLY**, in furtherance of these prohibitions and for general awareness:

1. Employers must comply with all conditions for operation required by the state Department of Labor & Industries, including interpretive guidance, regulations and rules, such as WAC 296-800-14035, and Department of Labor & Industries-administered statutes.
2. Everyone is required to cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19 and with the implementation of infection control measures pursuant to State Board of Health rule in WAC 246-101-425.
3. All mandatory guidelines for businesses and activities, which remain in effect except as modified by this Proclamation and the *Order of the Secretary of Health 20-03*, may be found at the Governor's Office website, *COVID-19 Resources and Information*, and at *COVID-19 Reopening Guidance for Businesses and Workers*.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are reminded again that no credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order goes into effect immediately, and remains in effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded, or until 11:59 p.m. on August 6, 2020, whichever occurs first.

Signed and sealed with the official seal of the state of Washington on this 7th day of July, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State

6

# EXHIBIT L

COMPLAINT
NO. _____
Sunday, November 29, 2020

62

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**JAY INSLEE**
**Governor**

**STATE OF WASHINGTON**

# OFFICE OF THE GOVERNOR

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

## PROCLAMATION BY THE GOVERNOR
## AMENDING PROCLAMATIONS 20-05 and 20-25 et seq.

### 20-25.7

### "SAFE START - STAY HEALTHY"
### COUNTY-BY-COUNTY PHASED REOPENING

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53 and 20-55 through 20-63, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS**, I issued Proclamations 20-25, 20-25.1, 20-25.2,and 20-25.3 (*Stay Home - Stay Healthy*), and I subsequently issued Proclamation 20-25.4 on May 31, 2020, ("*Safe Start – Stay Healthy" County-By-County Phased Reopening*), wherein I amended and transitioned the previous proclamations' prohibitions  to the  "*Safe Start – Stay Healthy*" framework, prohibiting all people in Washington State from leaving their homes except under certain circumstances and limitations based on a phased reopening of counties as established in Proclamation 20-25.4, et seq., and according to the phase each county was subsequently assigned by the Secretary of Health; and

**WHEREAS**, when I issued Proclamation 20-25.4 on May 31, 2020, I ordered that, beginning on June 1, 2020, counties would be allowed to apply to the Department of Health to move forward to the next phase of reopening more business and other activities; and by July 2, 2020, a total of five counties were approved to move to a modified version of Phase 1, 17 counties were in Phase 2, and 17 counties were in Phase 3; and

**WHEREAS**, when I issued the *Safe Start– Stay Healthy* order (Proclamation 20-25.4) on May 31, 2020, there were approximately 21,349 cases of COVID-19 in Washington State with 1,118 deaths ; and when I issued the *Safe Start-Stay Healthy* order (Proclamation 20-25.5) on July 1, 2020, there were approximately 32,824 cases and 1,332 deaths; and

**WHEREAS**, on July 1, 2020, when I issued Proclamation 20-25.5 ("*Safe Start – Stay Healthy*" *County-By-County Phased Reopening*), I amended the previous proclamations, and incorporated the prohibitions involving statewide face coverings in *Order of the Secretary of Health 20-03*; and

prohibited, among other things, employers from failing to cooperate with public health authorities; and updated the Reopening Plan; and

**WHEREAS**, on July 2, 2020, due to the increased COVID-19 infection rates across the state, I ordered a freeze on all counties moving forward to a subsequent phase, and that freeze remains in place today while I work with the Department of Health and other epidemiological experts to determine appropriate strategies to mitigate the recent increased spread of the virus and increased hospitalizations and deaths, and those strategies may include restricting some business and other activities; and

**WHEREAS**, when I last issued an extension of the *Safe Start– Stay Healthy* order (Proclamation 20-25.6) on July 7, 2020, the Department of Health reported that there were 37,420 cases, 4,723 hospitalizations and 1,384 deaths; and just over 2 weeks later (16 days), on July 23, 2020, there were 50,009 cases, 5,276 hospitalizations and 1,482 deaths, demonstrating the ongoing present threat and a dangerous upward spread of this lethal disease, and an apparent disregard by many individuals for the health and safety measures recommended by the Washington State Department of Health and the Centers for Disease Control and Prevention to control its spread; and

**WHEREAS**, on July 7, 2020, I issued Proclamation 20-25.6 ("*Safe Start – Stay Healthy*" *County-By-County Phased Reopening*), wherein I amended the previous proclamations, and, among other things, prohibited all employers in Washington from operating, allowing a customer to enter a business, or conducting business with a customer inside any building that is open to the public or outdoors in a public place unless the customer is wearing a face covering as required by *Order of the Secretary of Health 20-03*; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially members of our most vulnerable populations; and

**WHEREAS**, health professionals and epidemiological modeling experts advise that Washington is still in a state of COVID-19 outbreak, and pauses in phase reopening, restrictions on gathering size, and increased mask use may help prevent Washington from experiencing the crisis situation in Florida and Arizona; and

**WHEREAS**, the United States Centers for Disease Control and Prevention recommends that, in addition to its recommendation to maintain six-feet of physical distance from non-household members and frequent hand washing with soap and water or alcohol-based hand sanitizer, people wear cloth face coverings when they are in public settings where they cannot reliably maintain six feet of distance from others at all times, given the substantial increase in the numbers of cases of COVID-19 infection, these precautions must be mandatory; and

**WHEREAS,** the science also suggests that by ensuring safe social distancing hygiene practices, and the use of cloth face coverings, many business and recreational activities can be conducted with limited exposure to customers, which is important to revitalizing Washington State's economy, restoring jobs, and providing necessary goods and services; and

**WHEREAS**, on June 8, 2020, I ordered all employees to wear a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start*

2

*Washington Phased Reopening Plan*, and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 workplace safety and health requirements; and

**WHEREAS**, on June 24, 2020, the Secretary of Health issued Order 20-03, effective June 26, 2020, requiring all individuals in Washington State to wear a face covering that covers their nose and mouth when in any indoor or outdoor public setting, except under certain circumstances, which provides a minimum level of protection for Washingtonians when they are not at work where the Department of Labor & Industries' face covering requirements apply; and

**WHEREAS**, due to a surge in COVID-19 infections in Yakima County, on June 24, 2020, I issued Proclamation 20-60, wherein I prohibited all employers in Yakima County from operating, allowing a customer to enter a business, or conducting in-person business with a customer unless the customer wore a face covering in compliance with *Order of the Secretary of Health 20-03*; and

**WHEREAS**, on July 24, 2020, the Secretary of Health issued Order 20-03.1, effective July 25, 2020, which expands the Secretary's prior face covering mandate to require all people in Washington State to wear a face covering when they are outside of their house, mobile home, apartment, condominium, hotel or motel room, bedroom in a congregate living setting, or other dwelling unit; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., are amended to extend all of the prohibitions described herein until this order is amended or rescinded.  And except as otherwise provided in this order, the *Safe Start Washington Phased Reopening County-by-County Plan* found here, the *Order of the Secretary of Health 20-03.1*, issued on July 24, 2020, found here, and all other provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

**FURTHERMORE**, in addition to new prohibitions established in this Order and Reopening Plan, for the convenience of the reader, I repeat the language in Proclamation 20-25.6 below; and

**FURTHERMORE**, until there is an effective vaccine, effective treatment or herd immunity, it is crucial to continue to maintain some level of community interventions to suppress the spread of COVID-19 throughout all phases of recovery; and, therefore, throughout all phases, individuals should (or must, as noted below) continue to engage in personal protective behaviors including:

- practicing physical distancing, staying at least six feet away from other people;
- wearing face coverings in public settings (required, with some exceptions, pursuant to *Order of the Secretary of Health 20-03.1*);
- staying home if sick;
- avoiding others who are sick;
- washing hands frequently;
- covering coughs and sneezes;
- avoiding touching eyes, nose and mouth with unwashed hands; and
- disinfecting surfaces and objects regularly; and

**FURTHERMORE**, I hereby incorporate by reference the previously-issued order requiring face coverings in the work place and further order, in addition to other requirements detailed in the *Safe Start Washington Phased Reopening Plan*, that:

<u>While at work</u>:
- No employee may work unless that employee wears a face covering when working, except when working alone or when the job involves no in-person interaction, as detailed in the *Safe Start Washington Phased Reopening Plan*; and, further, that employers must provide cloth facial coverings to employees, unless their exposure dictates a higher level of protection as described in the Department of Labor & Industries' COVID-19 Workplace Safety and Health Requirements. These prohibitions involving the use of face coverings supersede the prohibitions involving the use of face coverings in *Order of the Secretary of Health 20-03.1* to the extent that they would apply to employees when working.

<u>When not at work</u>:
- As required by *Order of the Secretary of Health 20-03.1*, or as I otherwise direct, no individual may appear in any indoor or outdoor public or non-public setting outside of their house, mobile home, apartment, condominium, hotel or motel room, or other dwelling unit without wearing a face covering, unless the individual or activity is specifically exempted. Among other exemptions, an individual does not have to wear a face covering while in an outdoor area if they maintain a distance of at least six feet from non-household members.

<u>Employers</u>:
- No employer may operate, allow a customer to enter a business, conduct business, or employ employees unless the employer (a) cooperates with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19; (b) cooperates with the implementation of infection control measures, including but not limited to isolation and quarantine and following  the cleaning guidelines set by the CDC to deep clean and sanitize; (c) complies with all public health authority orders and directives; and (d) complies with all Department of Labor & Industries interpretive guidance, regulations, and rules and Department of Labor & Industries-administered statutes. Cooperation and compliance requirements are listed in the Reopening Plan.

- No business may operate, allow a customer to enter a business, or conduct business with a customer inside any building that is open to the public or outdoors in a public place unless the customer is wearing a face covering, as required by *Order of the Secretary of Health 20-03.1*.
- No employer may operate, unless it notifies the employer's local health jurisdiction within 24 hours if the employer suspects COVID-19 is spreading in the employer's workplace, or if the employer is aware of 2 or more employees who develop confirmed or suspected COVID-19 within a 14-day period; and

**FURTHERMORE,** I continue to permit the low-risk activities previously permitted as reflected or clarified in formal guidance documents here, and which may be updated or modified as the science and data support; and

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust the *Safe Start Washington Phased Reopening Plan* accordingly. Such adjustments may include, if necessary based on the data and science, delaying progress of any or all counties to a subsequent phase, or returning any or all counties to a prior phase.

**ADDITIONALLY**, in furtherance of these prohibitions and for general awareness:

1. *Order of the Secretary of Health 20-03.1*, issued on July 24, 2020, is incorporated by reference, may be amended as is necessary, and all such amendments are also incorporated by reference.
2. Employers must comply with all conditions for operation required by the state Department of Labor & Industries, including interpretive guidance, regulations and rules, such as WAC 296-800-14035, and Department of Labor & Industries-administered statutes.
3. Everyone is required to cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19 and with the implementation of infection control measures pursuant to State Board of Health rule in WAC 246-101-425.
4. All mandatory guidelines for businesses and activities, which remain in effect except as modified by this Proclamation and the *Order of the Secretary of Health 20-03.1*, may be found at the Governor's Office website, *COVID-19 Resources and Information*, and at *COVID-19 Reopening Guidance for Businesses and Workers*.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military

Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

All persons are reminded again that no credentialing program or requirement applies to any activities or operations under this Proclamation.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order goes into effect immediately, and remains in effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded or until this order is amended or rescinded.

Signed and sealed with the official seal of the state of Washington on this 24th day of July, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State

6

# EXHIBIT M

COMPLAINT
NO. _____
Sunday, November 29, 2020

63

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

**JAY INSLEE**
**Governor**



**STATE OF WASHINGTON**

## OFFICE OF THE GOVERNOR

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

### PROCLAMATION BY THE GOVERNOR
### AMENDING PROCLAMATIONS 20-05 and 20-25, et seq.

### 20-25.8

### "STAY SAFE– STAY HEALTHY"
### ROLLBACK OF COUNTY-BY-COUNTY PHASED REOPENING
### RESPONDING TO A COVID-19 OUTBREAK SURGE

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS**, I issued Proclamations 20-25, et seq., first entitled "*Stay Home – Stay Healthy*," and later changed to "*Safe Start – Stay Healthy" County-By-County Phased Reopening* found here, in which I initially prohibited all people in Washington State from leaving their homes except under certain circumstances and then gradually relaxed those limitations based on county-by-county phasing established according to metrics provided by the Secretary of Health; and

**WHEREAS**, on July 2, 2020, due to the increased COVID-19 infection rates across the state, I ordered a freeze on all counties moving forward to a subsequent phase, and that freeze remains in place today; and

**WHEREAS,** on July 24, 2020, the Secretary of Health issued *Order of the Secretary of Health 20-03.1*, found here, which, among other things, requires (with exceptions) the use of face coverings throughout the state; and

**WHEREAS**, despite this guidance, positive COVID-19-related cases and hospitalizations have been on a steady rise since early September; and, most alarmingly, from the latter part of October through the first two weeks of November, 2020, COVID-19 cases have doubled in

Washington, and COVID-19-related hospitalizations have risen sharply, putting our people, our health system, and our economy in as dangerous a position as we faced in March 2020; and

**WHEREAS,** there is evidence that the virus is spread through very small droplets called aerosols that are expelled from our mouths when we breathe, talk, sing, vocalize, cough, or sneeze, that these aerosols linger in air, and that a significant risk factor for spreading the virus is prolonged, close contact with an infected person indoors, especially in poorly ventilated spaces; and

**WHEREAS,** we know that several factors increase the risk for person-to-person COVID-19 transmission; such factors include (1) the more that people and groups interact, (2) the longer those interactions last, (3) the closer the contact between individuals, and (4) the denser the occupancy for indoor facilities; and

**WHEREAS,** the Washington State Department of Health and the Centers for Disease Control and Prevention have provided health and safety guidance to reduce the risk of transmission of COVID-19 generally and in specific sectors, environments, and settings, yet many individuals continue to disregard this guidance, and person-to-person interactions, including gatherings, have led to many infections and are a primary factor in the dangerous increase in COVID-19 cases and hospitalizations currently being experienced in Washington; and

**WHEREAS,** to reduce the severe increases in COVID-19 cases and hospitalizations we are currently facing, and to reduce the increase in deaths from COVID-19 that likely will follow, it is necessary to immediately modify prior prohibitions and guidance, and to issue further guidance as it is developed; and

**WHEREAS,** COVID-19, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State and remains a significant health risk to all of our people, especially among our most vulnerable populations; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the

2

impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), Proclamations 20-25, et seq., renamed "Stay Safe – Stay Healthy" are amended to extend all of the prohibitions described herein until this order is amended or rescinded. Except as otherwise provided in this order, the *Safe Start Washington Phased Reopening County-by-County Plan* found here, the *Order of the Secretary of Health 20-03.1*, issued on July 24, 2020, found here, and all other provisions of Proclamations 20-25, et seq., shall remain in full force and effect.

**FURTHERMORE,** pursuant to RCW 43.06.220(3), the prohibitions set forth in Proclamations 20-25, et seq., are modified as set forth below. Unless otherwise specifically noted, the modifications take effect at 12:01 a.m., Tuesday, November 17, 2020. All modifications to existing prohibitions set forth herein shall expire at 11:59 p.m., Monday, December 14, 2020, unless otherwise extended.

If an activity is not listed below, currently existing guidance shall continue to apply. If current guidance is more restrictive than the below listed restrictions, the most restrictive guidance shall apply. These below modifications do not apply to education (including but not limited to K-12, higher education, trade and vocational schools), childcare, health care, and courts and judicial branch-related proceedings, all of which are exempt from the modifications and shall continue to follow current guidance. Terms used in this proclamation have the same definitions used in the *Safe Start Washington Phased Reopening County-by-County Plan.*

**Modifications to existing prohibitions:**

1. **Indoor Social Gatherings** with people from outside your household are prohibited unless they (a) quarantine for fourteen days (14) prior to the social gathering; or (b) quarantine for seven (7) days prior to the social gathering and receive a negative COVID-19 test result no more than 48-hours prior to the gathering. A household is defined as individuals residing in the same domicile.
2. **Outdoor Social Gatherings** shall be limited to five (5) people from outside your household.
3. **Restaurants and Bars** are closed for indoor dine-in service. Outdoor dining and to-go service are permitted, provided that all outdoor dining must comply with the requirements of the Outdoor Dining Guidance here. Table size for outdoor dining is limited to a maximum of five (5) people. These modified restaurant and bar restrictions go into effect at 12:01 a.m. Wednesday, November 18, 2020.

3

4. **Fitness Facilities and Gyms** are closed for indoor operations. Outdoor fitness classes are permitted but are subject to and limited by the outdoor social gathering restriction listed above.

5. **Bowling Centers** are closed for indoor service.

6. **Miscellaneous Venues:** All retail activities and business meetings are prohibited. Only professional training and testing that cannot be performed remotely, as well as all court and judicial branch-related proceedings, are allowed. Occupancy in each meeting room is limited to 25 percent of indoor occupancy limits or 100 people, whichever is fewer.

   ▪ Miscellaneous venues include: convention/conference centers, designated meeting spaces in a hotel, events centers, fairgrounds, sporting arenas, nonprofit establishment, or a substantially similar venue**.**

7. **Movie Theaters** are closed for indoor service. Drive-in movie theaters are permitted and must continue to follow current drive-in movie theater guidance.

8. **Museums/Zoos/Aquariums** are closed for indoor service.

9. **Real Estate:** Open houses are prohibited.

10. **Wedding and Funerals:** Ceremonies are limited to a total of no more than 30 people. Indoor receptions, wakes, or similar gatherings in conjunction with such ceremonies are prohibited.

11. **In-Store Retail** shall be limited to 25 percent of indoor occupancy limits, and common/congregate seating areas and indoor dining facilities such as food courts are closed.

12. **Religious Services** are limited to 25 percent of indoor occupancy limits, or no more than 200 people, whichever is fewer. Congregation members/attendees must wear facial coverings at all times and congregation singing is prohibited. No choir, band, or ensemble shall perform during the service. Vocal or instrumental soloists are permitted to perform, and vocal soloists may have a single accompanist. Outdoor services must follow the Outdoor Dining Guidance, found here, applicable to the structure or facility.

13. **Professional Services** are required to mandate that employees work from home when possible and close offices to the public if possible. Any office that must remain open must limit occupancy to 25 percent of indoor occupancy limits.

14. **Personal Services** are limited to 25 percent of indoor occupancy limits.

   ▪ Personal service providers include: cosmetologists, cosmetology testing, hairstylists, barbers, estheticians, master estheticians, manicurists, nail salon workers, electrologists, permanent makeup artists, tanning salons, and tattoo artists.

15. **Long-term Care Facilities:** Outdoor visits are permitted. Indoor visits are prohibited, but individual exceptions for an essential support person or end-of-life care are permitted. These restrictions are also extended to the facilities in Proclamation 20-74, et seq. All other provisions of Proclamations 20-66, et seq., and 20-74, et seq., including all preliminary criteria to allow any visitors, remain in effect.

16. **Youth and Adult Sporting Activities**: Indoor activities and all contests and games are prohibited. Outdoor activities shall be limited to intra-team practices only, with facial coverings required for all coaches, volunteers and athletes at all times.

**FURTHERMORE,** in collaboration with the Washington State Department of Health, in furtherance of the physical, mental, and economic well-being of all Washingtonians, I will continue to analyze the data and epidemiological modeling and adjust guidance accordingly.

**ADDITIONALLY**, as a reminder, a travel advisory for all non-essential travel, issued on November 13, 2020, remains in effect. That advisory provides the following guidance: (1) Persons arriving in Washington from other states or countries, including returning Washington residents, should self-quarantine for 14 days after arrival. These persons should limit their interactions to their immediate household; and (2) Washingtonians are encouraged to stay home or in their region and avoid non-essential travel to other states or countries.

**ADDITIONALLY**, in furtherance of these prohibitions and for general awareness:

1. *Order of the Secretary of Health 20-03.1*, issued on July 24, 2020, is incorporated by reference, and may be amended as is necessary; and, all such amendments are also incorporated by reference.
2. Employers must comply with all conditions for operation required by the state Department of Labor & Industries, including interpretive guidance, regulations and rules such as WAC 296-800-14035, and Department of Labor & Industries-administered statutes.
3. Everyone is required to cooperate with public health authorities in the investigation of cases, suspected cases, outbreaks, and suspected outbreaks of COVID-19 and with the implementation of infection control measures pursuant to State Board of Health rule in WAC 246-101-425.
4. All mandatory guidelines for businesses and activities, which remain in effect except as modified by this Proclamation and the *Order of the Secretary of Health 20-03.1*, may be found at the Governor's Office website, *COVID-19 Resources and Information*, and at *COVID-19 Reopening Guidance for Businesses and Workers*.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

Unless extended or amended, upon expiration or termination of this amendatory proclamation the provisions of Proclamation 20-25, et seq., will continue to be in effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded.

Signed and sealed with the official seal of the state of Washington on this 15th day of November, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____

Secretary of State

# EXHIBIT N

COMPLAINT
NO. _____
Sunday, November 29, 2020

64

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

# Professional Sports & Other Sporting Activities COVID-19 Requirements

**Summary of November 16 changes:**

**Pursuant to Governor Inslee's Proclamation 20-25.8, *Stay Safe-Stay Healthy*, these requirements are effective November 16, 2020 through December 14, 2020. Summary of changes in November 16 Proclamation 20-25.8 update:**

- School and Non-school sporting activities youth and adult now require facial coverings for all coaches, volunteers and athletes at all times.
- School and Non-school sporting activities youth and adult can are only allowed outdoors. Indoor practice, training, competitions, and other activities are not allowed.
- School and Non-school sporting activities youth and adult low and moderate risk sports are now allowed intra-team competitions and are not restricted to groups of six. No practice, training or competitions with other teams allowed.
- School and Non-school sporting activities youth and adult requirements are now the same for every county of the state. Non-essential travel such as out-of-state team or individual travel for sporting activities are subject to quarantines as detailed in the Governor's Travel Advisory.

**New Higher Education, Colleges, Universities Sporting Activities Guidance, effective immediately with no end date:**

- Section added for higher education, colleges and universities including requirements for school COVID-19 prevention plans for schools and COVID-19 prevention plan for athletic conferences, and clarification on spectator restrictions.

**Included Here:**

- Professional sporting activities indoor and outdoor
- School and non-school youth team sports indoor and outdoor, and adult recreational team sports indoor and outdoor
- Higher education, colleges and universities sporting activities

All professional sporting activities, indoor and outdoor, outdoor youth team sports, and outdoor adult recreational team sports operating during the Safe Start Washington phased reopening must adopt a written procedure for employee safety and customer interaction that is at least as strict as this procedure and that complies with the safety and health requirements below, including recreation-specific guidance.

**No business may operate until it can meet and maintain all the requirements in this document, including providing materials, schedules and equipment required to comply. Additional considerations may be adopted, as appropriate.**

**Professional Sporting Activities, Indoor and Outdoor**

**RESTART COVID-19 REQUIREMENTS AND RECOMMENDATIONS**

All professional sporting activities, including back office operations of up to 50 people, unless a county's then-current phase permits a greater number of people, full team practices, and spectator-less games

and competitions, can resume on June 5, 2020, regardless of phase, if all of the following conditions are met:

- The organization follows both the league-wide and team-specific "return to play" safety plans.
- The league-wide plan is approved by the player's association or union representing players of the team.
- The team must report in advance to its respective county health department the dates when full team practices and spectator-less pre-season games will occur.
- For horse racing, instead of the above requirements, a horse racing safety plan safety plan must be developed and followed and, along with specific guidance to horse racing, which can be found here.

**School and Non-school Youth Team Sports Indoor and Outdoor and Adult Recreational Team Sports Indoor and Outdoor**

The risk of transmitting the SARS CoV-2 virus that causes COVID-19 depends on multiple factors including: 1) Number of people in a location, 2) Type of location, 3) Distance between people, 4) Length of time at location, 5) Level of protective equipment used (e.g. face coverings). As general guidance, smaller groups are safer than larger ones; outdoor locations are safer than indoor; sports that can ensure distance of six (6) feet or more are safer than closer contact; and shorter duration is safer than longer.

**Sport Risk Category guidance**

*For the purposes of this document, sports are defined using the following risk categories (The list below is not all-encompassing. Some sports are covered in other guidance documents, and if so those guidance documents govern those activities. If a sport does not appear on this list that does not necessarily mean it is prohibited at this time.):*

Low risk sports: tennis, swimming, diving, pickleball, golf, cross country, track and field, sideline/no-contact cheer and dance, disc golf.

Moderate risk sports: softball, baseball, t-ball, soccer, futsal, volleyball, lacrosse, flag football, ultimate frisbee, ice hockey, cricket, gymnastics, crew, field hockey, school bowling competitions.

High risk sports: football, rugby, wrestling, cheerleading with contact, dance with contact, basketball, water polo, martial arts competitions, roller derby.

**Pursuant to Governor Inslee's Proclamation 20-25.8, *Stay Safe-Stay Healthy*, these requirements are effective November 16, 2020 through December 14, 2020 and apply to ALL counties regardless of current COVID-19 activity rates:**

High risk sports:

Facial coverings required for all coaches, volunteers and athletes at all times. Outdoor team practices and/or training can resume for high risk sports if players are limited to groups of six in separate parts of the field/court, separated by a buffer zone. Indoor practice, training, competitions, and other activities are not allowed. Brief close contact (ex: 3 on 3 drills) is permitted. It is preferable for the groups of six to be stable over time. Attendance rosters should include group contact information. Each league, organization, or club must publish and follow a "return to play" safety plan.

<u>Low and Moderate risk sports</u>

Facial coverings required for all coaches, volunteers and athletes at all times. Outdoor team practices, training and intra-team competitions can resume for low and moderate risk sports. Scrimmage against other teams or training or practices with other teams is not allowed. Indoor practice, training, competitions, and other activities are not allowed. Coached training and practices for individual water sports, such as swimming and diving, are allowed in indoor or outdoor pools in accordance with the Department of Health water recreation guidelines, but meets and competitions are not allowed. Attendance rosters should include group contact information. Each league, organization, or club must publish and follow a "return to play" safety plan.

**Guidance applicable to ALL sporting activities at ALL county risk levels**

All Indoor facility operations are closed; all indoor activities, training, practice, and all contests and games are prohibited. Coached training and practices for individual water sports, such as swimming and diving, are allowed in indoor or outdoor pools in accordance with the Department of Health water recreation guidelines, but meets and competitions are not allowed.

No tournaments allowed.

Non-essential travel such as out-of-state team or individual travel for sporting activities are subject to quarantines as detailed in the Governor's Travel Advisory.

No spectators allowed except for one parent/guardian/caregiver for each minor-aged participant allowed. Spectators must maintain physical distance of at least six (6) feet between each person and wear facial coverings at all times. No spectators allowed for participants 18 and older.

*Stay home when sick or if a close contact of someone with COVID-19*

Athletes, coaches, umpires/referees, spectators and any other paid or volunteer staff should be required to stay home if they feel unwell, show any signs of COVID-19, or are a close contact of a confirmed case. All coaches and students should be screened for signs/symptoms of COVID-19 prior to a workout. Screening should consider symptoms listed by the CDC. Any person with symptoms of COVID-19 or who is a close contact of someone with confirmed COVID-19 should not be allowed to participate and should contact his or her primary care provider or other appropriate health-care professional.

Those who are excluded from training or contests due to COVID-19 symptoms or because they are close contacts must follow DOH and local public health isolation and quarantine guidance before returning to training or contests.

People with underlying health conditions should consult with their medical provider regarding participation in athletic activities.

*Masks*

Masks required for all athletes/participants. Coaches, trainers, managers, spotters, and any other paid or volunteer staff must wear face coverings at all times.

*Physical Distance*

Physical distance of 6 feet must be maintained between staff, volunteers, and any spectators at all times with exceptions for training and medical personnel and volunteers performing their medical duties.  Six feet of distance must be maintained among athletes when not engaged in sporting activities, huddles and team meetings must be physically distanced.

*Hygiene*

Require athletes, coaches, umpires/referees and any other paid or volunteer staff to practice good hygiene including washing their hands frequently and covering their sneezes and coughs. Wash hands often with soap and water for at least 20 seconds before and after practice, especially after touching shared objects or blowing your nose, coughing, or sneezing. Avoid touching your eyes, nose, and mouth. If soap and water are not readily available, use a hand sanitizer that contains 60-95% alcohol content. Cover all surfaces of your hands and rub them together until they are dry. Athletes should not share water bottles, uniforms, towels, or snacks and should not spit (saliva, sunflower seeds, etc.).

Provide handwashing or hand sanitizing stations at training and contest locations.

Limit the use of locker rooms to handwashing and restroom use only. Showers should not be used due to potential spread of aerosolized droplets. If use of locker rooms for changing is necessary, maximize ventilation and use tape, spots, or cones to signal 6 feet of distance for athletes who need to change. If locker rooms are used cleaning protocols must be included in the sporting activity safety plan. Stagger entry to the changing area and use of these facilities as appropriate with members of the same team or training cohort only. Limit occupancy of the locker rooms to avoid crowding.

*Cleaning*

Clean high touch surfaces and disinfect shared equipment before and after each use. Ensure restrooms are cleaned and disinfected regularly. Current CDC guidance for cleaning and disinfection for COVID-19 states that disinfectants should be registered by the EPA for use against the COVID-19. Find the current list here: List N: Disinfectants for Use Against SARS-CoV-2 (COVID-19). Disinfectants based on hydrogen peroxide or alcohol are safer than harsher chemicals. The University of Washington has a handout with options for safer cleaning and disinfecting products that work well against COVID-19.

*Ventilation*

Ventilation is important to have good indoor air quality. Ensure that ventilation systems operate properly. Increase air circulation and ventilation as much as possible by opening windows and doors. Offer more outside time, open windows often and adjust mechanical ventilation systems to bring in as much outside air as possible. Increase filters to MERV 13 if the HVAC can accommodate. Use of fans for cooling is acceptable. In indoor spaces, fans should only be used when windows or doors are open to the outdoors in order to circulate indoor and outdoor air. They should blow away from people.

Outdoors locations are preferred to indoors locations, and should be utilized to the greatest extent possible to allow for maximum fresh air circulation and social distancing. Outdoor temporary structures may be used. An outdoor temporary structure is defined as having no more than two walls to provide appropriate ventilation.

*Transportation*

Limit exposure to those outside the household unit during travel. Encourage only those in the same household to travel together, and if not in the same household, travel in separate vehicles if possible.

For travel groups, (groups that include more than one household in the same vehicle whether in a carpool or on a bus) all members of the travel group, including the driver, must wear a face covering and spread out as much as possible within the vehicle. Limit travel groups to those who have been in regular contact (e.g. team members). Encourage family members to sit together. Maximize ventilation in the vehicle by opening windows.

Buses should install safety barriers (such as plexiglass shields) between the driver and passengers or close (block off/leave empty) the seats nearest the driver to ensure 6 feet of distance between the driver and passengers. Passengers should board from the rear door when possible. Buses should improve air filtration where possible. Buses should be cleaned and disinfected daily after use with attention to frequently touched services (doors, rails, seat backs).

*Records and Contact Tracing*

Keep a roster of every athlete, staff and volunteer present at each practice, training session, and contest to assist with contact tracing in the event of a possible exposure. Similarly keep a roster and seating chart for each travel group.  Attendance rosters and seating charts must be kept on file for 28 days after the practice, contest, or trip.

*Employees*

Employers must specifically ensure operations follow the main Labor & Industries COVID-19 requirements to protect workers. COVID-19 workplace and safety requirements can be found here.

**Higher Education, Colleges, Universities Sporting Activities Guidance**

**RESTART COVID-19 REQUIREMENTS AND RECOMMENDATIONS**

Before returning to play sporting and athletic activities colleges, universities, and higher education institutions must:

1. Adhere to the Governor's Office guidance in the Higher Education and Workforce Training COVID-19 Requirements, and follow the principals of the Campus Reopening Guide.
2. Adhere to the Secretary of the Department of Health Face Coverings Order, and current DOH orders specific to higher education, and any other relevant DOH guidelines regarding hygiene, cleaning, ventilation, transportation, and records and contact tracing. Department of Health Resources and Recommendation can be found here.
3. Ensure operations follow the Labor & Industries COVID-19 requirements to protect workers. COVID-19 workplace and safety requirements can be found here.

In order to return to practices and competition colleges, universities, and higher education institutions must have a COVID-19 prevention plan for athletics. The plan must either:

- Adopt sporting activities guidelines from Governor's office **or**,

- Create a COVID-19 prevention plan for athletics and integrate requirements from an approved COVID-19 prevention plan for athletics adopted by the athletic conference in which the college, university, or higher education institution is a member.

4. A college, university, or higher education institution that does not adopt the Sporting activities guidance and adopts their conference COVID-19 prevention plan for athletics must maintain their return-to-play COVID-19 prevention plan on file for review upon request by the local health jurisdiction in the county where the college, university, or higher education institution resides or by the Washington State Department of Health. If a college, university, or higher education institution participates in an athletic conference, that athletic conference's COVID-19 prevention plan for athletics must be approved by all member schools of the conference who are participating in athletic competition with Washington state schools and be submitted for review, but not for approval, to the Washington State Department of Health. Schools participating in athletic activities are responsible for ensuring their athletic conference COVID-19 prevention plan is submitted to Washington State Department of Health for review.

5. Regardless of which plan (Washington State Sporting Activities guidelines or a conference COVID-19 prevention plan) a higher education institution follows, there shall be no spectators at games and competitions until such time as spectators are allowed for sporting activities and athletics under the Safe Start Washington Plan.

# EXHIBIT O

COMPLAINT
NO. _____
Sunday, November 29, 2020

65

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

COVID-19

For the latest COVID-19 health guidance, statistics and resources, visit Coronavirus.wa.gov.

NOTE: Due to scheduled maintenance, webforms will be unavailable Thursday, November 26th from 4:00 AM to 5:00 AM.

**Washington Governor - Jay Inslee**

## Inslee statement on protests and activation of additional National Guard personnel

May 31, 2020

### Story

Gov. Jay Inslee today activated an additional 200 members of the Washington National Guard in response to a second request from the City of Seattle to help clean up, protect against property damage, and manage crowds and traffic during downtown protests. Guard personnel will be unarmed and work under the direction of City of Seattle leadership.

The additional guard personnel were activated by a letter from the governor to Maj. Gen. Bret Daugherty, commander of the Washington National Guard, the day after demonstrations in Seattle protesting the death of George Floyd in Minnesota earlier this week turned destructive.

Inslee this morning issued the following statement:

"Saturday's disheartening events in Seattle – carried out by a smattering of the thousands of protesters on hand – will not deter the cause of justice. Hundreds of public servants and volunteers are already helping clean up the property damage done. I have complete faith that downtown Seattle will recover from this quickly, and the state will help, however we may be of assistance.

"Thousands were protesting peacefully against an atrocious act of brutality. This cause confronts a different kind of destruction, one that can't be fixed with new windows, graffiti-scrubbed walls or insurance. The message behind the demonstration was compelling and one all of us should share. We will not allow vandalism and destruction to obscure the protest's central call for justice.

"On behalf of all Washingtonians who believe in justice, I want to thank the protesters who carried a peaceful and important message. We all also owe gratitude to law enforcement, fire fighters, medics, National Guard and volunteers who are working to protect the city and its people."

Read the letter here.

**Background:**

- Inslee statement on Saturday protests
- Inslee activates National Guard at request of City of Seattle

## Media Contact

Tara Lee | tara.lee@gov.wa.gov
360.902.4136

Karina Shagren | Karina.Shagren@mil.wa.gov
253.442.4765

# EXHIBIT P

COMPLAINT
NO. _____
Sunday, November 29, 2020

66

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

COVID-19

**For the latest COVID-19 health guidance, statistics and resources, visit Coronavirus.wa.gov.**

NOTE: Due to scheduled maintenance, webforms will be unavailable Thursday, November 26th from 4:00 AM to 5:00 AM.

**Washington Governor - Jay Inslee**

## Inslee statement on Saturday protests

May 30, 2020

### Story

"As people gather today to protest the unjust death of George Floyd, I hope they do so peacefully and safely. Everyone has the freedom - and the right - to demonstrate and speak their mind. However, violence and destruction have no place in Washington state or our country.

"Together, we grieve for the death of George Floyd, and many, many others. The events in Minnesota and across the nation the past few nights have been stunning and illustrate how inequity causes people to lose faith in their public institutions.

"The trauma inflicted on generations of people of color must be acknowledged, and more must be done to correct it. Feeling second-class in one's own community does not make people feel safe. Insecurity hardens into anger.

"I fully support the right to free speech and peaceful assembly. I applaud every Washingtonian standing for what they believe in, but we must do so in a way that allows space for these important and necessary discussions, not in a way that inspires fear.

"If you choose to protest today, please be safe and peaceful. These are important issues that deserve our full attention, without distraction from violence and destruction. Without solutions to inequity, the long road to justice will run even longer."

### Media Contact

Public and constituent inquiries | 360.902.4111
Press inquiries | 360.902.4136

# EXHIBIT Q

COMPLAINT
NO. _____
Sunday, November 29, 2020

67

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

| | |
|---|---|
| **From:** | Martin, Tim |
| **To:** | Benton, Paul; Harris, Trent; Musich, Michael (Max) |
| **Subject:** | FW: |
| **Date:** | Thursday, June 18, 2020 2:13:09 PM |
| **Attachments:** | 061820 event.PNG |
| | I-5 march.jpg |
| | I-5 Post.jpg |

I spoke with Commander King about this, and the only thing being asked of NRT is to simply monitor on the outer perimeter for Antifa issues, just like normal.

This is due to go from 1600-1900 hours tomorrow, and no intervention beyond that unless it is absolutely needed.  The freeway/bridge is being given to them by order of the Governor, and WSP has been told to divert traffic from I-5 onto SR-500.  I am sure OSP is doing the same across the river.  We are not intervening in WSP's operation and last time this occurred on I-84, they did the same and were off the roadway in about 20-30 minutes.

Sorry I can't be there to help, but I will be available around 1830 if I need to come in.

Sgt Chylack will be participating as well, and Schoolcraft/Yoder.

---

**From:** King, Dave
**Sent:** Thursday, June 18, 2020 12:40 PM
**To:** Martin, Tim; Chylack, Mike; Dumas, Sean; Shipp, McAvoy; Barton, Kevin; Kubala, Therese; Anderson, Jack W. (VPD); Geddry, Blaise; Winther, Timmi; Githens, Michael; Whitney, Michael; Raquer, Greg
**Cc:** Hatley, Kevin; Williams, Chad (VPD); Knotts, Mike; Geddry, Blaise; Foster, Amy; McNicholas, Kathy; Kistler, Nannette; Price, Troy
**Subject:** FW:

All

In planning for this event, I want to expand on the basic plan we have used these past few weeks with SIU in the crowd and NRT, traffic and patrol  resources available as needed.  I will have the formal IAP completed and distributed this afternoon.  We will need East resources available if the situation requires it.

Days – hold over until 7 with normal patrol duties
Early Swings – no change
Swings – no change
Graves –in early at 6 PM
Bikes – assigned from patrol to bike duties at 3 PM

Traffic, NRT and SWAT will all have specific  assignments.  Briefing will occur at West Precinct for Sergeants at 3 PM. VPD HQ will serve e as the staging area for MFF and be the Incident Command location.

Dave

# EXHIBIT R

COMPLAINT
NO. _____
Sunday, November 29, 2020

68

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

| **To:** | Gundermann, John (WSP) |
| **Cc:** | Sharff, Trisena (WSP) |
| **Subject:** | Fwd: Protester |
| **Date:** | Friday, June 19, 2020 8:17:15 PM |

Evening Sir-
I am told you are responding to all protest related complaints. I will send a few calls/complaints your way as the result of the I5 Bridge protest tonight.
I will also send you a copy of our IAP as a reference as well.  See below.
Thanks/Jason

Sent from my iPhone
Begin forwarded message:

From: "Adams, Tom (WSP)" <Tom.Adams@wsp.wa.gov>
Date: June 19, 2020 at 7:09:51 PM PDT
To: "Linn, Jason (WSP)" <Jason.Linn@wsp.wa.gov>
Subject: Protester

Jim Ferguson # ███████████

He has requested a phone call referencing the blockage of the bridge. He was advised that we were under the order of the Governor but he would still like a phone call.  He was not rude but cordial on the phone.

Tom

# EXHIBIT S

COMPLAINT
NO. _____
Sunday, November 29, 2020

69

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

| | |
|---|---|
| **From:** | Juve, Gene |
| **To:** | Price, Troy |
| **Cc:** | McElvain, James |
| **Subject:** | RE: Report of Non-Compliance |
| **Date:** | Thursday, April 16, 2020 10:12:00 AM |
| **Attachments:** | image001.png |

That sounds good to me, Troy… I sent a follow-up request to Heather this morning regarding Walnut Grove Church. BTW: I didn't find the precinct maps on the web very useful… do you have an e-version that would also show the districts?

Thanks,

Gene

---

**From:** Price, Troy
**Sent:** Thursday, April 16, 2020 9:55 AM
**To:** Juve, Gene
**Cc:** McElvain, James
**Subject:** FW: Report of Non-Compliance

Good morning Gene!

Just to bring you up-to-speed on our process, Heather Abbott receives the complaint information and funnels it to the appropriate precinct to be appropriately addressed. Our process doesn't send the information back to her from the precinct.

If the complaint is about social distancing issues at a business, we are not taking any enforcement action. We will contact businesses that are considered non-essential if we receive information that they are operating and open to the public. In those instances, we will actually create a call with CRESA and document our response. Our plan is that this information will be routed back to you via email through the precinct that addressed the complaint.

Please feel free to give me a call if you have any questions.

Thanks and stay healthy!

**Troy Price | Assistant Chief of Police**

**Vancouver Police Department**



CITY OF VANCOUVER, WASHINGTON
P.O. Box 1995 | Vancouver, WA 98668-1995
P: 360.487-7463 | F: 360.487-7380
www.cityofvancouver.us | www.cityofvancouver.us/socialmedia

Confidentiality Notice: This email may contain confidential and privileged information. If you have received this message by mistake, please notify me immediately by replying to this message or telephoning me, and do not review, disclose, copy, or distribute. Thank you.

---

**From:** Juve, Gene
**Sent:** Sunday, April 12, 2020 9:47 AM
**To:** Abbott, Heather
**Cc:** Price, Troy; Hannon, Julie
**Subject:** Report of Non-Compliance

Greetings, Heather!

Chief Price requested that I forward reports of non-compliance for VPD action to you.

The attached report alleges the Fred Meyer store at Grand Central was not enforcing physical distancing yesterday afternoon, as required by the Governor's Proclamation 20-25.

Please take action to:

     Contact store officials and remind them of the requirement to promote and enforce physical distancing.

     Contact Susan Grove to acknowledge her concern and let her know the outcome.

Please email me a brief summary of your actions when complete.

Thanks and Happy Easter,

Gene

# EXHIBIT T

COMPLAINT
NO. _____
Sunday, November 29, 2020

70

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

**NON-COMPLIANCE REPORTS received by City EOC Director (Apr 7 - May 14)**

| DATE RECEIVED | TYPE | Within City Boundary | In County Unincorporated Area |
|---|---|---|---|
| 7-Apr | Farmer's Market (vs. stay-home order) (from Gov. report list) | X | |
| 8-Apr | Cosmotologist (operating illegally from home) | X | |
| 9-Apr | Walnut Grove Church (parking lot distancing) | X | |
| 10-Apr | Construction @ Waterfront (operating illegally) | X | |
| 11-Apr | Grand Station Fred Meyer (customer distancing, etc.) | X | |
| 13-Apr | Lowe's Camas (customer distancing, etc.) | X | |
| 13-Apr | Chuck's Produce Salmon Creek (customer distancing) | | X |
| 15-Apr | Construction H Company (operating illegally) | | X |
| 15-Apr | Orchards Park  group of kids (group size, distancing) | | X |
| 16-Apr | Construction Pacific Lifestyle (operating illegally) | | X |
| 16-Apr | Kitchen rennovation (operating illegally) | | X |
| 16-Apr | Construction Kirkland Company (operating illegally) | | X |
| 17-Apr | Elegant Garden Design (operating illegally) | | X |
| 20-Apr | Salon 1010 (operating illegally) | X | |
| 23-Apr | Grapes and Hops (serving customers in-house) | X | |
| 27-Apr | Landlord distancing/PPE violation re low immune child | X | |
| 27-Apr | Old Spaghetti Factory (customer distancing, etc.) | X | |
| 27-Apr | Pest Co. (door-to-door soliciting) | X | |
| 28-Apr | Orchards Park church group (group size, distancing, etc.) | | X |
| | *Following reports received from Gov. report list on 5/14* | | |
| 7-Apr | Farmer's Market (vs. stay-home order) | X | |
| 15-Apr | Orchards Park (youth activity/distancing) | | X |
| 4-May | City employees back to work (violates Exec. Order) | X | |
| | | | |
| | **Total** | 13 | 9 |

# EXHIBIT U

COMPLAINT
NO. _____
Sunday, November 29, 2020

71

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

| From: | Juve, Gene |
|---|---|
| To: | Young, Jonathan; Lloyd, Dan |
| Cc: | Hannon, Julie |
| Subject: | Reports of Non-Compliance with Governor"s 20-25 Proclamation |
| Date: | Thursday, April 9, 2020 9:39:00 AM |
| Attachments: | Covid-19 Non Licensed Cosmetologist.msg |
| | INSLEE VIOLATION WALNUT GROVE CHURCH.msg |

The State directs reports of business non-compliance to the 'appropriate' state licensing or regulatory agency for 'action'. There are approximately 15,000 reports of business non-compliance in the que and at a processing rate per day in the hundreds, response is uncertain... and for , untimely. The state directs reports of individual or personal non-compliance to local law enforcement.

CRESA recently established an email link for citizens to report suspected violations within the city of the Governor's Proclamation 20-25 limiting business operations, restricting people gatherings, maintaining social distancing, etc. The reports come to me as the EOC Director, and our objective is to be responsive to citizen concerns while educating the public on what is and what is not allowed. I'd appreciate your advice on how to process the reports.

I've received the first couple of reports (attached).

1. The first one is an alleged violation of operating a business not allowed by the Governor's list.
   Other factors that could come into play include:
   a. Operating a business without a city business license
   b. Possible failure to obtain a Home Occupation Permit
   c. Note: While self-quarantine may be recommended, it is voluntary unless directed
   • My inclination is to refer the complaint to CED to
       Determine if the activity in fact violates the Governor's order or any of the city's licensing or permitting requirements. If so, CED should advise the operator to stop performing these services.
       Contact the complainant to acknowledge her concern and let her know the outcome.

2. The second report alleges a church is conducting operations not in compliance with the Governor's guidance.
   a. Determine if the church's operation violates the Governor's directive (While not listed as an allowed activity, it is my understanding that a church is allowed to operate with sufficient staff to prepare and deliver on-line services to its congregation.)
   b. There is insufficient detail to determine whether the teen get-together of 4-8 people violates the order... especially if social distancing is practiced.
   • I'd probably send the church complaint to VPD and ask them to
       Contact the church and confirm their operation is within what is allowed
       Ask them to monitor social distancing in the parking lot
       VPD would then contact the complainant to acknowledge her concern and let her know the outcome.

Thanks for your help,
Gene

_____

From: Whitney Rene Paige [whitneyrenepaige@gmail.com]
To: City EOC Director [eocdirector@cityofvancouver.us]
CC:
Subject: Covid-19: Non Licensed Cosmetologist
Sent: Wednesday, April 08, 2020 16:42:36
Attachment 1: Screenshot_20200408-163254.png
Attachment 2: Screenshot_20200408-161129.png
Attachment 3: Screenshot_20200408-161123.png
Attachment 4: Screenshot_20200408-160800.png
Attachment 5: Screenshot_20200408-160953.png
Attachment 6: Screenshot_20200408-160947.png
Attachment 7: Screenshot_20200408-161046.png
Attachment 8: Screenshot_20200408-160806.png

_____

CAUTION: This email originated from outside of the City of Vancouver. Do not click links or open
attachments unless you recognize the sender and know the content is safe.
Upon viewing my Facebook account I saw that a classmate of mine (Robyn Eileen King) from the now closed
Manning Academy of Cosmetology was offering discounted services during this time, from her home.


Along with this, her young son is believed to potentially have Covid-19.


Please see screenshots for more information.

G000100-052120 LEE - 000013

# EXHIBIT V

COMPLAINT
NO. _____
Sunday, November 29, 2020

72

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Vancouver Police Department

| NARRATIVE | |
|---|---|
| **AUTHOR**<br>WILLIAMS, CHAD (231322) | **DATE/TIME**<br>05/20/2020 |
| **SUBJECT**<br>NARRATIVE | |

Summary:

This report is to document a Vancouver business, The PetBiz, opening in violation of Governor Inslee's Stay Home-Stay Healthy Proclamation 20-05. This potential violation is covered under RCW 43.06.220.5.

Narrative:

On May 14th, 2020, Investigations told me of an upcoming event in the geographical area I oversee as the District 3 Lieutenant. Sergeant Moore informed me that a local business, The PetBiz, located at 5620 NE Gher Road, Ste 5, was planning on opening for business in violation of Governor Inslee's Stay Home-Stay Healthy Proclamation #20-05. The owner of the business, Kelly Carroll, made several Facebook posts outlining her plan to open her business on May 16th. During these Facebook posts, Carroll acknowledged understanding of the Governor's Proclamation and voiced her intent to ignore the order. Additionally, she urged people to "Rally with me." She also said that she contacted the media and was doing this not for her but for the whole State of Washington.

Carroll said that if she was arrested or fined that she encouraged people to financially support her by making donations on her website.

On Saturday, May 16th, 2020, Carroll carried out her plan and had a re-opening rally / celebration at The PetBiz. Vancouver Police Department members witnessed the crowd and estimated that there were over 100 people present for the rally. Some of the people in attendance marched around the area carrying flags and signs but were observant of traffic / pedestrian laws.

On May 19th at approximately 1515 hours, Lieutenant Hatley and I went to The PetBiz to contact Carroll. I explained to her that I was going to forward the potential violation of Governor Inslee's Proclamation to the City Attorney's Office for review. Carroll would not provide me with her mailing address or her date of birth and told me that I could get it from her business license application. As Lt. Hatley and I were in the shop, a customer picked up her two dogs and paid for the service with a credit card, so there was no mistaking that Carroll was open for, and conducting, business at that location.

I explained to Carroll that VPD's response to these types of situations was education, but that it was obvious that she already had a meaningful understanding of the situation due to her Facebook posts and videos.

Carroll's argument as to why she opened was that she needed money for food and housing. She explained that she spent approximately $27,000 getting her business up and running and was shut down due the to Proclamation a short time after she opened up. She further said that her exposure for her customers and the public was minimal as she receives a customer's dog at the front door and does not have a waiting room inside the business, so the customer leaves or waits outside for her to complete her work on the pet. She told me that she feels like pet grooming is an essential business because of the matting that can occur on a dog's coat if it is not properly trimmed.

Vancouver Police Department

I was able to locate Carroll's date of birth, address and other identifying information through investigative resources. I confirmed her information by looking at her Department of Licensing photo.

I took screen recordings of Carroll's Facebook posts as well as a screenshot of her website, which showed that she was open for business, and logged these into TraQ.

Action Recommended:

Forward to City Attorney and Washington State Department of Labor and Industries.

# EXHIBIT W

COMPLAINT
NO. _____
Sunday, November 29, 2020

73

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



**DATE:**       May 27, 2020

**TO:**         Anne McEnerny-Ogle, Mayor

                City Council

**FROM:**       Eric J. Holmes, City Manager

**RE:**         **City of Vancouver COVID-19 Emergency Response Update and Ratification of Emergency Orders**

---

**Executive Summary**

Earlier this month, the Governor declared Clark County as eligible to seek a variance under the Safe Start Washington plan to move from Phase 1 to Phase 2 earlier than June 1.  The Board of Health (County Council) authorized the application for a variance shortly thereafter, which was submitted by Clark County Public Health to state health officials.  During the pendency of the variance request, an outbreak of COVID-19 infections at the Firestone Foods processing plant in Fruit Valley resulted in the variance application being placed on hold while this outbreak is resolved.  As of this writing, there is not a clear date by which a decision on the variance may be rendered by State officials.  Clark County Public Health is working closely with state health officials to address concerns about the Firestone outbreak in the context of a Phase 2 variance.  Moving into Phase 2, if approved by the state, could allow additional activities ranging from additional outdoor recreation to opening of restaurants and retail, all under more detailed guidance issued by the governor.

**Operational Changes**

General Operations

The City continues to work in a manner consistent with the governor's Stay Home, Stay Healthy order, which is effective through May 31 and is expected to maintain in some form through all four phases of the Safe Start Washington plan.  A majority of administrative staff are teleworking, and City facilities are closed to the public.

Public Meetings

Consistent with the governor's order on the Open Public Meetings Act (OPMA), all non-essential public meetings, such as planning commission, have remained suspended and City Council business has been restricted to "regular and necessary" items responsive to the pandemic emergency.   However, as of the date of this memorandum, the Governor's order regarding OPMA is anticipated to expire midnight May 31, allowing these

other public meetings to resume and for a wider variety of items to be considered on the City Council's agenda. While these other meetings may resume, they will need to be conducted in a manner consistent with the other orders issued by the governor (virtual, physically distanced, etc.), guidance from the CDC, and the standards under development by the City of Vancouver to minimize the risks associated with the conduct of these meetings.  We anticipate transitioning back to weekly meetings of the City Council in June, except the fourth Monday, which we have supplanted for time on June 20 for a retreat on financial forecast and 2021-22 budgets.

Parklets & Street Closures

Following the Council discussion on May 18 regarding parklets and street closures, staff has prepared the parameters of a parklet pilot program that is ready to be launched concurrent with the transition into Phase 2. The details of the program are in the attached briefing paper.  The program anticipates two primary facets:  one focuses on removing barriers to private parties building parklets in downtown and on private lots throughout the City, the other is the City taking an active role in funding construction of two to three "demonstration" parklets that could be used to illustrate a standard and be deployed in multiple locations throughout downtown. The funding for such a demonstration project would be approximately $200,000 and could be funded from the CDBG business assistance allocation that is contemplated on Council's Monday agenda.

With respect to street closures, the City reached out to the Vancouver Downtown Association with an initial exploration of the interest in closing downtown streets to accommodate both space of pedestrians to physically distance and for outdoor retail sales.  The initial response was not favorable.  The City will continue to explore the role temporary street closures can play in an overall response.

Homelessness

Through a partnership with CTRAN, the City has found a new site for a safe park operation that had been located in the Vancouver Mall parking lot.  CTRAN has made available a portion of the Evergreen Park n Ride located on the southwest corner of 18th and 137th Avenue, and site preparations re underway to set this facility up.  In addition, the Living Hope church camp site is exceeding initial expectations on capacity and the City is exploring other partnerships for additional managed encampments.  Additional details can be found in the attached update memorandum.

Neighborhood Cleanups

The pandemic response has also had a significant impact on the City of Vancouver's regular Spring Neighborhood Cleanup events. The free annual cleanups, sponsored by Solid Waste Services, are prized by neighborhood associations as a way to build community while disposing of bulky items and improving livability. This year, in compliance with Washington's "Stay Home" order, neighborhood cleanups scheduled for March, April, May and June were canceled. As the pandemic response continues, time and resources needed to conduct these events equitably for all neighborhoods has become constrained. City staff is working on alternatives to support neighborhoods and protect the health of the public and employees. These include promotion of the already expanded Spring Yard Debris & Tire coupon program through July, as well as expansion of the free curbside appliance pickup to include some bulky items collected at the curb. The latter would be a one-time, 2020 option only, scheduled in advance with Waste Connections.  More information on these efforts is

anticipated in early June as details are coordinated with Waste Connections.  These changed offerings will be designed to be cost neutral alternatives to the regular Neighborhood Cleanup events.

Reopening plan

The internal team tasked with developing the plan for Vancouver's reopening is well underway.  To give a sense of the volume of details that need to be addressed for business operations to resume in a world with COVID-19, attached for Council's reference is a DRAFT departmental playbook outline developed by the team.  While the Phase 3 reopening of customer-oriented City services could come in late June, until we are able to confidently and consistently meet these kinds of workplace standards, we will not reopen.  Even after reopening, we will rely heavily on telework arrangements to as part of a comprehensive approach to keeping our employees and those we serve safe and healthy.

Parks and Recreation Services

As we look forward to the transition to future Phases of the Safe Start plan in concert with improving summer weather, the City has prepared an initial tiered approach to reopening some of these facilities as services.  Attached for Council's reference is a _preliminary_ list of "What's a go!" and "What's a no!" over the summer months.

**Communications**

From the onset of the pandemic, the City has used a variety of channels to communicate with our community about our response, to educate and raise general awareness of the Governor's orders, Vancouver's emergency orders, and public health information about the virus.  Attached for Council's reference is a summary of data about the City's communications efforts March – April.

**Emergency Orders**

Following the May 18 Council meeting and consistent with the new gubernatorial proclamations, I have executed a new emergency order this week (Order 2020-14, attached) modifying the dates of closures of relevant City facilities and programs.  I want to note for the Council that following provisions of certain emergency orders will naturally expire at the end of May 31:

- Defense from eviction of small businesses (2020-08, Sec. 1)

- Defense from residential foreclosure on private mortgages.  (2020-08, Sec. 2).

- Utility Ratepayer Assistance.  (2020-07, Sec. 2).

The current emergency order is accompanied by a ratifying resolution for Council's consideration.

**Crime Statistics**

Attached for reference is an updated analysis of crime during the COVID-19 emergency compared to previous years and a five year trend.  A few observations from Chief McElvain:

- Overall, our calls for service and officer initiated activity throughout the pandemic are lower than previous years; however, we are seeing these increasing to the average.
- As time continues, we see notable increase in property crimes such as auto theft, burglary and vandalism.  Although not provided in the documents, our NRT and Property Crimes Unit have made a few recent key arrests where suspects have been tied to multiple burglaries or other crimes.
- Lastly regarding Crime Stats, I would point out the highlighted section in the document named "AC Price Crime Stats" where we have noted the emerging crime series involving unemployment identity theft.

Traffic Stop Information (Two Documents):  Recognizing the current activity and expressed community conversation/concern about exhibition of speed and racing vehicles on the west side of the city, we have increased our patrol emphasis to address these concerns by directed focus in the areas of Lower River Road (SR 501), the Waterfront west of I-5, and the Waterfront east of I-5 to Marine Park.

- The first document provides two tables.  The first table provides total traffic stops by month for the past three months (May is to date, not the entire month).  The second table provides total citations written for the same periods of time.  You will note in May, the marked increase in proactivity and enforcement, which coincides with racers migrating from Portland to the west side of Vancouver.
- In the second document, you will note the exhibition of speed and police activity increase Friday through Sunday, and largely in the late evening hours.

West Precinct Command is actively monitoring and providing resources to address the current trends in the identified areas.  During recent enforcement, we have noted as many as 300 or more racers gathering in the area, which increases the volume of calls when they disperse in smaller groups.  We also note the racers use spotters for law enforcement in an effort to thwart enforcement.

**Emergency Order Enforcement & Expectations**

Despite movement toward Phase 2, we are seeing plans for community gatherings that are inconsistent with the Governor's current stay home stay healthy order.  Further, the combination of a prolonged "stay home" state, improving weather, national media coverage that creates confusion and ambiguity, and continually evolving public health guidance have all contributed to more individuals and households venturing out.

We recognize that a strong, aggressive law enforcement led approach to enforcement of the current stay home orders is both unrealistic and inconsistent with the relationship we strive to foster with the community we serve.  We also recognize that there are real public health risks associated with public gatherings that are inconsistent with standing orders.  Finally, there are indications from local and national public health officials and experts that living with COVID-19, a highly commutable disease, is likely to continue without a vaccine or herd immunity for a long time – 18 to 24 months or longer.

In light of this, the City is taking an approach that is focused on **education**, **awareness** and **expectations** to support voluntary compliance with standing orders and long term behavior change that is reflective of the conduct that will help keep Clark County on track to move through the phases of reopening as well as keep our community healthy for the long term.

The City's communications team is working with the Joint Information Center to develop a coordinated campaign in support of these objectives.  The campaign is anticipated to complement the Clark County Can campaign developed by Public Health, and to focus on raising awareness, educating and encouraging behavior change using positive, supportive and engaging themes.  It is expected to rely on our media channels (social media, CVTV, The Messenger), include signage and marking in public spaces to provide guidance and visual cues of something being different in the community, and include supportive materials for businesses.

Enforcement as trailing action

We recognize that, while voluntary compliance is the norm for our community and across the state, there are individuals or organizations that will seek to deliberately violate standing orders.  For these activities, the City's approach relies on **early intervention** focused on dissuading potentially illegal activities**, education and awareness** to improve understanding of the current orders to encourage voluntary compliance, and if events proceed **assure a physical presence at the event** focused on preserving public order and continuing to encourage voluntary compliance with applicable laws, proclamations, and emergency orders. In addition to the above, we also intend to reach out to businesses in the area of each event to raise their awareness of the potential impacts to them so they can make informed choices to close or stay open. We are forming an internal multi-faceted team to address these kinds of activities that includes police, law, code compliance, parking enforcement and economic development representatives, as well as invitation to confer with Public Health.

Central to all these efforts is voluntary compliance as a strategy to assure we stay on track to full Phase 4 opening.

Despite our efforts on early intervention, some event sponsors may choose to proceed, and some events may become opportunities for special interests to advance their message or interests.  In these circumstances, we will be diligent and disciplined in our enforcement efforts in a manner that minimizes the risks of escalation.  That said, it is important to understand that regardless of whether there are citations issued or arrests of participants at these events, the event organizers may still face prosecution by the City Attorney's office based on information and evidence gathered by VPD at the scenes of these events.

Finally, this week the Washington Department of Labor and Industries issued notice that businesses that violate standing orders are subject to citation and fines.

 This week the City received its formal notice of allocation of CARES act funding from the State of Washington, which included additional guidance on how the funds may be deployed.  In addition to the detail of how the allocation will be disbursed, organizations who receive reimbursement under this allocation will need to meet a five way test for expenditures:

- The expense is connected to the COVID-19 emergency.
- The expense is "necessary".
- The expense is not filling a short fall in government revenues.
- The expense is not funded through another budget line item, allotment or allocation, as of March 27, 2020.
- The expense wouldn't exist without COVID-19 OR would be for a "substantially different" purpose.

Under this guidance, we have identified a collection of new costs incurred as part of the City's COVID-19 response that include staffing expenses, technology investments, and identify how to effectively deploy these resources as part of the City's response.  An appropriation for the use of this funding is anticipated to be part of the supplemental budget planned for later in June.

The operating environment of the COVID-19 pandemic continues to be dynamic, with daily changes to expectations rules and regulations.  Inherent in this is ambiguity about the "right" path forward.  I appreciate the Council's support, the resilience of our workforce and the compassion in our community as we chart a sustainable path to living and working in a world with COVID-19.

Attachments:

A.  Emergency order (2020-14) and resolution
B.  Parklet briefing paper
C.  Homeless response update
D.  DRAFT operational reopening playbook
E.  PRELIMINARY tiered approach to restoring parks and recreation services
F.  Updated crime statistics and analysis during COVID-19 emergency

# EXHIBIT X

COMPLAINT
NO. _____
Sunday, November 29, 2020

74

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

FILED
Clark County District Court
08-06-2020, 09:29

1

2

3

4

5

6

7

8

IN THE DISTRICT COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF CLARK

| | |
|---|---|
| CITY OF VANCOUVER, | No. 23649V VCA CN |
| Plaintiff, | |
| v. | MOTION AND ORDER FOR |
| | DISMISSAL WITH PREJUDICE |
| Kelly Carroll, | |
| Defendant | |

9

10

11

12

13

14        COMES NOW, Jonathan Young, City Attorney, and moves the above Court to

15   dismiss the above-entitled case for the reason that:

16

17        Newly discovered evidence reveals that the customer observed paying for

18   services on 05/19/2020 was an essential worker; and Defendant, Kelly Carroll, had

19   taken proactive steps after issuance of the Governor's Stay Home-Stay Healthy Order,

20   and prior to date of the charged offense, to expand her business (the PetBiz) to include

21   dog daycare services.

22        (Though Defendant was also charged with organizing and conducting a 100+

23   person rally, the VPD Sergeant on-scene has since acknowledged to Counsel for the

24   Defense that he had not read or familiarized himself with the Governor's Orders, and

25   was not in a position to testify that any laws were broken on 05/16/2020.)

26        The combination of these facts tends to negate the guilt of the accused for the

27   charged offense, and has created an inference of innocence of the accused. Dismissal

28   with prejudice is therefore appropriate.

29

MOTION AND ORDER FOR DISMISSAL - 1                    VANCOUVER CITY ATTORNEY
                                                       415 W. 6TH STREET
                                                       PO BOX 1995
                                                       VANCOUVER, WA 98668-1995
                                                       (360) 487-8500

DATED this 6th day of August, 2020.

s/ Jonathan Young
Jonathan Young, WSBA #35648
City Attorney
Vancouver City Attorney's Office
PO Box 1995 / 415 W 6th St
Vancouver WA 98668-1995
Telephone: 360-487-8500| Fax: 360-487-8501
E-mail: jonathan.young@cityofvancouver.us

## ORDER

THIS MATTER having come before the Court upon the Motion and the Court now being fully advised in the premises and on consideration whereof finds in the interests of justice said Motion should be sustained;

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that said case shall be dismissed with prejudice.

DATED this _____ day of _____

Digitally signed by user 'hagensej'
Reason:
Date: 08/06/2020  12:16:57 PM

JUDGE OF THE DISTRICT COURT

PRESENTED BY:

s/ Jonathan Young
Jonathan Young, WSBA #35648
City Attorney
Vancouver City Attorney's Office
PO Box 1995 / 415 W 6th St
Vancouver WA 98668-1995
Telephone: 360-487-8500| Fax: 360-487-8501
E-mail: jonathan.young@cityofvancouver.us

MOTION AND ORDER FOR DISMISSAL - 2

# EXHIBIT Y

COMPLAINT
NO. _____
Sunday, November 29, 2020

75

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Vancouver Police Department

| FOLLOWUP REPORT #1 | |
|---|---|
| **ASSIGNED TO**<br>MOORE, PAT (231324) | **RANK** |
| **ORG UNIT**<br>INTEL UNIT | **CAPACITY**<br>1-PATROL SUPPLEMENTAL |

| **ASSIGNED ON**<br>07/07/2020 | **ASSIGNED BY**<br>MOORE, PAT | **SUBMITTED ON**<br>07/07/2020 | **APPROVED ON**<br>07/20/2020 | **APPROVED BY**<br>OLSON, JEFF |
|---|---|---|---|---|

| SUPPLEMENTAL | |
|---|---|
| **AUTHOR**<br>MOORE, PAT (231324) | **DATE/TIME**<br>07/07/2020 1501 |
| **SUBJECT**<br>(VICTIM #1) ███████████ (DOB: ████████) | |

### SUPPLEMENTAL REPORT:

Protest(s) in response to the owner of Pet Biz, Kelly Carroll, being summoned into court for violating the Washington State Governor's stay at home orders and non-essential businesses remaining closed.

On 6/29/20, I was contacted by Lt. McNicholas who requested I reach out to Vancouver City Attorney ████████ to provide a safety plan. This was in response to protesters, specifically the group "People's Rights of Washington," arriving at ████████ residence on the evening of 6/28/20.

In summary, organizer Kelli Stewart of the People's Rights of Washington, along with Joey Gibson from the group Patriot Prayer, held an organized protest out front of Assistant City Attorney's ████████ residence. This event lasted from 1230-1930 hours. Around 1930 hours, City Attorney ████████ and his wife ████ who were visiting ████ at the time of the protests, exited ████ residence, approached the crowd and provided a brief statement about taking over the Kelly Carroll case. After providing the statement, the ████ drove off and headed home. I was monitoring the event and observed this conversation, as Kelli Stewart, organizer of People's Rights of Washington, was live broadcasting on Facebook. Within minutes, viewers of the live broadcast were commenting and posting ████████ address. Immediately, the crowd packed up and traveled to ████████ residence and remained until 10:00pm. See Officer Long's original report for complete details.

Prior to meeting with ████████ I called and spoke with Officer Long who updated me on her investigation and contact with the ████████

On 6/29/20 at approx. 1600 hours, I met with ████████ and his wife Ariel at their residence. We sat for a little over two hours and discussed the groups responsible for the protests, a safety plan and next steps. During my meeting, ████████ stated he had some video he wanted to provide to me and mentioned he would be uploading these to YouTube and sending me the links. I received these links on 7/2/20. See below.

I've also included some video links directly from the People's Rights of Washington Facebook page. One Video shows the large group gathered at ████████ residence and the 2nd video is another link showing ████████ interaction with the crowd and Kelli Stewart.

████████ also sent me a photo of a message he received from Kelly Carroll. On 7/2/20, ████████ and his wife received flowers and a message from Kelly Carroll, owner of Pet Biz. The message read, *"Hi ████ A friend told me about your accident*

# Vancouver Police Department

*on the mountain. I know how you feel. 7 yrs ago I was hit by a car on my bike and broke my leg, my back in 6 places and a double head trauma. It took me 9 months to walk again. Jesus Healed me! I would love to pray with you Kelly Carroll."*

This photo, along with the three videos ▮▮▮▮ sent, will be uploaded into the VPD Traq evidence system.

In addition to the videos, ▮▮▮▮ sent me screen-shots of comments being made during the live broadcast. These came from individuals who were not present at ▮▮▮▮ residence, but rather watching online. Screen-shots will be uploaded into Traq.

Here is a sample of those texts from Facebook:

From  Grant A. Coatney Sr. *"Make a Citizen's Arrest on this Prosecutor. He's the one that's breaking the Law. Get 6 or seven people to make an arrest"*

Nancy Taylor-Babcook. *"You should put on black masks and break windows and carry brinks. You will be ok then."*

Raz Kyle. *"I guess if we set is house on FIRE it's ok...right? I mean that's what LIBTARDs to (j/k) but it's tru.. they get away with ANYTHING."*

Videos provided by ▮▮▮▮ ▮▮▮▮

**Video #1:**   Van   https://youtu.be/pEDQpQyQX2Y

Earlier on 6/28 while at ▮▮▮▮ ▮▮▮▮ residence, he walked outside and had a brief conversation with a female who was sitting inside a minivan recording him. At the time, ▮▮▮▮ believed the female was Kelly Carroll, but that was not the case. The vehicle, bearing Washington License Plate BGA5032, is registered to Victoria Heacock. I viewed a driver's license photo and compared it to the video and confirmed the female was Victoria Heacock.

I've transcribed a little of the interaction between Victoria and ▮▮▮▮

Victoria:  Filming you guys back.

▮▮   You're the one who said something very intimidating a moment ago.

Victoria: I didn't actually say anything intimidating. I said it would be good to have a conversation.

▮▮   You said it will work out better for us if you did.

Victoria: Well, if you don't want us to have a protest here in public, on public property, we won't do anything illegal, we never do. But we would love to have a conversation.

16

Vancouver Police Department

**Video #2**  https://youtu.be/MWlPg2isV7A  (This is a short video showing the crowd out front of ▉▉▉ residence to include a drone that was being flown outside.)

**Video # 3**  https://youtu.be/VYBfb6YaBIE    (Kelly Stewart filming her contact with ▉▉▉ when he exited ▉▉▉ residence.)

Two additional videos to describe the crowd at ▉▉▉ residence.

Video at ▉▉▉ residence: https://www.facebook.com/uniteforlibertynow/videos/352445489070413/

Video of ▉▉▉: https://www.facebook.com/trina.visser.1/videos/pcb.954962114952629/954936621621845/?type=2&theater

The People's Rights of Washington, along with Patriot Prayer, have held several protests/gatherings re: Kelly Carroll being criminally charged.

The group has gathered and protested twice at ▉▉▉ residence; twice at ▉▉▉ residence and on 7/6/20 the group gathered at Esther Short Park in hopes of attending the Vancouver City Council meeting.  Due to Covid-19, City Hall was locked and visitors were not allowed inside.  Members from the group attempted to call into the meeting but unable to participate, so they packed up and traveled to Mayor Anne McEnerny-Ogle's residence.   Protesters remained out front of the Mayor's residence for approx. 3 hours then left around 10:00PM.

During all these events, organizers Kelli Stewart and Joey Gibson both reminded individuals attending to not commit any crimes, do not trespass, do not threaten or intimidate, do not violate the VMC noise ordinance and to make sure they clean up after themselves when they leave an area.

Prior to leaving ▉▉▉ residence on 6/29, we discussed the RCW regarding intimidating a public servant and ▉▉▉ requested this report be forwarded to the Clark County PA's office for review.

Below, I've included the elements pertaining to Intimidating a public servant. RCW 9A.76.180.   The main element in this RCW is "by use of Threat."  And Threat, as used in this section, means: to communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time.

Det. Romiti and I have both been physically present during the events described above, as well as monitoring the live feeds.  At no time have I heard anyone in the group, to include the organizers, threaten Attorneys ▉▉▉ ▉▉▉ ▉▉▉ or Mayor Anne McEnerny-Ogle with any use of force.

17

Vancouver Police Department

A Majority of the group's chants during these protests are:

"Drop the charges ▮▮▮▮▮▮ Kelly is not a criminal."
"Grandmas Lives Matter."
"Dismiss the charges, do the right thing."
"Uphold the Constitution."
Repeating over and over "Kelly Carroll."

**RCW 9A.76.180**
Intimidating a public servant.
(1) A person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant.
(2) For purposes of this section "public servant" shall not include jurors.
(3) "Threat" as used in this section means:
(a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
(b) Threats as defined in RCW 9A.04.110.
(4) Intimidating a public servant is a class B felony.

**Below are some excerpts from the Peoples Rights of Washington Facebook Page:**

Peaceful 1st amendment assembly at the City of Vancouver Mayor's house, Anne McEnerny-Ogle. We don't support sending granma's to jail for working! Free Kelly Carroll! Dismiss the charges! Working is a RIGHT, not a privilege!!! Learn more about her case here:

City of Vancouver Protest! Drop the charges on Kelly Carroll!
VPD Chad Williams, Vancouver prosecutors ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ have all conspired using threats force and coercion to intimidate a grandma to close her business. We the People say that's a violation to their oath of office, and we are here to redress our grievance with these tax paid servants. Sunlight is the best disinfectant!

Peoples Rights of Washington:    https://www.facebook.com/uniteforlibertynow/videos/581858779367928/

7/6/2020  Event Page: https://www.facebook.com/events/2861090384000442/

After a few hundred patriots rallied in front of prosecuting attorney ▮▮▮▮▮▮ house for criminally charging Kelly Carroll he has decided to recuse himself from the case. City Attorney ▮▮▮▮▮▮ is now taking on the case.

# Vancouver Police Department

Vancouver City Council has oversight powers pertaining to City Attorney ▮▮▮▮▮▮. Monday we will rally before the city council meeting and have a BBQ at 5 pm just across the street of city hall in Esther Short Park. City Council meeting starts at 6:30 pm. We legally have a right to public comments.

We will accept nothing short of the charges being dropped on Kelly Carroll. If they can arrest her for defying fake unconstitutional orders then they can arrest any of us. STAND NOW!

## RECOMMENDATIONS:

At this time, I find there is no probable cause for intimidating a public servant.

Per ▮▮▮▮▮▮ request, this report will be forwarded to Clark County PA for review.

# EXHIBIT Z

COMPLAINT
NO. _____
Sunday, November 29, 2020

76

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



Published on *City of Vancouver Washington* (https://www.cityofvancouver.us)

# Statement from City Attorney Jonathan Young and Vancouver Police Chief James McElvain regarding COVID-19 emergency order enforcement

# Statement from City Attorney Jonathan Young and Vancouver Police Chief James McElvain regarding COVID-19 emergency order enforcement

**Press Release Date:**

Thursday, August 6, 2020

The City's approach to enforcement of COVID-19 emergency orders is focused on education, awareness and expectations to support voluntary compliance with standing orders and long term behavior change that is reflective of the conduct that will help keep Clark County on track to move through the phases of reopening as well as keep our community healthy for the long term.

In support of these objectives, the City has worked with Clark County on communications campaigns and messaging, as well as providing information, assistance and guidance to residents and businesses.

We recognize that not all residents or businesses will voluntarily comply with the emergency orders and there are individuals and organizations that will seek

to deliberately violate standing orders. In these cases, the City's approach relies on early intervention focused on dissuading potentially illegal activities, education and awareness to improve understanding of the current orders to encourage voluntary compliance and, if a large gathering or event proceeds in violation of an emergency order, assuring a physical presence at the event focused on preserving public order and continuing to encourage voluntary compliance.

If we are made aware of an unsanctioned event, we conduct in-person outreach to businesses in the area to raise their awareness of event and the potential impacts to them so they can make informed choices to close or stay open. We have formed an internal multi-faceted team to address these kinds of activities that includes police, law, code compliance, parking enforcement and economic development representatives.

We will also make every attempt to contact the unsanctioned event organizers. Despite our efforts on early intervention, some event sponsors may choose to proceed. In these circumstances, we will be diligent and disciplined in our enforcement efforts in a manner that minimizes the risks of escalation. Regardless of whether there are citations issued or arrests of participants at these events, information concerning the event organizers will be referred for prosecutorial review if evidence suggests that their conduct was carried out in willful violation of the Governor's Order. Prosecutorial review is conducted by the City Attorney's office based on information and evidence gathered by VPD at the scenes of these events.

Central to all these efforts is voluntary compliance as a strategy to assure we stay on track to move towards a full Phase 4 opening.

Return to Top

function googleTranslateElementInit() { new google.translate.TranslateElement({pageLanguage: 'en', includedLanguages: 'de,es,fr,hi,it,ko,ru,vi,zh-CN', layout: google.translate.TranslateElement.InlineLayout.SIMPLE}, 'google_translate_element'); }

- Home
- Sitemap
- Employee portal
- Legal notices
- Accessibility

# EXHIBIT AA

COMPLAINT
NO. _____
Sunday, November 29, 2020

77

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

MEMORANDUM

To:     Vancouver City Manager Eric Holmes
        Vancouver HR Director Lisa Takach

From:  Vancouver Police Sgt. Pat Moore

Copy:  VPOG President Neil Martin
        VPOG Attorney Anil Karia
        VPD Lt. Kathy McNicholas  (Chain of Command)
        VPD Assistant Chief Jeff Mori  (Internal Affairs)

Date: 10/20/2020

RE:  Complaint against City Attorney Jonathan Young

This memorandum serves as a complaint against City Attorney Jonathan Young for retaliation, conflicts of interest, and ethics violations.

Based on my interaction and discussions with Mr. Young, I believe Mr. Young's conduct inconsistent with the degree of knowledge, preparation, and neutrality that I have grown accustomed to observing from members of the City of Vancouver Attorney's Office. I would ask that you review, consider, and follow-up on the information below consistent with your standard practices.

<u>Background</u>

Mr. Young sent the following e-mail to the Vancouver Police Department regarding my conduct, as set forth in VPD IA notice 2020-0106:

> *On August 28, 2020, Vancouver City Attorney, Jonathan Young sent an email to Chief James McElvain and Assistant Chief Jeff Mori concerning a defense interview in which you participated on July 30, 2020. The interview was related to the criminal case against a local pet grooming business, Pet Biz. Mr. Young's email message outlined two sentiments you expressed during the defense interview that he believed warranted mentioning to the Chiefs: As described by Mr. Young, who was also present in the July 30 interview,*
>
> *1. Sgt. Moore stated that he had not read or familiarized himself with any of Governor Inslee's emergency proclamations, did not know what the Governor's proclamations say, and could not tell defense counsel – even generally – any of the conduct that the they prohibit.*
>
> *2. Sgt. Moore stated that he was familiar with Joey Gibson, the founder of Patriot Prayer USA, and that Joey Gibson is 'not the problem' or words to that effect.*

> *Sgt. Moore elaborated that Mr. Gibson 'attracts an unwelcome crowd'*
> *specifically BLM and Antifa. In closing,*
>
> *Mr. Young stated, "(T)he statements above were inconsistent with the degree of*
> *knowledge, preparation, and neutrality that I have grown accustomed to*
> *observing from members of VPD. I would ask that you review, consider and*
> *follow-up on the information above consistent with your standard practices."*
> *Based on the information provided by Mr. Young, Assistant Chief Mori initiated*
> *an administrative investigation pursuant to Policy 1004 and completed a Blue*
> *Team entry.*

I find Jonathan Mr. Young's behavior retaliatory in nature. On 6/29/20, I met with Mr. Young and his ▓▓▓▓▓ for approximately two hours and answered any and all of their questions regarding protests occurring at their personal residence. I provided my professional opinion, which is based on facts and observations that I had gathered as part of my official duties regarding the group People Rights of Washington and Joey Gibson. In addition, I provided Mr. and ▓▓▓▓▓ with a safety plan. During the approximately two hour conversation, we discussed the RCW pertaining to Intimidating a Public Servant and it was obvious Mr. Young didn't agree with my assessment and stated he felt there was probable cause to arrest protestors at his personal residence. Since there were numerous protestors I asked Mr. Young who he thought should be arrested and he responded, the organizers of the event. I informed Mr. Young that based on the elements set forth in the RCW, I didn't believe there was probable cause. He disagreed with me and requested I forward my report to the Clark County PA's office for review, which I did. Later, after speaking with VPD Assistant Chief Troy Price, I learned the Clark County PA's office agreed with my assessment.

During this meeting, Mr. Young mentioned one of the main reasons he took the Pet Biz case back over from Kevin McClure was due to him being Mr. McClure's boss and him not wanting protestors to keep causing problems at Mr. McClure's residence. Further, Mr. Young indicated the Vancouver Municipal Codes were stronger in Vancouver and more enforceable. Mr. Young also mentioned he hasn't prosecuted a criminal case in over ten years and he was unsure what he was doing, so he would be leaning on Mr. McClure for assistance moving forward.

Leaving that night it was obvious that Mr. and ▓▓▓▓▓ were not happy with my assessment of the group Peoples Rights of Washington and Joey Gibson (all which turned out to be true), nor were they happy with my professional assessment that probable cause was lacking or insufficient for the crime of Intimidating a Public Servant. Please review VPD report 2320-10381 for further information.

As part of my duties with the Vancouver Police Department Special Investigations Unit, I have monitored and observed various groups over the past three years. These groups include Patriot

Prayer, Antifa, Black Lives Matter, People Rights of Washington, Proud Boys and many others. I have personally attended, in my official capacity with the Vancouver Police department, numerous protests in Portland and Vancouver and have observed the contact and behavior of all parties involved.  For the past four months I have reported to VPD command staff with updates on protests and gatherings within in the City of Vancouver.  I've communicated verbally and via e-mail with precinct command regarding planning for these events which include SIU's assessments and professional opinions of what VPD can expect in regards to number of attendees and anticipated behaviors.  All this information allows for proper staffing of police recourses at these events.

On 8/3/20, I received a text message from .              was aware that Joey Gibson had received a copy of my police report and she asked for a copy.              requested I send a copy of my report to Mr. Young's work e-mail.  Assuming Mr. Young has access to police reports in his office, I informed              that I would defer to Mr. Young and I explained typically, these requests require a public disclosure request and he should be aware of the process.  I never heard back from              .

Around the last week of August, and close to two months after my initial meeting with the Young's, I received a phone call from Lt. Kathy McNicholas who was directed to call me by VPD Assistant Chief Lester. It's my understanding Mr. Young and/or his              had a conversation with an employee from the City of Vancouver, City Hall, or possibly a City Council member and shared their frustration with me regarding our contact in June. During this phone call I was told I was dismissive towards              by providing my opinions and they felt I was sympathetic towards the conservative groups that were protesting at their residence.  I believe the message was clear from the Chief's office that I was not to provide my personal opinions during an investigation. My discussions with Mr. and              in June were not based on personal opinion, but on my professional opinion. My discussion with Mr. and              was clear and my professional opinions regarding specific groups are based on facts and my observations over the course of the past three years monitoring all the groups listed above.

On 9/30/20, I participated in a Zoom/Webex defense interview with Defense Attorney Angus Lee and City Attorney Jonathan Young. This defense interview was in regards to the charging of Pet Biz owner, Kelly Carroll.  I had little to no involvement in the case and/or the charging decisions.  My sole purpose was to monitor the gathering/crowd at the Pet Biz location and if needed call in additional VPD resources if opposition groups arrived.

Being the target of protestors and all the scrutiny Mr. Young has been receiving from the owner of Pet Biz and Defense Attorney Lee, I believe that Mr. Young's participation in the defense interview was a conflict of interest for him and the City of Vancouver and that he should have recused himself.

Further, I've participated in numerous defense interviews over the course of my career. Typically, officers are required to answer questions about the specific case or assignment they were involved in. Often times defense attorneys will start to ask questions outside the scope of the investigation. This appeared to be the case during this particular interview. Defense Attorney Lee asked numerous questions about a BLM protest at Esther Short Park and the blocking of the I-5 Bridge,  and tactics used by VPD.  Comparing this protest and march to the Pet Biz gathering, barbeque, and reopening were not the same. I voiced my relevancy objections during the interview.

Mr. Young stated the line of questioning was within the scope and requested I continue to answer questions, even though many of the defense questions were outside the scope of my actions pertaining to the case. State of Washington v. Mankin (2010) gives us guidelines as to the content of the interview, our rights in the interviews and our right to be recorded or not. Below is an excerpt from a document authored by a member from VPD.

> *I've spoken with our City attorney Kevin McClure and inquired whether there is any case law timelier than Mankin which could guide us in these interviews. I was told there is not. Therefore, it is my understanding that Officers (who do agree to a recorded interview) have certain rights, worded clearly in case law, when attending defense interviews. Most importantly:*
>
> *1.      To control under what conditions we are willing to give an interview.*
>
> *2.      **The right to restrict the interview to our actions taken in the incident and our training and experience as it pertains to the case.***

<u>Allegations</u>

It appears Mr. Young doesn't share the same views regarding my professional assessment and opinions.  It's obvious he continues to harbor ill will toward me with his communication with a member of city hall / city council two months after I met with him and ▉▉▉▉ at his residence. Now, after providing my assessment, professional opinions and expertise within a defense interview, which I'm required to be truthful, Mr. Young has retaliated by filing a complaint against me with VPD.

I believe this is an unwarranted attack on my credibility and also believe Mr. Young attempted to use his position of authority in attempt to influence me to file criminal charges on event organizers, in which he sees himself as a victim. I believe complaint IA 2020-0106 that Mr. Young filed was in retaliation for me not moving forward with charging protest groups without probable cause and for me disagreeing with his initial assessment regarding groups protesting at his residence.

Based on all that has transpired (media attention, social media comments and calls for Mr. Young to be fired, removed from his position, etc.), Mr. Young was too emotionally involved in

this particular case and set of circumstances. He had a conflict of interest given his personal interests, and yet he continued without recusing himself.

I question the purposes of Mr. Young's complaint against me. Was it to sow seeds of dissention within VPD? To cast a shadow on my reputation, integrity and professionalism? To forward his e-mail to Chief McElvain and Assistant Chief Mori and try to underhandedly voice his concerns and then refuse to be interviewed during the Internal Affairs Investigation for an action he initiated is unethical.

Years ago, I took an oath to solemnly swear that I will faithfully, honestly and impartially perform my duties as a Law Enforcement Officer, to support the Constitution and uphold the laws of the State of Washington (RCW) and the Vancouver Municipal Codes. I have done so in all of my dealings involving Mr. Young and the associated events.

I believe Mr. Young is in Violation of City of Vancouver Policies 501 (Core Ethics Policy) and 503 (Conflicts of Interest)

Respectfully submitted,

Sgt. Pat Moore

# EXHIBIT BB

COMPLAINT
NO. _____
Sunday, November 29, 2020

78

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268



Published on *City of Vancouver Washington* ([https://www.cityofvancouver.us](https://www.cityofvancouver.us))

**Statement from City Attorney Jonathan Young and Vancouver Police Chief James McElvain regarding COVID-19 emergency order enforcement**

# Statement from City Attorney Jonathan Young and Vancouver Police Chief James McElvain regarding COVID-19 emergency order enforcement

**Press Release Date:**

Thursday, August 6, 2020

The City's approach to enforcement of COVID-19 emergency orders is focused on education, awareness and expectations to support voluntary compliance with standing orders and long term behavior change that is reflective of the conduct that will help keep Clark County on track to move through the phases of reopening as well as keep our community healthy for the long term.

In support of these objectives, the City has worked with Clark County on communications campaigns and messaging, as well as providing information, assistance and guidance to residents and businesses.

We recognize that not all residents or businesses will voluntarily comply with the emergency orders and there are individuals and organizations that will seek

to deliberately violate standing orders. In these cases, the City's approach relies on early intervention focused on dissuading potentially illegal activities, education and awareness to improve understanding of the current orders to encourage voluntary compliance and, if a large gathering or event proceeds in violation of an emergency order, assuring a physical presence at the event focused on preserving public order and continuing to encourage voluntary compliance.

If we are made aware of an unsanctioned event, we conduct in-person outreach to businesses in the area to raise their awareness of event and the potential impacts to them so they can make informed choices to close or stay open. We have formed an internal multi-faceted team to address these kinds of activities that includes police, law, code compliance, parking enforcement and economic development representatives.

We will also make every attempt to contact the unsanctioned event organizers. Despite our efforts on early intervention, some event sponsors may choose to proceed. In these circumstances, we will be diligent and disciplined in our enforcement efforts in a manner that minimizes the risks of escalation. Regardless of whether there are citations issued or arrests of participants at these events, information concerning the event organizers will be referred for prosecutorial review if evidence suggests that their conduct was carried out in willful violation of the Governor's Order. Prosecutorial review is conducted by the City Attorney's office based on information and evidence gathered by VPD at the scenes of these events.

Central to all these efforts is voluntary compliance as a strategy to assure we stay on track to move towards a full Phase 4 opening.

<u>Return to Top</u>

function googleTranslateElementInit() { new google.translate.TranslateElement({pageLanguage: 'en', includedLanguages: 'de,es,fr,hi,it,ko,ru,vi,zh-CN', layout: google.translate.TranslateElement.InlineLayout.SIMPLE}, 'google_translate_element'); }

- <u>Home</u>
- <u>Sitemap</u>
- <u>Employee portal</u>
- <u>Legal notices</u>
- <u>Accessibility</u>