HON. BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSEPH GIBSON,<br>　　　　　　　　　　PLAINTIFF,<br><br>vs.<br><br>CITY OF VANCOUVER, et al.,<br>　　　　　　　　　DEFENDANTS. | No. 3:20-CV-6162<br><br>PLAINTIFF'S EMERGENCY MOTION FOR<br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION<br><br>Noted on Motion Calendar: 12/2/2020 |

COMES NOW Joseph Gibson, by and through the Angus Lee Law Firm, PLLC, seeking a temporary restraining order and then a preliminary injunction to prevent defendants from arresting or prosecuting Mr. Gibson, a street preacher, for organizing and participating in a 20-person outdoor prayer protest against Governor Inslee's current COVID-19 restrictions on December 5, 2020, and also an order restraining defendants from the selective prosecution or arrest of Mr. Gibson for leading and organizing the prayer protest.

The gathering, prayer, and singing, would be in violation of the unconstitutional restrictions placed on spiritual gatherings by Washington State Governor Inslee's current COVID-19 restrictions, which currently limit outdoor spiritual gatherings by private citizens to 5 persons.

Mr. Gibson has very good reason to believe arrest or prosecution will be imminent, and that he will be specifically targeted for arrest and prosecution by the Vancouver Police Department (VPD) and the Vancouver City Attorney (VCA), because (1) Vancouver City developed a written unconstitutional policy to target for criminal investigation only those individuals who are

MOTION FOR TRO AND INJUNCTION
NO. 3:20-cv-6162

1

noncompliant with Covid-19 restrictions *and* who organize events to promote a message in opposition to Covid-19 restrictions; (2) VPD has evidenced a pattern of targeting only those individuals who lead protests against Governor Inslee's current COVID-19 restrictions for criminal investigation; (3) VPD and VCA developed and maintain a written unconstitutional policy to target event organizers of protests expressing opposition to Covid-19 restrictions; and (4) VCA Jonathon Young has developed a special interest in Mr. Gibson making plain his intent to prosecute Mr. Gibson as soon as he has the opportunity.  This threat is credible since the VCA has already attempted to prosecute one anti-lockdown protest leader specifically for "conducting and organizing a 100+ person rally." In each VPD criminal investigation of a protest against the Covid-19 restrictions, VPD has documented Mr. Gibson's presence at or near the protest.

Both the enforcement of the unconstitutional restrictions and policies, and the selective targeting of Mr. Gibson based on his position as a leader of a prayer protest is contrary to First and Fourteenth Amendments to the United States Constitution.

Further, the activity sought to be restrained would not be in the public interest, would substantially and irreparably harm Mr. Gibson, and more importantly, would chill public speech, prayer, and political activity and protest against unconstutional restrictions. Finally, a favorable judicial decision will prevent or redress the injury.

Mr. Gibson asks this court to issue a Temporary Restraining Order to preserve the status quo, and to protect Mr. Gibson from irreparable harm until Mr. Gibson can obtain preliminary and/or permanent injunctive relief.

## I.    FACTS

Joseph Gibson is a well-known and established Christian street preacher who has been conducting prayer and protest gatherings in the Vancouver area for many years, and intends to

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1  lead an outdoor twenty-person prayer protest in the public park next to the Vancouver Police

2  Department's East Precinct on December 5, 2020. (Gibson Decl. ¶¶ 1-3)  The protest will consist

3  of gathering for song, prayer, and protest, with the publicly stated intention and request that God

4  will intercede in the hearts the officers of the Vancouver Police Department, and City Attorney's

5  Office, such that the officers will have the wisdom, courage, and fortitude to honor their oaths to

6  uphold the Constitution and that they will refuse to enforce unconstitutional restrictions imposed

7  by gubernatorial proclamations. (*Id.*)

8      Over the past several months, Washington Governor Jay Inslee has issued a series of

9  executive orders called "Proclamations," along with "guidance" that is incorporated into the

10  proclamations by reference. (Lee Decl., Ex. B-N, AA-CC)  These proclamations, guidance, and

11  memoranda ("Covid-19 restrictions") have placed extreme restrictions on the liberty of individuals

12  to gather and engage in religious, spiritual, and civic activity, while at the same time imposing

13  lesser restrictions on comparable secular activity like shopping and adult recreational sports. (*Id.*)

14      The Covid-19 restrictions forbid street preachers like Mr. Gibson from gathering in groups

15  larger than five.  They restrict Mr. Gibson from carrying out his planned prayer protest and make

16  it illegal to sing at his service. (*Id.*)  At the same time, the Covid-19 restrictions do not bar people

17  from gathering in large numbers to shop, play contact sports, and sing in secular settings. (*Id.*)  The

18  restrictions on secular versus religious activity are discussed in greater detail in the argument

19  section below.  Violations of Covid-19 restrictions put in place by these executive orders

20  constitutes a crime and are punishable by 364 days in jail. RCW 43.06.220.

21      Defendants maintain a policy and practice of selectively targeting organizers of protests

22  against Covid-19 restrictions for criminal investigation and/or prosecution under the Covid-19

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162                                3

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1  restrictions. (Lee Decl. ¶¶ 18-20, 54, 68-84, Ex. W, Z) The City internal memo on the policy states:

2  Despite our efforts on early intervention, some event sponsors may choose to
3  proceed, and some events may become **opportunities for special interests to**
4  **advance their message or interests. In** *these* **circumstances we will be diligent**
5  **and disciplined in our enforcement efforts** … **the event organizers may still**
6  **face prosecution** …
7
8  (*Id*., Ex. W (emphasis added))
9
10  The public policy announcement from Vancouver City Attorney (VCA) Jonathan Young

11  and Vancouver Police Department (VPD) Chief McElvain reads in part (with emphasis added):

12  We will also make every attempt to contact the **unsanctioned event organizers**.
13  Despite our efforts on early intervention, some event sponsors may choose to
14  proceed. … Regardless of whether there are citations issued or arrests of
15  participants at these events, **information concerning the event organizers will be**
16  **referred for prosecutorial review** …

17  (*Id*., Ex. Z (emphasis added))

18  This summer, in accord with policy, VPD referred four cases for prosecution for Covid-19

19  offenses; each involved speech in opposition to the Covid-19 restrictions. (Lee Decl. ¶¶ 68-84)

20  The four referrals from VPD to the VCA for prosecution of COVID-19 related offenses were Kelly

21  Carroll, who led the PetBiz Rally against Covid-19 Restrictions on businesses; Brandi

22  Youngstrom, owner of HuggaMug, who advertised a "Rally to Fight for Liberty" on her Facebook

23  page, Patrick Morris, who allegedly held a "church gathering" in his home and expressed his

24  opposition to Covid-19 restrictions to the investigating officer, and Jerry Knutson, who held a rally

25  in opposition to Governor Inslee's Stay Home-Stay Healthy Proclamation outside of his tattoo

26  shop. (*Id*.)  Of these referrals, VCA selected to prosecute Ms. Kelly Carroll for "organizing and

27  conducting a 100+ person rally" against Governor Inslee's Covid-19 restrictions. (*Id*., ¶ 21, 85-

28  107, Ex. X)  The prosecution failed and the case was later dismissed. (*Id*.)

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

4

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    VCA Jonathon Young, has also taken a special interest in Mr. Gibson and personally

2    requested senior VPD officer Pat Moore arrest Mr. Gibson because he was the event organizer of

3    a protest against the VCA prosecution of Kelly Carroll.  (*Id.*, ¶¶ 26-27, 108-119, Ex. X, Y).  Yet

4    the protest for which VCA Young requested charges against Mr. Gibson was described in Sergeant

5    Moore's report as follows:

6        Det. Romiti and I have both been physically present during the events described
7        above, as well as monitoring the live feeds. At no time have I heard anyone in the
8        group, to include the organizers, threaten Attorneys [redacted] or Mayor Anne
9        McEnerny-Ogle with any use of force.
10       A Majority of the group's chants during these protests are:
11       "Drop the charges [redacted] Kelly is not a criminal."
12       "Grandmas Lives Matter."
13       "Dismiss the charges, do the right thing."
14       "Uphold the Constitution."

15   (*Id.*, ¶ 113, Ex. Y)  VCA Young's blatant efforts to influence Sergeant Moore to file charges

16   against Mr. Gibson prompted Sergeant Moore to file a complaint with the City accusing VCA

17   Young of Conflicts of Interests and of attempting to have Gibson charged without probable cause.

18   (*Id.*, ¶ 29, Ex. A)

19       Sergeant Moore accused Young of misusing his position to improperly attempt to influence

20   Moore to file criminal charges, and of retaliating against Moore for not "charging protest groups

21   without probable cause." (*Id.*)  Moore wrote that "Mr. Young was too emotionally involved in this

22   particular case… had a conflict of interest given his personal interests, and yet he continued

23   without recusing himself." (*Id.*). City Attorney Young is currently under investigation by the City

24   based on Sergeant Moore's complaint.  (*Id.*, ¶¶ 30, 127-128)

25       Mr. Gibson's presence at protests against Covid-19 restrictions has been documented with

26   special attention by VPD officers and his actions were detailed in reports. (*Id.*, ¶¶ 24-25)  Because

27   of the City's policy to target event organizers and because of the special interest already taken in

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

5

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1   Mr. Gibson by law enforcement and City Attorney Young, Mr. Gibson has a reasonable belief and

2   fear that he will be subject to arrest and prosecution in retaliation for his protected speech and

3   religious activity and based upon the City's own unconstitutional viewpoint discriminatory

4   policies as well as its prior efforts to enforce the patently unconstitutional Covid-19 restrictions.

5   (*Id*., ¶¶ 31-33)

6        While Mr. Gibson has a reasonable fear that he will be arrested and prosecuted for his

7   religious activity, de facto gathering exemptions have been granted to certain viewpoints by

8   Vancouver Police Department (VPD) and Governor Inslee.  (*Id*., ¶¶ 34-53, Ex. O-R)  When a BLM

9   gathering took place in Vancouver on June 19, 2020, in violation of the Covid-19 restrictions, VPD

10  facilitated the 250 person gathering, and the Interstate 5 bridge was "given to [BLM] **by order of**

11  **the Governor**." (*Id*. (emphasis added))

12                          **I.      ARGUMENT**

13       A temporary restraining order (TRO) is a short term device used to restrain the actions of

14  a party until the court holds a hearing to determine whether to issue a preliminary injunction. Fed.

15  R. Civ. P. 65(b); *Warner Bros. Inc. v. Dae Rim Trading Inc*., 877 F.2d 1120, 1124–1125 (2d Cir.

16  1989).  A preliminary injunction is an interlocutory order issued as a means of preserving the

17  relative positions of the parties until a trial on the merits can be held. See *University of Texas v.*

18  *Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981).

19       To seek injunctive relief in federal court, the moving party must establish (1) the party is

20  under threat of suffering "injury in fact" that is concrete and particularized, (2) the threat is actual

21  and imminent, not conjectural or hypothetical; and it must be fairly traceable to the challenged

22  action of the party sought to be enjoined, and (3) it is likely that a favorable judicial decision will

1   prevent or redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142, 1149,

2   173 L. Ed. 2d 1 (2009).

3       A.   THIS COURT HAS JURISDICTION.

4       This court has subject matter jurisdiction under Fed. R. Civ. P. 65 Federal Rule, 42 U.S.C.

5   §§ 1983, 1985, and 1988, 28 U.S.C. §§ 1331, and 1343.  "There can be no doubt that the civil

6   rights act confers upon the federal courts not only jurisdiction, but equitable jurisdiction, to enforce

7   federal constitutional rights against state action which violates those rights." *Krahm v. Graham*,

8   461 F.2d 703, 709 (9th Cir. 1972).

9       Federal courts may enjoin state officials to conform their conduct to federal law.  *Ex parte*

10  *Young*, 209 U. S. 123, 155-156, 28 S. Ct. 441, 52 L. Ed. 714 (1908).  The Supreme Court has long

11  held that federal courts may "grant injunctive relief against state officers who are violating, **or**

12  **planning to violate**, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-

13  27, 135 S. Ct. 1378, 1384 (2015) (emphasis added)).  The Court has long recognized, if an

14  individual claims federal law immunizes him from state enforcement, the court may issue an

15  injunction upon finding the state actions preempted. *Id.*, at 326 (citing *Young*, at 155-156).

16      Where there is a genuine threat of enforcement, federal law does "not require, as a

17  prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm,

18  so to speak, by taking the violative action." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118,

19  129, 127 S. Ct. 764, 772 (2007).  Likewise, the Supreme Court has not required the plaintiff to

20  proceed to distribute handbills and risk actual prosecution before he could challenge enforcement

21  of a state statute prohibiting such distribution. *Id.*, at 129 (citing *Steffel v. Thompson*, 415 U.S.

22  452, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974).  This court has jurisdiction over this matter.

23      B.   THREAT OF INJURY IS ACTUAL, IMMINENT, AND IRREPARABLE.

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162
7
ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    Defendants have evidenced a clear pattern of targeting leaders of protests against Covid-

2    19 restrictions.  They have also evidenced a special focus on Mr. Gibson's political and religious

3    activities.  VCA Young, in particular, has even pressured one officer to arrest Mr. Gibson where

4    there was no probable cause.  When the officer refused, VCA Young filed a complaint on the

5    officer and worked with Chief McElvain to establish a policy that requires officers to send a report

6    on protest leaders directly to VCA so that criminal charges can be filed.  There is no doubt that the

7    threat of arrest and prosecution of Mr. Gibson is actual and imminent.

8    "There can be no question that the challenged restrictions, if enforced, will cause

9    irreparable harm.  'The loss of First Amendment freedoms, for even minimal periods of time,

10   unquestionably constitutes irreparable injury.'" See *Roman Catholic Diocese of Brooklyn v.*

11   *Cuomo*, ___ U.S. ___, No. 20A87, 2020 U.S. LEXIS 5708, at *7 (Nov. 25, 2020) (citing *Elrod v.*

12   *Burns*, 427 U. S. 347, 373 (1976).

13   As the Ninth Circuit has repeatedly emphasized, "[i]t is well established that the

14   deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v.*

15   *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, at 373, (1976)); *see also Arevalo v.*

16   *Hennessy*, 882 F.3d 763, 766 (9th Cir. 2018) (same).  "[C]onstitutional violations cannot be

17   adequately remedied through damages and therefore generally constitute irreparable harm." *Am.*

18   *Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted); *see*

19   *also* 11A Charles Alan Wright, Fed. Prac. & Proc., § 2948.1 (2d ed. 2004) ("When an alleged

20   deprivation of a constitutional right is involved, most courts hold that no further showing of

21   irreparable injury is necessary.").

22   A decision to prosecute may not be based on the defendant's exercise of constitutional

23   rights. *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 1531 (1985); *see United States*

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

8

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1  *v. P.H.E., Inc.,* 965 F.2d at 849 ("The First Amendment bars a criminal prosecution where the

2  proceeding is motivated by the improper purpose of interfering with the defendant's

3  constitutionally protected speech."). Moreover, the bringing of a bad faith prosecution is a

4  constitutional deprivation in itself, and defense of the state criminal prosecution "will not assure

5  adequate vindication of constitutional rights." *Perez v. Ledesma*, 401 U.S. at 118 (Brennan,

6  concurring) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 485, 85 S. Ct. 1116, 1120 (1965)). In

7  simplest terms, a bad faith prosecution causes an immediate and irreparable constitutional injury.

8      A showing that a prosecution was brought in retaliation for or to discourage the exercise

9  of constitutional rights "will   justify an injunction ***regardless*** of whether valid convictions

10  conceivably could be obtained." *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (emphasis

11  added); see also *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979) (preliminary injunction

12  of state criminal proceeding permissible if: (1) conduct retaliated against is constitutionally

13  protected; and (2) prosecution is motivated at least in part by purpose to retaliate or deter);

14  *Heimbach v. Village of Lyons*, 597 F.2d 344, 347 (2d Cir. 1979) (per curiam) (allegation that state

15  criminal prosecution was intended to chill First Amendment rights sufficient to remove *Younger*

16  bar against federal court interference in active state case).

17  C.  THE COVID-19 RESTRICTIONS THAT PROHIBIT MR. GIBSON, A STREET
18      PREACHER, FROM ORGANIZING AND LEADING A RELIGIOUS GATHERING
19      WITH SINGING ON PUBLIC PROPERTY WITH MORE THAN FIVE ADDITIONAL
20      PEOPLE ARE UNCONSTITUTIONAL ON THEIR FACE.

21      Governor Inslee's Covid-19 restrictions violate the First Amendment because they place

22  greater restrictions on religious exercises than secular activities.

23      Congress shall make no law respecting an establishment of religion, or prohibiting
24      the free exercise thereof; or abridging the freedom of speech, or of the press; or the
25      right of the people peaceably to assemble, and to petition the Government for a
26      redress of grievances.

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

9

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1   USCS Const. Amend. 1.

2       1) *Free Exercise Clause: The Restrictions Imposed on Religious Individuals and Activities*
3          *are Greater Than Those Imposed by Secular Activities and Do Not Withstand Strict*
4          *Scrutiny.*
5

6      The Constitution "protects religious observers against unequal treatment." *Trinity*

7   *Lutheran*, 582 U. S., at ___, 137 S. Ct. 2012, 198 L. Ed. 2d 551, at 559 (internal quotation marks

8   and alterations omitted).  "Government is not free to disregard the First Amendment in times of

9   crisis. At a minimum, that Amendment prohibits government officials from treating religious

10  exercises worse than comparable secular activities, unless they are pursuing a compelling interest

11  and using the least restrictive means available." Diocese at *6, *9 ("But even in a pandemic, the

12  Constitution cannot be put away and forgotten"), see also *Harvest Rock Church, Inc. v. Newsom*,

13  977 F.3d 728, 731 (9th Cir. 2020); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603,

14  2610-11 (2020).  "[T]he minimum requirement of neutrality is that a law not discriminate on its

15  face," *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533, 113 S. Ct. 2217, 2227

16  (1993), and "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters

17  of religion." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U. S. ___, ___,

18  138 S. Ct. 1719, 1731, 201 L. Ed. 2d 35, 48 (2018).  Where the challenged restrictions are not

19  'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they

20  must be 'narrowly tailored' to serve a 'compelling' state interest." *Diocese.*, at *4-5.

21      When a law on its face favors or exempts some secular organizations, activities, or

22  individuals, as opposed to religious organizations, activities, or individuals, a court entertaining a

23  constitutional challenge by the religious individual or organizations must determine  whether the

24  State has sufficiently justified the basis for the distinction. See *Calvary Chapel*, at 2612

25  (Kavanaugh, dissenting).  To do so, courts must engage in a basic two-step inquiry. "First, does

MOTION FOR TRO AND INJUNCTION                    ANGUS LEE LAW FIRM, PLLC
NO.  3:20-cv-6162                        10               9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1  the law create a favored or exempt class of organizations and, if so, do religious organizations fall

2  outside of that class? That threshold question does not require judges to decide whether a church

3  is more akin to a factory or more like a museum, for example. Rather, the only question at the start

4  is whether a given law on its face favors certain organizations and, if so, whether religious

5  organizations are part of that favored group. If the religious organizations are not, the second

6  question is whether the government has provided a sufficient justification for the differential

7  treatment and disfavoring of religion." *Id.*, at 2613.

8      Here, Inslee's Covid-19 restrictions limit public and private spiritual gatherings by

9  religious individuals (such as street preachers or Bible study leaders) to 5 people, whether indoors

10  or outdoors.  Governor Inslee's initial Proclamation 20-25: "Stay Home Stay Healthy" read:

11  **All people in Washington State shall immediately cease participating in all public and**
12  **private gatherings and multi-person activities for social, spiritual and recreational**
13  **purposes, regardless of the number of people involved, except as specifically identified**
14  **herein.** Such activity includes, but is not limited to, community, civic, public, leisure, faith-
15  based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar
16  activities.[1]

17      The restrictions on spiritual gatherings by religious individuals were next modified by

18  Proclamation 20-25.3's attached plan: Safe Start Washington: A Phased Approach to Recovery

19  ("Safe Start: Phased Approach Plan").  The Safe Start: Phased Approach Plan limited Phase 2

20  spiritual gatherings to no more than 5 people outside your household per week.  It limited Phase 3

21  spiritual gatherings to no more than 50 people outside your household per week.

22      Further modifications to the activities of religious individuals such as street preachers have

23  not been clearly made, although many of the other types of gatherings identified alongside spiritual

24  gatherings in Proclamation 20-25 have seen expansion.  Restrictions specifically upon Religious

---

[1] All proclamations and guidance referenced in this motion are attached as exhibits to the supporting declaration of the undersigned counsel.

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162                                                    11

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1   and Faith-based *Organizations* were modified by formal "Guidance" issued to supplement

2   Proclamation 20-25.4. The Guidance is entitled "Religious and Faith-based Organizations" and

3   provides guidance to "religious and faith based organizations" allowing those organizations to

4   "[h]old indoor services at a place of worship" or to hold outdoor services "on the organization's

5   property (or immediately adjacent property if explicitly permitted by the local jurisdiction)."

6         The Religious and Faith Based Organizations Guidance applies specifically to religious

7   organizations that own or lease property and maintain a traditional "place of worship." Street

8   preaching, by contrast, is the act of evangelizing a religious faith in public places by an individual

9   who attracts worshippers.[2]  Street preaching finds its roots in the earliest moments of the Gospel

10  as John the Baptist, a charasmatic preacher who gained a large public following announced the

11  coming of Jesus Christ, not from a church building or pulpit, but as "The voice of one crying in

12  the wilderness." Mathew 3:1-6.  Likewise, the original disciples of Jesus Christ were instructed

13  not to congregate at local temples but to "Go forth and teach all nations, baptizing them in the

14  name of the Father and of the Son and of the Holy Spirit." Mathew 28:19.  Street preachers have

15  a well established history in the United States of exercising their religion by promoting the Word

16  of God in public places and by gathering "congregations" to hear the word of God and to worship

17  outdoors.

18        Governor Inslee next and most recently directly modified restrictions on religious activities

19  by Proclamation 20-25.8.

20        **Religious Services** are limited to 25 percent of indoor occupancy limits, or no more
21        than 200 people, whichever is fewer. Congregation members/attendees must wear
22        facial coverings at all times and congregation **singing is prohibited**. No choir,
23        band, or ensemble shall perform during the service. . . .  Outdoor services must

---

[2] https://en.wikipedia.org/wiki/Open-air_preaching

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    follow the Outdoor Dining Guidance, found here, applicable to the structure or
2    facility.

3  (Lee Decl. Ex. M)(Emphasis added)

4        The Proclamation prohibits singing at a religious service.  Thus, whereas all provisions of

5  Proclamations 20-25, et seq., remain in full force and effect except where explicitly amended,

6  religious individuals such as street preachers are limited to gatherings of five pursuant to the The

7  Safe Start: Phased Approach Plan.  Mr. Gibson, the most well known street preacher and prayer

8  event organizer in Washington, is prohibited from organizing a spiritual gathering of prayer and

9  protest on public property in a group larger than 5, and singing at his service is not allowed.

10        By contrast, Governor Inslee's Covid-19 restrictions provide secular activities with

11  multiple exemptions to the five person gathering and singing bans.  For example, the Covid-19

12  restrictions do no place a limit on the number of children in any classroom; schools must simply

13  "practice physical distancing . . . as much as possible."  (Lee Decl. Ex. BB (K-12 Reopening Fall

14  Guidance p. 6)  Singing is allowed in K-12 schools and school choir may or may not be cancled at

15  the discretion of the school.  (*Id*., p. 7 ("Schools *may consider* . . . cancel[ing] . . . choir . . ..")

16  (emphasis added).   All non-lecture based higher education activities (indoors or outdoors) are

17  permitted without any occupancy limitation, even where social distancing cannot be maintained.

18  (Lee Decl. Ex. AA (Phase 2 Higher Education & Workforce Training COVID-19 Requirements

19  Guidance)).  K-12 students are allowed to gather in classrooms without numerical limitation and

20  are permitted to sing in choir.  Those same students are prohibited from joining their parents

21  outdoors at a street preacher's prayer protest to sing.

22        Gatherings for in-store retail shopping is permitted at up to 25 percent of indoor occupancy

23  limits.  Guidance Summary Proclamation 20-25.8. Retail occupancy limits are calculated at 60

ANGUS LEE
LAW FIRM, PLLC

1  s.f./person. (Lee Decl. Ex. CC (City of Vancouver: Determining Occupant Load for Covid-19

2  capacities)).  Thus, while the restrictions permit only five worshippers to gather in a 2000 square

3  foot home, up to eight people are allowed to gather in a retail store of the same size.

4      Governor Inslee's Covid-19 restrictions also exempt outdoor secular gatherings from the

5  five person gathering ban.  Youth and adult recreational sport teams may gather outdoors and play

6  full contact intrasquad competitions, including full contact soccer, which has been identified as a

7  "moderate risk sport." (Lee Decl. Ex. N (Professional Sports and Other Sporting Activities Covid-

8  19 Requirements)).  Social distancing is not required during sport activities.  Thus, several teams

9  of 18 (plus coaches) may practice on the same soccer field, leading to a gathering of 40 – 60 on a

10  single field.  Professional sports are permitted to gather outdoors in groups of up to 50 for practices

11  and require no masks during competitions.

12      There is no evidence that outdoor spiritual gatherings have contributed to the spread of

13  Covid-19 or would do so at a degree higher than full contact youth sports; and there are many other

14  less restrictive rules that could be adopted to minimize the risk to those attending outdoor religious

15  gatherings, such as masking and social distancing. The only explanation for treating spiritual and

16  political gatherings differently seems to be a judgment that spiritual and political gatherings are

17  not as "essential" as what happens in secular spaces such as retail, youth sports, or public schools.

18  "*That* is exactly the kind of discrimination the First Amendment forbids*." Id.*, at *10-11 (Gorsuch,

19  concurring*)*.

20      In sum, Governor Inslee's Covid-19 restrictions blatantly discriminate against religious

21  and spiritual activity and thus warrant strict scrutiny under the Free Exercise Clause. The governor

22  has not provided a sufficient justification for the differential treatment and disfavoring of street

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162                                            14

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

preachers' exercise of religion. Therefore, the restrictions on spiritual gatherings are unconstitutional on their face.

### 2) Free Speech Clause: The Restrictions Favor Secular Viewpoints Over Religious Viewpoints and Do Not Withstand Strict Scrutiny

Governor Inslee's Covid-19 restrictions fare no better under the Free Speech Clause. Laws that restrict speech based on the viewpoint it expresses are presumptively unconstitutional, *see, e.g., Iancu v. Brunetti*, 588 U. S. ___, ___-___, 139 S. Ct. 2294, 204 L. Ed. 2d 714, 719 (2019), and under Supreme Court cases, religion counts as a viewpoint, *Rosenberger v. Rector* and *Visitors of Univ. of Va*., 515 U. S. 819, 831, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). Here, the proclamations plainly discriminate on the basis of viewpoint.

Compare the Covid-19 restrictions' treatment of sports entertainment versus spiritual and political activity. Both involve expression, but the proclamations favor the secular expression in sports shows over the religious expression in open prayer, or political expression in protest. *See Calvary Chapel*, at 2607-08 (2020) (Alito, dissenting) (noting that both casinos and churches are expressions of viewpoint).

Finally, a policy permitting mass violations of the law based upon viewpoint is presumptively unconstitutional. Indeed, having occasion to consider the situation where government officials permit mass protests in violation of a Governor's directive for the purpose of expressing support for a certain viewpoint, while simultaneously restricting other forms of protected First Amendment conduct, Justice Alito had the following to say:

> Public protests, of course, are themselves protected by the First Amendment, and any efforts to restrict them would be subject to judicial review. But respecting some First Amendment rights is not a shield for violating others. The State defends the Governor on the ground that the protests expressed a viewpoint on important issues, and that is undoubtedly true, but favoring one viewpoint over others is anathema to the First Amendment.

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    *Calvary Chapel*, 140 S. Ct. 2603, 2607-08 (Alito Dissenting)

2        Here, defendants and Governor Inslee have granted a de facto exemption to the gathering

3 ban to those gathered outdoors for BLM protests by permitting mass violations.  The Governor

4 further ratified these exemptions by publicly supporting similar protests in violation of his own

5 Covid-19 restrictions. (Lee Decl. Ex. O, P (press statements of support).  However, he has not

6 provided a sufficient justification for the discrimination against other viewpoints such as religious

7 ones expressed by street preachers in public gatherings.

8     D. <u>SELECTIVELY TARGETING MR. GIBSON FOR ARREST OR PROSECUTION</u>
9        <u>BASED ON HIS POSITION AS A LEADER OR ORGANIZER OF A PUBLIC</u>
10        <u>PRAYER PROTEST INVOLVING DISFAVORED SPEECH IS</u>
11        <u>UNCONSTITUTIONAL; MR. GIBSON IS UNDER IMMEDIATE THREAT OF</u>
12        <u>SELECTIVE PROSECUTION BY VCA YOUNG.</u>

13        "The Fourteenth Amendment prohibits any state from taking action which would 'deny to

14 any person within its jurisdiction the equal protection of the laws.'" *United States v. Falk*, 479 F.2d

15 616, 618 (7th Cir. 1973).  "The promise of equal protection of the laws is not limited to the

16 enactment of fair and impartial legislation, but necessarily extends to the application of these

17 laws." *Id.*, at 618.  The United States Supreme Court announced in *Yick Wo v. Hopkins*, 118 U.S.

18 356, 373-374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), that the application of laws "with an evil eye and

19 an unequal hand, so as practically to make unjust and illegal discrimination between persons in

20 similar circumstances" constitutes a denial of equal protection and is "within the prohibition of the

21 Constitution." *Yick Wo*, at 373-374.

22        When a statute, regulation, or proclamation, is extremely broad and permits near unfettered

23 discretion in the decision to prosecute, it "sanctions a device for the suppression of the

24 communication of ideas and permits the official to act as a censor." *Cox v. Louisiana*, 379 U.S.

25 536, 557 (1965).

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1   It is clearly unconstitutional to enable a public official to determine which
2   expressions of view will be permitted and which will not or to engage in invidious
3   discrimination among persons or groups either by use of a statute providing a
4   system of broad discretionary licensing power or, as in this case, the equivalent of
5   such a system by selective enforcement of an extremely broad prohibitory statute.

6   *Id. at* 557-58.

7       Thus, the actions of prosecutors and police officials are duly subject to these constitutional

8   constraints; and prosecutorial discretion is not unfettered. *United States v. Batchelder*, 442 U.S.

9   114, 125, 60 L. Ed. 2d 755, 99 S. Ct. 2198 (1979); *Falk*, 479 F.2d at 618. "Selective prosecution"

10  is thus prohibited by the Constitution and occurs where "the government looks beyond the law

11  itself to arbitrary considerations, such as race, religion, or ***control over the defendant's exercise***

12  ***of his constitutional rights***, as the basis for determining its applicability." *United States v. Berrios*,

13  501 F.2d 1207, 1209 (2d Cir. 1974) (emphasis added); *United States v. Armstrong*, 517 U.S. 456,

14  464, 116 S. Ct. 1480, 1486 (1996). In those instances, selective prosecution becomes a weapon to

15  punish those harboring beliefs with which the administration in power may disagree. *Berrios*, at

16  1209.

17      Discrimination on the basis of the exercise of protected First Amendment activities is

18  forbidden by the Constitution. *Falk*, 479 F.2d, at 620. Accordingly, the decision whether to arrest

19  or prosecute may not be based on a desire to punish people who express certain ideas, while

20  excusing those who do not express those ideas. *United States v. Steele*, 461 F.2d 1148, 1152 (9th

21  Cir. 1972). Specifically, "[t]he Government may not prosecute for the purpose of deterring people

22  from exercising their right to protest official misconduct and petition for redress of grievances."

23  *Dixon v. District of Columbia*, 394 F.2d 966, 968 (D.C. Cir. 1968). Prosecution related to a desire

24  to chill speech violates the prohibition on selective prosecution. See *Falk*, 479 F.2d, at 620*; Steele*,

25  461 F.2d 1148, 115; *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972).

MOTION FOR TRO AND INJUNCTION
NO. 3:20-cv-6162                                    17

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1       Federal intervention is warranted where a selective prosecution is undertaken in retaliation

2   for, or for the purpose of chilling or deterring, the defendant's exercise of First Amendment rights,

3   regardless of whether valid convictions conceivably could be obtained. *Fitzgerald v. Peek*, 636

4   F.2d at 945 (emphasis added); *see also Lewellen v. Raff*, 843 F.2d 1103, 1108 (8th Cir. 1988); *see*

5   *Younger v. Harris*, 401 U.S. 37, 48, 91 S. Ct. 746, 752 (1971); see also *Elrod v. Burns*, 427 U.S.

6   347 (1976); *see also United States v. P.H.E., Inc.,* 965 F.2d 848, 853 (10th Cir. 1992).

7       To demonstrate that this type of selective prosecution has been undertaken for the purpose

8   of retaliating for, or deterring the exercise of First Amendment rights, the plaintiff must prove that

9   (1) conduct retaliated against or sought to be deterred is constitutionally protected; (2) the

10  prosecution or threat of prosecution would "chill a person of ordinary firmness" from continuing

11  to engage in the protected activity; and (3)  the prosecution is substantially motivated by the

12  purpose to retaliate for or deter the protected activity. *See Ariz. Students' As''n v. Ariz. Bd. of*

13  *Regents*, 824 F.3d 858, 867 (9th Cir. 2016); but see *Wilson v. Thompson*, 593 F.2d at 1387

14  (requiring a lower showing that the prosecution is motivated *at least in part* by the purpose to

15  retaliate or deter that conduct).

16      There is no question that the conduct retaliated against and deterred here is constitutionally

17  protected; indeed not only will Mr. Gibson be exercising his evangelical religion, but he will

18  engage in core political speech warranting the highest level of protection. "Core political speech"

19  involves interactive communication concerning political change. *Meyer v. Grant, 486 U.S. 414,*

20  *421-22 (1988).* "A person's First Amendment free speech right is at its highest when that person

21  engages in "core political speech,"" *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858,

22  867 (9th Cir. 2016).  The threat of prosecution for engaging in prayer and protest of Covid-19

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162                                18

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1    restrictions would certainly chill a person of ordinary firmness from continuing to engage in the

2    protected activity.

3         The intent to deter or retaliate for protected speech is demonstrated where (a) a pattern of

4    discriminatory enforcement exists (*United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972)),

5    or (b) "special interest" has been taken in those prosecuted (*Steele*, at 1152; *Cullen v. Fliegner*, 18

6    F.3d 96, 104 (2d Cir. 1994); *Falk*, 479 F.2d at 618, 621-623), or (c) the government maintains a

7    policy of not prosecuting those who violate the law but who acquiesce in some manner to the

8    government, while it prosecutes those who refuse to acquiesce (see *United States v. Adams*, 870

9    F.2d 1140, 1145 (6th Cir. 1989); *Falk*, at 617, 621-623), or (d) the selection for prosecution under

10   a broad regulation does not correspond to a higher degree of the violation (*Crowthers*, 456 F.2d at

11   1079).

12        *1) Discriminatory Intent Evidenced by Discriminatory Criminal Enforcement.*

13        The intent to deter or retaliate for First Amendment rights is evidenced where there is a

14   pattern of discriminatory enforcement designed to inhibit the exercise of federal rights. See *Perez*

15   *v. Ledesma*, 401 U.S. 82, 120 n.11 (1971).  A pattern of discriminatory enforcement is plainly

16   evidenced by numerical or statistical findings showing that other violations of regulation occurred;

17   yet those who did not openly criticize the regulation were not prosecuted.  *Steele*, 461 F.2d at 1152.

18        Here, evidence shows that there have been at least 15,000 reports of business non-

19   compliance with the Stay Home Stay Safe Proclamation and numerous instances of individual

20   noncompliance with the Proclamations. (Lee Decl. Ex. U (internal city email to Young)).  Only

21   four were referred for criminal prosecution, and each of those four instances involved speech in

22   opposition to the Covid-19 restrictions. (*Id.*, ¶¶ 70-74).

23        *2) Discriminatory Intent Evidenced by Special Interest.*

1    The intent to retaliate for or deter First Amendment speech is also evidenced where a

2 "special interest" has been taken in those who are prosecuted. *United States v. Steele*, 461 F.2d

3 1148 (9th Cir. 1972).  A special interest is demonstrated where reports have been compiled on

4 vocal offenders, while virtually no information has been collected on other violators. *United States*

5 *v. Steele*, 461 F.2d 1148 (9th Cir. 1972); *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973).  It is

6 likewise evinced when officials take the position that the vocal offenders cause trouble in enforcing

7 the law against which they protest.  *Falk*, 479 F.2d 616.   Finally, a finding of personal animosity

8 or an expressed desire to "do something about" a vocal offender is probative of improper motive

9 by government officials. *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994); see also *Phelps v.*

10 *Hamilton*, 59 F.3d 1058, 1067 (10th Cir. 1995).

11    Mr. Gibson is unquestionably a "vocal dissenter." Like the defendants in *Steele*, *Falk*, and

12 *Cullen*, Mr. Gibson has spoken at protests, criticized the Covid-19 restrictions on media platforms,

13 and organized multiple rallies in opposition to the same around the state.  In Vancouver, his

14 presence was noted by VPD at each of the three rallies which were later referred for criminal

15 prosecution.  Virtually no evidence was collected about any other protestors who arguably were in

16 violation of the Covid-19 restrictions on gatherings.  The City has indicated concern about its

17 ability achieve compliance with Covid-19 restrictions in view of those who protest the restrictions.

18    Finally, it is beyond dispute that VCA Young has developed a personal animosity towards

19 Mr. Gibson as evidenced by his repeated attempts to have Mr. Gibson, by name, charged with a

20 crime, even in the absence of probable cause. (Lee Decl. Ex. A (complaint by Sgt. Moore))  A

21 senior law enforcement officer has described city Attorney Young as being "too emotionally

22 involved" in the set of circumstances involving Mr. Gibson and Young is currently under internal

23 investigation in relation to his efforts to have Mr. Gibson arrested. (*Id.*)

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1    *3) Discriminatory Intent Evidenced by Policy to "Educate" Rather than Prosecute.*

2    The intent to deter the exercise of constitutional rights is also evident where the government

3 maintains a policy of not prosecuting those who, in fact, violate the law but who acquiesce in some

4 manner to the government, while it continues to prosecute those who refuse to acquiesce.  See

5 *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989); *Falk*, 479 F.2d 616, 617, 621-623.

6 For example, Falk, a vocal offender actively involved in protesting the Vietnam War, was charged

7 with failure to possess a draft card.  The court held that improper discriminatory enforcement

8 existed and found compelling the fact that the government maintained an admitted policy not to

9 prosecute certain violators of the card possession regulations if the violator, unlike Falk, chose to

10 turn in his card. *Id.*, at 621.

11    Here, the city's stated policy has been to provide warnings or administrative remedies to

12 those violators who, though plainly acting illegally as in the case of the Old Spaghetti Factory, do

13 not hold rallies protesting Covid-19 restrictions. (Lee Decl. ¶ 61, Ex. T) By contrast it seeks

14 criminal investigation for those organizing protests against Covid-19 restrictions, even where the

15 violation is not of a greater degree.

16    *4) Discriminatory Intent Evidenced by Lack of Correlation to Greater Violation.*

17    Discriminatory intent is also demonstrated where selection for prosecution under a broad

18 regulation does not correlate to a higher degree of the actual conduct constituting the violation, but

19 instead correlates to the government's disapproval of the message expressed by the violator.

20 *Crowthers*, 456 F.2d at 1079-1080; see also *Cox v. Louisiana*, 379 U.S. at 557-58. For example,

21 in *Crowthers*, prayer protestors were charged with disorderly conduct. Although the prayer

22 protestors were in fact, in violation of the noise regulation, evidence showed others had violated

23 the regulation to the same or greater degree. *Crowthers*, 456 F.2d at 1079-1080.  Thus, the court

1   found that discriminatory intent to suppress a viewpoint was evident because "[i]n choosing whom

2   to prosecute, it is plain that the selection [was] made not by measuring the amount of obstruction

3   or noise but because of governmental disagreement with ideas expressed by the accused." *Id*.

4       Here, there is no question that many others have violated the Covid-19 restrictions to a far

5   great degree that Mr. Gibson's intended prayer protest.  Indeed, the largest mass violation of the

6   Covid-19 restrictions in Vancouver occurred when VPD facilitated the Black Lives Matter

7   demonstration on I-5. Yet, because those violators espoused favored speech, no criminal

8   enforcement action has been taken against them whatsoever.

9   E.   DEFENDANTS MAINTAIN FACIALLY UNCONSTITUTIONAL POLICIES TO
10       TARGET FOR CRIMINAL PROSECUTION THOSE WHO ORGANIZE EVENTS TO
11       PROTEST COVID-19 RESTRICTIONS; MR. GIBSON IS UNDER IMMEDIATE
12       THREAT OF PROSECUTION PURSUANT TO THIS POLICY.

13      Laws that restrict speech based on the viewpoint it expresses are presumptively

14  unconstitutional, see, e.g. *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019).  Here, Vancouver City

15  maintains a written policy to selectively criminally target event organizers of protests espousing a

16  particular viewpoint, namely, protest of Covid-19 restrictions. (Lee Decl. Ex. W, Z)

17      Despite having received numerous complaints about noncompliant businesses and

18  individuals, defendants have enacted a written policy to target its criminal enforcement efforts

19  specifically - and only - upon those individuals who are out of compliance with Covid-19

20  restrictions *and who also* organize events to "advance their message" in opposition to

21  unconstitutional Covid-19 restrictions.  Pursuant to City policy, the VPD has a practice of

22  selectively criminally investigating only event organizers of protests against Covid-19

23  Restrictions.  The Vancouver City Attorney has prosecuted only one individual pursuant to a

1    violation of Governor Inslee's Covid-19 restrictions: an event organizer for "organizing and

2    conducting a 100+ person rally" to protest Covid-19 restrictions.

3        VPD and VCA developed and currently maintain a written policy to refer event organizers of

4    protests against Covid-19 restrictions, directly to the City Attorney for prosecution where evidence

5    merely "suggests" organizers violated Covid-19 restrictions. The decision to charge for

6    misdemeanors is usually a decision made by street level officers. The legal standard for charging

7    a misdemeanor is whether probable cause existed, not whether the evidence "suggests" a violation,

8    yet VPD and VCA have created a lower standard to initiate criminal action against protest

9    organizers.  The policy applies only to protests of Covid-19 restrictions.

10        Likewise, as discussed above, a policy permitting mass violations of the law based upon

11    viewpoint is likewise presumptively unconstitutional. Here Governor Inslee and defendants have

12    permitted mass violations of the law based upon viewpoint. When large numbers of BLM

13    protesters openly violated the Covid-19 restrictions, VPD facilitated the violations and, under

14    orders from Governor Inslee, the Washington State Patrol gave the protesters the intersate bridge.

15        F.  <u>THE LIKELY INJURY TO MR. GIBSON OUTWEIGHS ANY HARDSHIP ON
16            DEFENDANTS BY GRANT OF THE TEMPORARY RESTRAINING ORDER.</u>

17        This factor weighs in favor of immediate injunctive relief because the hardship experienced

18    by plaintiff exceeds any possible hardship on defendants from the requested restraint.  Here, the

19    State has not claimed that attendance at street preaching events has resulted in the spread of the

20    disease. And the State has not shown that public health would be imperiled if less restrictive

21    measures were imposed.  There is simply no reason to believe that a 20-person, outdoor, socially

22    distanced prayer protest will harm the public or defendants any more than will the soccer practice

MOTION FOR TRO AND INJUNCTION                    ANGUS LEE LAW FIRM, PLLC
NO.  3:20-cv-6162                                9105A NE HWY 99, STE 200
23                    Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1  gatherings of hundreds down the street.  Finally, an injunction would protect Mr. Gibson from the

2  harm that comes with an unconstitutional arrest and or selective prosecution.

3      G.  NOTICE PROVIDED.

4      Plaintiff provided served a copy of the complaint and provided notice to counsel for

5  defendants on November 30, 2020 that plaintiff would be seeking a temporary restraining order

6  on December 1, 2020, at 8:00 AM.  (Lee Decl. ¶ 2)

| Daniel Lloyd, Assistant City Attorney | Sara Baynard-Cooke |
|---|---|
| PO Box 1995, Vancouver, WA 98668 | PO Box 1995, Vancouver, WA 98668 |
| (360) 487-8520 | (360) 487-8542 |
| Dan.Lloyd@cityofvancouver.us | Sara.Baynard-Cooke@cityofvancouver.us |

7      H.  DISCRETIONARY BOND AMOUNT.

8      No bond should be required for issuance of the Temporary Restraining Order, as

9  defendants are not subject to any harm, financial or otherwise.  Mr. Gibson asks this court to

10  require no bond, or alternatively to require a bond in the amount of $1.00.  The 9th Circuit has

11  "long-standing precedent that requiring nominal bonds is perfectly proper in public interest

12  litigation."  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *See also*

13  *People ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985).

14      **II.   CONCLUSION**

15      Mr. Gibson prays for a temporary restraining order preventing defendants from arresting

16  him or prosecuting him for participating in or leading an 20 person outdoor prayer protest until the

17  parties can have a hearing on preliminary (and ultimately permanent) injunction, and such other

18  and further relief as this Court deems equitable and just.

19      //

20      //

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

24

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC

1      DATED this Wednesday, December 2, 20.

2      *S// D. Angus Lee*
3      D. Angus Lee, WSBA# 36473
4      Attorneys for Joseph Gibson
5      Angus Lee Law Firm, PLLC
6      9105A NE HWY 99 Suite 200
7      Vancouver, WA 98665
8      Phone: 360.635.6464 Fax: 888.509.8268
9      E-mail: Angus@AngusLeeLaw.com

MOTION FOR TRO AND INJUNCTION
NO.  3:20-cv-6162

25

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

ANGUS LEE
LAW FIRM, PLLC